Alexandra M. Walsh
**ANAPOL WEISS**
14 Ridge Square, NW, 3rd Floor
Washington, DC 20016
Telephone: (771) 224-8065
Facsimile: (215) 735-2211
awalsh@anapolweiss.com

*Interim Liaison Counsel*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: ROBLOX CORPORATION CHILD SEXUAL EXPLOITATION AND ASSAULT LITIGATION | MDL No. 3166 <br><br> Case No. 25-md-03166-RS <br><br> **PLAINTIFFS' CONSOLIDATED CASE MANAGEMENT STATEMENT** |
| This document relates to: <br><br> ALL ACTIONS | |

Plaintiffs respectfully submit this Consolidated Case Management Statement addressing the subjects the Court has set for discussion at the initial case management conference on January 30, 2026, as well as the other topics identified by the Court in Pretrial Order No. 1. *See* ECF No. 2.

**I.       PLAINTIFFS' SUMMARY POSITION STATEMENT**

Defendants Roblox Corporation, Discord Inc., Snap Inc., and Meta Platforms, Inc. have all designed, and now operate and market, online platforms that enable sexual predators to target, groom, and abuse children. The pattern is consistent and forms the basis of the constituent cases in this MDL ("Related Actions"). Due to the design of Roblox's gaming platform and game product itself, predators are able to easily pose as minors and target and groom innocent, vulnerable children. The predators then escalate the abuse, including by soliciting explicit images, videos, and other child sexual abuse material ("CSAM"), which often leads to sextortion, and by setting up in-person meetings, which often end with kidnapping, sexual assault, and rape. The predators

frequently move the interactions with their victims from Roblox to other apps—namely, Discord, Snap, and/or Instagram.

Roblox and the other Defendants have long known that predators use their platforms to groom, exploit, and abuse children. Over the years, there have been dozens of criminal cases and countless other incidents in which predators used Roblox to gain access to children for the purpose of sexually grooming them and transitioning them to platforms such as Discord, Snapchat, and/or Instagram. Through this well-documented process, children are coerced into sending CSAM—which is often then widely distributed online—and are sexually assaulted, raped, and kidnapped.

Yet Defendants have continued to systematically represent their platforms as *safe* for children. For example, Roblox markets its platform as the "#1 gaming site for kids and teens," claims that "Safety is in our DNA," and assures parents that it has "zero tolerance" for predatory conduct, all while knowing that the platform is a "pedophile hellscape." Discord has similarly claimed "zero tolerance" and "safety by design," all while knowing that the features of its platform facilitate the creation, solicitation, and distribution of CSAM. Snap and Meta have made comparable public assurances of safety, all while designing features that connect minors with adult strangers and enable them to communicate anonymously and ephemerally.

Defendants' platforms fail to enforce and implement the most basic safety features to protect young users. Among other things, Defendants have failed to implement age/identity verification, verification of parental consent, effective parental controls, and sufficient CSAM-reporting mechanisms. The platforms provide an open market for child predators to connect and communicate freely with minor users and to weaponize platform features (such as Roblox's virtual currency, "Robux," and open chat) to groom and extort children. Despite knowing for years that predators systematically use their platforms to abuse children, Defendants refuse to warn children or their parents of such risks. The reason for all of this is simple: Defendants prioritize growing their user base over keeping children safe.

Based on Defendants' lies, conduct, and platform defects, Plaintiffs in the Related Actions assert legal claims against Roblox and the other Defendants predicated on fraud, negligence, and strict liability. Defendants have allowed sexual predators—often known sexual predators—onto

their platforms. And they have knowingly exposed Plaintiffs in the Related Actions, and thousands of other children across the country, to such predators. These are not isolated acts. Sexual predation is systemic on their platforms. Defendants have directly caused a crisis of sexual abuse resulting in lifelong trauma and permanent injuries to countless children. And their conduct gives rise to the factual and legal issues discussed in Part II.vi below.

## II.  CASE MANAGEMENT CONFERENCE DISCUSSION TOPICS
### i.  The Appointment of Lead Counsel for the Plaintiffs, and Any Further Needs for Organizational Structure

All Plaintiffs' counsel agree with the Court's inclination to appoint Lead Counsel as soon as practicable. Plaintiffs' counsel also agree that this MDL will be complex, expensive, and highly time consuming. As such, Plaintiffs' counsel agree that this Court should appoint a robust leadership group as in, for example, *In re Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig. ("Social Media Adolescent Addiction")*, MDL No. 3047, No. 22-md-03047 (N.D. Cal.).[1] The Court may wish to consider appointing leadership positions for defined, renewable terms, which is an approach other MDL courts have successfully employed, to allow the Court to periodically assess participation, workload, resources and evolving case needs as the litigation matures.

Consistent with Section 10.221 of the Manual for Complex Litigation (Fourth), Plaintiffs propose an organizational structure for Plaintiffs' counsel as follows:

**Plaintiffs' Lead Counsel**: responsible for determining and presenting Plaintiffs' positions to Defendants and the Court after consultation with the Plaintiffs' Executive and Steering Committees (below); coordinating discovery consistent with Fed. R. Civ. P. 26; leading motion briefing and argument or designating counsel to do so; coordinating bellwether selection at the appropriate time; conducting settlement negotiations; creating committees and delegating tasks; entering stipulations; preparing periodic status reports as required; reporting to non-leadership

---

[1] *See* Case Management Order No. 1, *In re: Social Media Adolescent Addiction*, MDL No. 3047, No. 22-md-03047, ECF No. 75, at 2-3 (N.D. Cal. Nov. 10, 2022) (attached as **Exhibit 1**), appointing 22 attorneys to leadership group: three Co-Lead Counsel; one Plaintiffs' Liaison Counsel; seven Plaintiffs' Steering Committee Leadership members; and eleven Plaintiffs' Steering Committee members.

3

counsel; monitoring work, time, and expenses under a common benefit order; assessing Plaintiffs' Executive and Steering Committee members and other counsel; and performing other duties necessary for coordination. Given the complexity of the anticipated tasks in this case, and the number of different Defendants, the Court should consider appointing multiple Co-Lead Counsel for Plaintiffs. Alternatively, the Court could also consider appointing one Lead Counsel and multiple Co-Lead Counsel, as has occurred in other recent MDLs. *See, e.g.*, Pretrial Order No. 7, *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 3:19-md-2885-MCR, ECF No. 376, at 1-2 (N.D. Fla. May 22, 2019) (attached as **Exhibit 2**); Pretrial Order No. 18, *In re: Depo-Provera Prods. Liab. Litig.*, 25-md-03140, ECF No. 180, at 1-2 (N.D. Fla. Mar. 16, 2025) (attached as **Exhibit 3**). Regardless of how the Court decides to structure leadership, Plaintiffs agree that at least three individuals are needed to best lead this MDL, and that robust committees of skilled and dedicated individuals also be appointed to assist in the collective effort of leading this MDL.

**Plaintiffs' Executive Committee**: responsible, as the heads of subcommittees, for assisting Lead Counsel and coordinating the work and responsibilities of Plaintiffs' Steering Committee members. Given the complexity of the tasks in this case, the Court should appoint an Executive Committee to oversee subcommittees on:

(1) Law-and-briefing issues, including arbitration, Section 230, First Amendment, and other cross-cutting issues this Court is expected to address in the MDL process;

(2) Screening and managing individual Plaintiffs, including by vetting claims before and after filing, ensuring document preservation, and managing any short-form complaints, Plaintiff fact sheets, Defendant fact sheets, fact sheet deficiencies, and responses to individualized discovery requests;

(3) Coordinating and managing what is expected to be voluminous ESI-intensive discovery and coordinating discovery into and across each Defendant in this matter (Roblox, Discord, Snap, and Meta) and third-party discovery;

(4) Experts, which will include evaluating, retaining, working with, coordinating, and presenting multiple testifying and consulting experts in a number of different areas necessary to establish industry standards, causation, and damages, including internet-based

4

gaming technology, online child safety, and common injuries and harm associated with online grooming, sexual assault, and generation and distribution of CSAM;

(5) Coordinating with state-court actions, including individual actions[2] as well as investigations and litigation by State Attorneys General. To the extent State Attorneys General cases are brought in the MDL there may be a need for a separate AG Track led by a smaller committee;

(6) Settlement; and

(7) Bellwether selection and trial.

**Plaintiffs' Steering Committee**: responsible for assisting in various aspects of the litigation as directed. Given the breadth and complexity of the tasks that will be required in this case, the number of Defendants, and Plaintiffs' counsel's interest in assigning discrete tasks to Steering Committee members as efficient and appropriate, the Court should appoint several Plaintiffs' Steering Committee members in addition to Plaintiffs' Lead Counsel and Executive Committee.

**Plaintiffs' Liaison Counsel**: a separate individual responsible for handling various administrative functions, including guardian *ad litem* procedures, receiving and transmitting Court orders, maintaining files, attending case conferences, and communicating with all counsel.

Within two weeks of the appointment of Plaintiffs' leadership, the appointed Lead Counsel should be prepared to provide the Court with a proposed order containing their proposed membership of the leadership team described above.

ii. **The Responsibilities and Authority of Lead Counsel in Conducting Pretrial Activities, Facilitating Resolution of the MDL Proceedings, and Reporting to the Court and Non-Leadership Counsel**

In general, Plaintiffs commend Judge Gonzalez Rogers's approach in Case Management Order No. 2, *Social Media Adolescent Addiction*, No. 22-md-03047, ECF No. 82 (N.D. Cal. Nov. 15, 2022) (attached as **Exhibit 4**), and Judge Rodgers's approach in Case Management Order No. 18, *In re: Depo-Provera*, *supra*, detailing the various responsibilities of Co-Lead Counsel,

---

[2] As detailed in Plaintiffs' list of all known similar cases pending in federal or state court (attached as **Exhibit 5**), there are currently at least nine cases pending in California state court against Roblox, some of which also name Discord. On December 29, 2025, a petition was filed seeking coordination of these state court cases for pretrial purposes.

Executive Committee, etc., such as determining and presenting the position of the plaintiffs on all matters arising during pretrial proceedings, coordinating the scheduling and conduct of discovery, leading briefing and arguing of motions, conducting settlement discussions, entering stipulations with opposing counsel as necessary, and preparing and distributing periodic status reports to the court and parties. Plaintiffs further suggest that, following appointment of Lead Counsel, the Court directs Lead Counsel to submit a proposed order outlining the responsibilities of Lead Counsel and of all other positions in whatever organizational structure the Court establishes for this MDL.

### iii. The Status of All Litigation Pending in this MDL Matter

As of the date of this submission, there have been approximately 108 Related Actions transferred to this MDL. The breakdown of named Defendants in these actions is as follows: Roblox (all actions); Discord (29 actions); Snap (9 actions); and Meta (3 actions). All Related Actions were in the early stages or were stayed pending resolution of the motion for transfer and consolidation filed with the Judicial Panel on Multidistrict Litigation, with no scheduling orders and no substantive discovery. There was limited substantive motion practice before the Related Actions were transferred. In the first-filed case, Roblox and Discord moved to compel arbitration before the case was stayed. *See Doe v. Roblox Corp.*, No. 25-cv-03520, ECF Nos. 48, 52 (N.D. Cal.). In the second-filed case, the parties fully briefed the motions to dismiss filed by Roblox and Discord, and Defendants moved to compel arbitration before the case was stayed. *See Doe v. Roblox Corp.*, No. 25-cv-00128, ECF Nos. 32-33, 49-50, 58, 60, 82, 89 (S.D. Tex.).

Certain pending related cases still await transfer to this MDL, as listed in **Exhibit 5**, which also lists related cases that are pending in state court.

### iv. Any Previously Entered Scheduling or Other Orders That Should Be Stayed or Vacated

Any briefing schedules set by transferor courts should be vacated and reset by this Court for coordinated briefing. Discovery orders should be stayed pending this Court's entry of a coordinated discovery plan. Other orders from transferor courts, including protective orders and preservation orders, should remain effective unless and until this Court orders otherwise, including the court's October 10, 2025 order (and corresponding certifications and amended certifications)

6

in *Doe v. Roblox Corp.*, No. 25-cv-05715, ECF Nos. 21, 31, 32, 36, 37 (E.D. Pa.), requiring Roblox and Snap to file certifications regarding preservation of information associated with the plaintiff's and the perpetrators' accounts.

### v. Priority Claims and Defenses Likely To Be Presented

<u>Priority claims</u>. As pled throughout the individual complaints in the Related Actions, Plaintiffs generally assert that Defendants' misrepresentations, omissions, design defects, failures to warn, and other misconduct render them liable for claims of (1) fraudulent concealment and misrepresentation; (2) negligent misrepresentation; (3) negligence – general; (4) negligence – failure to warn; (5) negligence – unreasonable design; (6) negligent undertaking; (7) strict liability – design defect; and (8) strict liability – failure to warn. Some complaints also assert violations of state consumer protection laws. *See, e.g.*, *Doe v. Roblox Corp.*, No. 25-cv-09624, ECF No. 1 (N.D. Cal. Nov. 7, 2025) (asserting violation of Illinois Consumer Fraud and Deceptive Business Practices Act). None of these claims has priority over others in terms of sequence or substance.

<u>Priority defenses</u>. Plaintiffs expect that Defendants will move to compel arbitration in many of the Related Actions. Although these motions will be baseless for reasons discussed briefly herein, Defendants have moved to compel arbitration in several cases filed to date, risking serious and needless delay to the litigation. The Federal Arbitration Act ("FAA"), 9 U.S.C. § 16(a), authorizes interlocutory appeals from orders denying motions to compel arbitration. And such appeals automatically stay district court proceedings pending resolution of the appeal. *See Coinbase, Inc. v. Bielski*, 599 U.S. 736 (2023). Plaintiffs therefore propose prioritizing a selection of bellwether cases for the purpose of resolving Defendants' arbitration arguments and expediting any appeals so that appellate rulings on those issues can be applied across the Related Actions.

To preview these threshold arbitration issues, the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act ("EFAA"), which renders arbitration agreements unenforceable against certain victims of sexual misconduct, *see* 9 U.S.C. §§ 401, 402, applies to most of the cases in this MDL. All Related Actions involve "disputes" that arose after the EFAA's enactment on March 3, 2022. Indeed, all these lawsuits were filed over three years after the EFAA was enacted. As the Eighth Circuit explained in *Famuyide v. Chipotle Mexican Grill, Inc.*, a

7

"dispute" arises for EFAA purposes when a conflict or controversy exists, not just when the underlying sexual assault conduct occurred, meaning that the plaintiff there was not subject to arbitration because her formal dispute arose after the EFAA's March 3, 2022 effective date, even though the assault occurred in 2021. 111 F.4th 895, 897-99 (8th Cir. 2024); *see also Cornelius v. CVS Pharmacy Inc.*, 133 F.4th 240, 246-47 (3d Cir. 2025) (adopting *Famuyide* and holding that the word "dispute" means "some opposition or disagreement between the parties" and is not equivalent to "injury"). This persuasive holding aligns with the EFAA's text and purpose to void forced arbitration for victims of sexual assault and harassment after the law's enactment. And most, if not all, Related Actions involve claims that fall under the EFAA's broad terms, which are designed to protect victims of sexual assault (i.e., nonconsensual sexual acts or contact) and sexual harassment.

Another threshold arbitration issue that should be prioritized is minor disaffirmance. Under state law, minors can disaffirm contracts. *See, e.g.*, *S.S. by & through Stern v. Peloton Interactive, Inc.*, 566 F. Supp. 3d 1019, 1035 (S.D. Cal. 2021) (explaining that under California and New York law, "even if a minor enters a contract before the age of majority, the minor can disaffirm that contract"); *J.T. ex rel. Thode v. Monster Mountain, LLC*, 754 F. Supp. 2d 1323, 1326 (M.D. Ala. 2010) ("Alabama, like virtually all jurisdictions, applies the longstanding common law rule that, except for a contract for necessaries, a minor is not liable on any contract he makes and that he may disaffirm the same." (citation and internal quotation marks omitted)); *Rivera v. Reading Hous. Auth.*, 819 F. Supp. 1323, 1331 (E.D. Pa. 1993) (emphasizing that it is "hornbook law that a minor can disaffirm a contract"). To the extent any minor Plaintiff purportedly entered a contract with any Defendant containing an arbitration clause, all minor Plaintiffs disaffirm every provision in the contract, including the arbitration clause and any "delegation provision" that claims to delegate the determination of issues such as disaffirmance to the arbitrator. Disaffirmance of a delegation clause is sufficient to "specifically" challenge the validity of that clause under *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 71 (2010), and a specific challenge to the delegation clause is to be decided by the Court, not an arbitrator, *see Coinbase, Inc. v. Suski*, 602 U.S. 143, 150-51 (2024) (explaining that "a party seeking to avoid arbitration must directly challenge the arbitration or delegation clause,

8

not just the contract as a whole," and that "where a challenge applies 'equally' to the whole contract and to an arbitration or delegation provision, a court must address that challenge" (citing *Rent-A-Center*, 561 U.S. at 71)).

In addition, all Plaintiffs will argue no contract was formed in the first place and thus no enforceable agreement exists. The lack of contract formation raises several issues common across the Related Actions, including whether Defendants' alleged account-creation and other screens put "a reasonably prudent user on inquiry notice of the terms of the contract," which turns "on the design of the website and the agreement's webpage." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014); *see also Doe v. Roblox Corp.*, 602 F. Supp. 3d 1243, 1256 (N.D. Cal. 2022) (holding that Roblox's sign-up screen (which has been the same for years) would not put a "reasonably prudent" child user "on inquiry notice that she was assenting to an agreement" given the design of the screen). Other issues likely to arise related to lack of formation include the inability of Defendants to identify the individual who actually set up the account, as oft-times that individual is a friend or sibling of the minor plaintiff, not the minor plaintiff themselves, and the utter lack of capacity many of these minor children have in even understanding the basic legal concept of arbitration, much less the specific and detailed language in the context of a long, complicated, and confusing click-through user agreement.

While prioritizing the briefing and resolution of these key cross-cutting arbitration issues, the Court should concurrently allow the parties to brief—and then should proceed to resolve—the likewise meritless threshold defenses that Defendants are also likely to raise under Section 230(c)(1) of the Communications Decency Act, 47 U.S.C. § 230(c)(1) ("Section 230"), and the First Amendment. Some of the Related Actions involve child exploitation that occurred *before* Roblox added an arbitration provision to its online terms of use in 2016. There is thus no argument that those actions should be subject to arbitration, and resolution of such Actions should not be delayed by Roblox's efforts to deprive other Plaintiffs of their day in court.

### vi. Factual and Legal Threshold Issues Likely To Be Presented

<u>Threshold Factual Issues</u>. Although certain aspects of an individual Plaintiff's abuse and exploitation will be specific to that Plaintiff, many threshold questions of fact will be common across all Related Actions, including, but not limited to, the following.

- **Defendants' Knowledge:** For nearly two decades, Defendants have known—through internal research, studies, reports, media coverage, and criminal prosecutions—that their platforms facilitate the systematic sexual exploitation of children. As alleged, Defendants have concealed their predator problem, made false safety statements, refused to make proportional safety investments, and even continued to design features that maximize engagement between users at the expense of user protection. These allegations raise issues about what Defendants knew, and when they knew, about predatory conduct, systematic exploitation patterns, cross-platform facilitation, and specific harms to children.

- **Truth of Safety Representations:** Plaintiffs' common allegations also raise issues about Defendants' repeated, affirmative representations about their platforms' safety, including what statements Defendants made; whether those statements were true; what Defendants knew when making such statements; and whether they concealed contradictory material information from users and their parents.

- **Reasonableness of Design:** Plaintiffs further allege that Defendants could have prevented the rampant sexual abuse and exploitation on their platforms with readily available, industry-standard safety features they refused to implement. These allegations raise issues regarding what design alternatives were available; what alternatives Defendants considered but rejected; the cost and feasibility of these alternatives; and industry standards for child internet safety.

- **Foreseeability:** Plaintiffs' claims also raise issues regarding whether, based on their knowledge of the well-documented systematic patterns of sexual exploitation on their platforms, Defendants could have foreseen Plaintiffs' traumatic and lifelong injuries.

<u>Threshold Legal Issues</u>. Threshold issues common across all Related Actions will likely include the validity of Defendants' purported arbitration agreements under the EFAA, 9 U.S.C.

§ 402, and basic tenets of contract law; the applicability of Section 230 to any of Plaintiffs' claims; and the First Amendment's applicability to any of Plaintiffs' claims.

- **Arbitration**. In response to any motion to compel arbitration, Plaintiffs will argue, as discussed above, that the arbitration provisions are unenforceable in most, if not all, Related Actions under the EFAA, which bars enforcement of arbitration agreements in cases that "relate to" a "sexual assault dispute" or a "sexual harassment dispute." 9 U.S.C. § 402. The agreements are independently unenforceable because nearly all Plaintiffs have disaffirmed these voidable contracts they purportedly entered as minors. Plaintiffs will also contend that they never entered any contracts with Defendants in the first place and therefore no agreement—arbitration or otherwise—was ever formed.

- **Section 230**. Defendants will presumably, and erroneously, assert that Section 230 bars all Plaintiffs' claims. Section 230 bars claims seeking to hold Internet platforms liable for conduct "identical to publishing or speaking." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1107 (9th Cir. 2009). Section 230 does not bar claims where the duty that the defendant allegedly breached "could have been satisfied without changes to the content posted by the website's users." *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016); *see also, e.g.*, *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092 (9th Cir. 2021). As in the *Social Media Adolescent Addiction* MDL, Plaintiffs challenge statements and omissions that are not even plausibly subject to Section 230, as well as design choices entirely independent of whatever third-party conduct or content Defendants choose to allow, including, among other things, Defendants' failures to implement age- and identity-verification measures, parental controls and notifications, and CSAM-reporting mechanisms, and failure to warn users of the risks of harm reasonably known to Defendants. In the *Social Media Adolescent Addiction* MDL, the court held that Section 230 did not bar the plaintiffs' design-related claims because the defendants could have fulfilled their duties to provide such features without altering or even reading any content on their own platforms. *See Social Media Adolescent Addiction*, 702 F. Supp. 3d 809, 825-36 (N.D. Cal. 2023). The same reasoning will apply here.

- **First Amendment**. Defendants may also argue that the First Amendment protects their so-called editorial decisions. Again, as in *Social Media*, Plaintiffs here challenge features or the lack thereof—such as age-verification systems, parental controls, and CSAM-reporting mechanisms—that are neutral, non-expressive, and unconnected from any editorial judgment, and thus not entitled to First Amendment protection. *See id*. at 836-37.

   vii. **Whether and When Consolidated Pleadings Should Be Prepared**

Plaintiffs propose that a Master Complaint be filed, setting forth common factual allegations and legal theories, for administrative convenience only and not as the operative pleading for the cases in this MDL. *See Gelboim v. Bank Am. Corp.*, 574 U.S. 405, 413 n.3 (2015) (explaining that in MDLs the parties may "elect" to file a "master complaint" and a corresponding "consolidated answer," which supersede prior individual pleadings, or the plaintiffs can file a master complaint that "is not meant to be a pleading with legal effect but only a summary of the claims brought by all plaintiffs"); *see also, e.g.*, *In re Acetaminophen ASD-ADHD Prods. Liab. Litig.*, No. 22CV8830 (DLC), 2023 WL 3026412, at *2 n.2 (S.D.N.Y. Apr. 20, 2023) ("The master complaint is not the operative pleading; it is an administrative document."). Plaintiffs further propose that Plaintiffs then file short-form complaints, as discussed below, that serve as the operative pleading and that may expressly adopt the Master Complaint in whole or in part. *See, e.g.*, *Acetaminophen*, 2023 WL 3026412, at *2 (resolving motion to dismiss based on facts "drawn from the Plaintiffs' short form complaint ('SFC') and the master complaint in this MDL that the SFC incorporates by reference").

After the Court appoints Lead Counsel for Plaintiffs, Plaintiffs propose to file the Master Complaint and confer with Defendants regarding individual short-form complaints. Short-form complaints should allow incorporation by reference of the Master Complaint and should focus on identifying relevant Defendants and claims, as well as plaintiff-specific allegations such as dates of use, platforms used, exploitation type, and injuries. Short-form complaints should not require information exceeding pleading requirements under the Federal Rules (e.g., detailed descriptions of platform interactions), especially given that Defendants already possess complete user data.

Plaintiffs submit the following proposed schedule:

| Event | Deadline |
|---|---|
| **Master Complaint** | 45 days after appointment of Lead Counsel and any other positions |
| Parties confer on short-form requirements | 30 days after Master Complaint |
| Joint letter on disputes (if any) | 14 days after meet-and-confer |
| Court resolves disputes | As scheduled |
| Short-form complaints (current cases) | 30 days after dispute resolution |
| Short-form complaints (later cases) | 30 days after transfer to MDL |

### viii. A Plan and Schedule for Exchange of Information About the Factual Bases for Parties' Claims and Defenses

To avoid the risk of losing relevant evidence and to permit the litigation to move forward expeditiously, it is crucial that the parties negotiate, and the Court enter, initial case management orders (often referred to as "First Day Orders") covering document and data preservation, ESI, and protection of confidential and sensitive material, as well as deadlines for the parties to confer and submit proposals for various case management orders. Likewise, the early exchange of ESI sources—including the identification of current and former custodians, internal departments, divisions, committees, or teams, and individual members thereof—possessing potentially relevant information is consistent with Rules 16(b), 26(a), and 26(f), and will help avoid later disputes about, for example, what sources of responsive information exist, what sources are reasonably accessible, and what sources will be searched for responsive information. This early exchange of information is particularly important given the substantial imbalance of information between the parties. Early disclosure will also prevent the deletion of ephemeral data such as chat or text messages that may reside on company servers and/or former employees' personal devices.

To that end, Plaintiffs request that the Court order a Rule 26(f) conference focused on preservation within 30 days of entry of the Court's order appointing leadership, with e-discovery vendors and in-house IT personnel attending, focused on ESI sources, data architecture, capabilities and limitations, ephemeral content, active accounts, CSAM, and preservation burdens. Plaintiffs further propose that the parties file their Joint Rule 26(f) Report within 10 days after the Rule 26(f) conference. Such an approach has been adopted in other MDL litigation. *See, e.g.*, Case Management Order No. 1, *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 3:19-md-2885-

13

1  MCR, ECF No. 86 (N.D. Fla. Apr. 23, 2019). The need to move swiftly is further justified by
2  Plaintiffs' preservation concerns highlighted in Section II.xi below.

3        Plaintiffs further ask the Court to order Defendants to immediately reproduce discovery
4  produced in any court case, government investigation, or government hearing regarding sexual
5  exploitation risks to minor users on their platforms and actual or considered changes to their
6  platforms relating to these risks. This information is facially relevant to the claims asserted by
7  Plaintiffs in the Related Actions. *See, e.g.*, Office of the Attorney General, State of Florida,
8  Investigative Subpoena Duces Tecum to Roblox Corporation (Apr. 16, 2025) (attached as **Exhibit**
9  **6**) (demanding production of materials such as "Documents supporting any representations made
10 in Your marketing materials that suggest Your Platform is safe for all ages"; "Documents sufficient
11 to show the age verification procedures You use relating to Child Users creating accounts on Your
12 Platform and any audits thereof"; "Communications related to knowledge of Safety Issues and Your
13 platform from January 2021 until the present"; and "Corporate meeting minutes which involved
14 Safety Issues, Children, guardrails, and means of protecting Children on your platform from
15 January 2021 until the present").

16       Because Defendants have already collected this information to respond to parallel
17 government investigations or lawsuits, the burden of producing it here is negligible and
18 significantly outweighed by the benefits to the Court and the parties of early disclosure. *See, e.g.*,
19 *Social Media Adolescent Addiction*, Discovery Order No. 1, No. 4:22-md-03047-YGR, ECF No.
20 125 (N.D. Cal. Dec. 29, 2022) (attached as **Exhibit 7**) (ordering production of materials from state
21 AG investigations, finding "narrow production of previously-produced relevant materials imposes
22 little burden on the defendants and promotes judicial efficiency in [the] multi-district litigation");
23 *In re: Uber Technologies, Inc. Passenger Sexual Assault Litig.*, Pretrial Order No. 5, No. 3:23-md-
24 03084-CRB, ECF No. 175 (N.D. Cal. Dec. 28, 2023) (attached as **Exhibit 8**) (ordering the
25 production of documents produced to the government or in other cases involving sexual assault);
26 *In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1113 (N.D. Cal. 2012) (Koh, J.)
27 (ordering defendants at first case management conference to "produce responsive, non-privileged
28 documents already produced to the DOJ"); *Ohio Police & Fire Pension Fund v. Standard & Poor's*

*Fin. Servs.*, No. 2:09-CV-1054, 2010 WL 2541366, at *2 (S.D. Ohio June 18, 2010) (ordering defendants to "produce to plaintiffs documents already produced to various state or federal regulators" while the motion to dismiss is pending); *Galaria v. Nationwide Mut. Ins. Co.*, No. 2:13-CV-00118, 2013 WL 6578730, at *1 (S.D. Ohio Dec. 16, 2013) (denying defendant's motion to stay discovery pending motion to dismiss, noting that "[i]f documents or other information … respond to requests for information from governmental agencies, it would be difficult to argue that production of that document would be burdensome").

> ix. **The Possibility of Bifurcating Proceedings to Address Threshold Issues Before Any Plaintiff-Specific Questions**

Bifurcation can enhance efficiency by allowing the Court to address threshold issues before turning to plaintiff-specific questions. Those efficiencies, however, will be lost if Defendants use threshold arguments to delay progress on the broader litigation. Given the risk that some of Defendants' anticipated threshold arguments would cause such delay, this litigation should be both bifurcated and dual-tracked as follows:

**Track 1 - Common Threshold Issues**

- *Legal:* Arbitration disputes involving EFAA, disaffirmance, and contract formation issues; Section 230 immunity scope; and First Amendment protection scope.
- *Factual:* Defendants' knowledge of predatory conduct; truth/falsity of safety representations; foreseeability of third-party exploitation; reasonableness of design choices; and availability of alternatives.

**Track 2 - Individual Issues:** Specific causation; individual reliance; plaintiff-specific damages; and case-specific arbitration facts.

**Discovery Phasing**

- *Track 1:* Focus on Defendants' common conduct, knowledge, design decisions, and public statements.
- *Track 2:* Focus on plaintiff-specific interactions and harms.

    **x.**    **A Schedule for Discovery**

To date, there has not been substantive discovery in any of the Related Actions, though there has been limited conferral on briefing schedules and relevant account identification. Plaintiffs propose that the parties meet and confer, and then submit proposals, on a schedule for discovery after receiving the Court's guidance on threshold legal issues. Given the incongruity of knowledge between the parties on certain technical issues related to ESI, Plaintiffs also propose an early Rule 30(b)(6) deposition of each Defendant so that the manner in which the ESI is stored, and the most efficient manner of production and preservation, can be learned and negotiated between the parties.

Because this case concerns a significant amount of data and Defendants' proprietary platforms, Plaintiffs anticipate undertaking negotiations of appropriate ESI and TAR (Technology Assisted Review) in earnest following the appointment of Plaintiffs' leadership. Plaintiffs propose that an agreed-upon TAR protocol would be considerably more efficient and less costly than keyword search terms, minimizing discovery disputes and avoiding significant delays.

    **xi.**    **Steps Taken to Preserve Relevant Evidence, Including Electronically Stored Information**

Pursuant to the Northern District's ESI Guidelines, Plaintiffs have taken reasonable steps to preserve relevant evidence, including instructing clients to preserve devices, account information, and communications while collecting relevant documentation. Plaintiffs have been and will continue to be reasonably transparent and cooperate in good faith in all aspects of the discovery process. The proposed preservation-focused Rule 26(f) conference, referenced in Section II.viii above, would foster and streamline these efforts.

That said, Plaintiffs have serious concerns about Defendants' efforts to preserve relevant evidence and would like to expedite the entry of an order by this Court compelling Defendants to preserve relevant data, including ESI, and to discontinue any automated data deletion. As Defendants know, they already should be preserving relevant data and should have issued company-wide litigation holds as they are obligated to do. Plaintiffs' preservation concerns arise largely from early preservation discussions that resulted in court-ordered certifications submitted by Roblox and Snap in *Doe v. Roblox Corp.*, No. 25-cv-05715, ECF No. 21 (E.D. Pa. Oct. 20,

2025), requiring these Defendants to affirmatively certify that they preserved information associated with the plaintiff's and the perpetrators' accounts. Defendants' certifications—and subsequent amended certifications—raise serious questions about the steps Defendants have taken to preserve relevant data and about Defendants' knowledge of their own procedures and policies for retaining and preserving such data.

Plaintiffs further propose that the parties meet and confer and submit a proposed order establishing a mutual exchange of information whereby Plaintiffs or any person anticipating filing a lawsuit in this MDL provide Defendants with information (e.g., usernames, email addresses, phone numbers) necessary for Defendants to preserve information associated with the account(s) and Defendants then provide the party submitting the information with a download of information associated with the account(s). Plaintiffs envision a process like the one that the parties, including Snap and Meta, agreed to, and the court entered, in the *Social Media Adolescent Addiction* MDL. *See* User Account Information Order, No. 22-MD-03047-YGR, ECF Nos. 550 (N.D. Cal. Jan. 22, 2024) & ECF No. 581 (Jan. 29, 2024) (attached as **Exhibit 9**) (establishing process and associated forms, including "Plaintiff User Account Information Form" and "User Account Identification Form").

  **xii.** **Whether Any Matters Should Be Referred to a Magistrate Judge or Special Master**

As the case proceeds to discovery, referral of discovery disputes to a Magistrate Judge or Special Master could facilitate more efficient resolution given the ESI complexity and volume. If discovery disputes become unmanageable, a technical expert special master may be helpful for the oversight of ESI processes. Given the factual issues involved in these cases, the appointment of a special master with expertise in federal CSAM law, law enforcement procedures, digital forensics, and victim protection to develop and oversee CSAM protocol may be beneficial to the process.

**III.** **Other Matters for Discussion**

<u>Direct Filing Order</u>. Plaintiffs anticipate that numerous additional cases will be filed in the coming months. Plaintiffs request that, to eliminate potential delays associated with transfer to this Court of actions filed in or removed to other federal district courts, and to promote judicial

efficiency, the Court enter a Direct Filing Order as one of the Initial Case Management Orders. *See, e.g.*, Case Management Order No. 4, *Social Media Adolescent Addiction*, No. 22-md-03047, ECF No. 119 (N.D. Cal Dec. 19, 2022.) (attached as **Exhibit 10**). Plaintiffs propose that the parties meet and confer and submit a proposed Direct Filing Order, including addressing Service of Process and Waiver, within two weeks of the Court's appointment of Lead Counsel for the MDL.

Pseudonymity Order. Plaintiffs in the Related Actions, as well as their guardians *ad litem* in cases involving Minor Plaintiffs, are proceeding under pseudonyms due to the sensitive, personal nature of their allegations and in many cases also because of their age. Most, if not all, plaintiffs and their guardians *ad litem* in future cases will also seek to proceed anonymously in this litigation. To lessen the burden on the Court and the parties associated with the filing of repetitive motions for plaintiffs to proceed anonymously, Plaintiffs propose that the parties meet and confer within two weeks of the appointment of Lead Counsel for the MDL and submit an omnibus proposed order establishing that the "[plaintiffs'] need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the [plaintiffs'] identit[ies]" in these cases, *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1068 (9th Cir. 2000), and outlining procedures that plaintiffs must follow if they wish to proceed anonymously. *See, e.g.*, Stipulation and Order Re: Plaintiffs Who Wish to Proceed Anonymously, *In re: Uber Techs., Inc. Passenger Sexual Assault Litig.*, No. 23-md-03084-CRB, ECF No. 174 (N.D. Cal. Dec. 28, 2023) (attached as **Exhibit 11**).

Order Regarding Appointment of Guardians *Ad Litem*. Plaintiffs request that, to ensure that minor or incompetent Plaintiffs in this MDL are adequately protected, the Court issue an order governing the process for the appointment of guardians *ad litem* for Plaintiffs who require one. Plaintiffs propose that the parties meet and confer within two weeks of the Court's appointment of Lead Counsel for the MDL and submit a proposed order to the Court establishing this process. *See, e.g.*, Order Regarding Appointments of Guardians *Ad Litem*, *Social Media Adolescent Addiction.*, No. 22-md-03047, ECF No. 122 (N.D. Cal. Dec. 27, 2022) (attached as **Exhibit 12**).

Case Website. Plaintiffs will be prepared to discuss the establishment of a case website at the initial case management conference.

Date:   January 16, 2026                    Respectfully submitted,

                                            By: */s/ Alexandra M. Walsh*
                                            Alexandra M. Walsh
                                            **ANAPOL WEISS**
                                            14 Ridge Square, NW, 3rd Floor
                                            Washington, DC 20016
                                            Telephone: (771) 224-8065
                                            Facsimile: (215) 735-2211
                                            awalsh@anapolweiss.com

                                            *Interim Liaison Counsel*