# EXHIBIT D

Pages 1-70

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Thomas S. Hixson,
United States Magistrate Judge

IN RE: )
)
SOCIAL MEDIA ADOLESCENT )
ADDICTION, ) **Case No. 22-MD-03047-YGR**
______________________________)

San Francisco, California
Monday, April 10, 2023

**TRANSCRIPT OF PROCEEDINGS**

APPEARANCES ON NEXT PAGE.

TRANSCRIPTION SERVICE BY:
Dipti Patel, CET-997
Liberty Transcripts
7306 Danwood Drive
Austin, Texas 78759
(847) 848-4907

**APPEARANCES VIA ZOOM VIDEOCONFERENCE:**

For the Plaintiffs:

MOTLEY RICE LLC
401 9th Street NW, Suite 630
Washington, DC 20004
**BY: PREVIN WARREN, ATTORNEY AT LAW**

MOTLEY RICE LLC
One Corporate Center
20 Church Street, 17th Floor
Hartford, Connecticut 06103
**BY: MATTHEW JASINSKI, ATTORNEY AT LAW**

SEEGERWEISS LLP
55 Challenger Road
Ridgefield Park, New Jersey 07660
**BY: JENNIFER SCULLION, ATTORNEY AT LAW**
**CHRISTOPHER AYERS, ATTORNEY AT LAW**

LIEFF CABRASER HEIMANN & BERNSTEIN
250 Hudson Street, 8th Floor
New York, New York 10013
**BY: KELLY MCNABB, ATTORNEY AT LAW**
**JASON L. LICHTMAN, ATTORNEY AT LAW**

For Defendants Meta Platforms, Inc. f/k/a Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, Siculus, Inc., and Mark Elliot Zuckerburg:

COVINGTON & BURLING, LLP
1999 Avenue of the Stars
Los Angeles, California 90067
**BY: ASHLEY M. SIMONSEN, ATTORNEY AT LAW**

For Defendants TikTok, Inc. and ByteDance, Inc.:

FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
**BY: AMY R. FITERMAN, ATTORNEY AT LAW**

FAEGRE DRINKER BIDDLE & REATH LLP
300 N. Meridian Street, Suite 2500
Indianapolis, Indiana 46204
**BY: ANDREA PIERSON, ATTORNEY AT LAW**

**APPEARANCES VIA ZOOM VIDEOCONFERENCE (CONTINUED):**

For Defendants TikTok, Inc. and ByteDance, Inc.:

KING & SPALDING, LLP
1700 Pennsylvania Avenue, NW
Suite 900
Washington, D.C. 20006
**BY: DAVID MATTERN, ATTORNEY AT LAW**

KING & SPALDING, LLP
1180 Peachtree Street, NE
Suite 1600
Atlanta, Georgia 30309
**BY: GEOFFREY DRAKE, ATTORNEY AT LAW**

For Defendants YouTube, LLC, Google, LLC, and Alphabet, Inc.:

WILLIAMS & CONNOLLY, LLP
680 Maine Avenue SW
Washington, DC 20024
**BY: ASHLEY W. HARDIN, ATTORNEY AT LAW**

WILSON SONSINI GOODRICH & ROSATI
12235 El Camino Real
San Diego, California 92130
**BY: SAMANTHA MACHOCK, ATTORNEY AT LAW**

For Defendant Snap, Inc.:

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
**BY: JOHN BEISNER, ATTORNEY AT LAW**

MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Suite 500 E
Washington, D.C. 20001
**BY: LAUREN BELL, ATTORNEY AT LAW**

MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
50th Floor
Los Angeles, California 90071
**BY: VICTORIA DEGTYAREVA, ATTORNEY AT LAW**
**ARIEL T. TESHUVA, ATTORNEY AT LAW**

**San Francisco, California, Monday - April 10, 2023, 8:40 a.m.**

**P R O C E E D I N G S**

---o0o---

**THE CLERK:** Good morning. We are here in Civil Action 22-3047, In re Social Media Addiction; the Honorable Thomas S. Hixson presiding.

Okay. Let's get -- do you want them to all state the appearances, Judge?

**THE COURT:** I think that's a good idea.

**THE CLERK:** Okay.

**THE COURT:** Why don't we start with the plaintiffs and then go through with the defendants.

**THE CLERK:** Okay. Go ahead. Anyone that's plaintiffs' counsel, please state your name and who you represent.

**MR. WARREN:** Thank you --

**MS. SCULLION:** Good morning, Your Honor.

Go ahead, Previn.

**MR. WARREN:** All right. I can start. I'm Previn Warren with the law firm Montley Rice, and I represent the plaintiffs.

**MS. SCULLION:** Good morning, Your Honor.

Jennifer Scullion from SeegerWeiss representing the plaintiffs.

**MS. McNABB:** Good morning, Your Honor.

Kelly McNabb from Leiff, Cabraser, Heimann & Bernstein

for the plaintiffs.

**MR. LICHTMAN:** Good morning, Your Honor.

Jason Lichtman also Leiff Cabraser, for the plaintiffs.

**MR. JASINSKI:** Good morning, Your Honor.

Matthew Jasinski with Motley Rice for the plaintiffs.

**MR. AYERS:** Good morning, Your Honor.

Chris Ayers of SeegerWeiss on behalf of the plaintiffs.

**THE CLERK:** Okay. And how about Meta Platforms, Facebook, Facebook Holdings, all the defendants' counsel in that.

**MS. SIMONSEN:** Yes. Thank you.

Good morning, Your Honor.

Ashley Simonsen, Covington & Burling, for the Meta defendants.

**THE CLERK:** Okay. And TikTok and ByteDance?

**MS. FITERMAN:** Good morning, Your Honor.

Amy Fiterman, Fagre Drinker, on behalf of the TikTok and ByteDance defendants.

**MR. MATTERN:** Good morning, Your Honor.

David Mattern from King & Spalding, also on behalf of the TikTok and ByteDance defendants.

**MS. PIERSON:** Good morning, Your Honor.

Andrea Pierson also on behalf of TikTok & ByteDance.

**MR. DRAKE:** And good morning, Your Honor.

Geoffrey Drake, King & Spalding, for TikTok & ByteDance.

**THE CLERK:** Okay. YouTube and Google and Alphabet, Inc.

**MS. HARDIN:** Ashley Hardin from Williams & Connolly on behalf of the Google and YouTube defendants, Your Honor.

**MS. MACHOCK:** Good morning, Your Honor.

Samantha Machok from Wilson Sonsini on behalf of Google and YouTube.

**THE CLERK:** Anybody else?

(No audible response)

**THE CLERK:** Okay. Snap, Inc.

**MR. BEISNER:** Good morning, Your Honor.

John Beisner from the Skadden Arps firm on behalf of Snap.

**MS. BELL:** Good morning, Your Honor.

Lauren Bell from Munger, Tulles & Olson on behalf of Snap.

**MS. DEGTYAREVA:** Good morning.

Victoria Degtyareva from Munger, Tolles & Olson on behalf of Snap.

**MS. TESHUVA:** Good morning.

Ariel Teshuva from Munger Tolles also on behalf of Snap.

**THE CLERK:** Okay. Then Social Media Victims Center and anybody here from there?

Ms. Garrett, Marquez-Garrett, Mr. Bergman, or Mr. Draper?

(No audible response)

**THE CLERK:** No.

All right. They sent me an email, but I don't see any of them in the audience, either. So it could have been --

**MS. SCULLION:** Yeah, good morning. This is Jennifer Scullion. They are plaintiff's counsel, and so we are representing the entire plaintiffs' group.

**THE CLERK:** Okay, great. So that's it, Judge. We're all set.

**THE COURT:** All right. Well, good morning, everyone. Certainly a large group here today.

So the parties have submitted their joint discovery letter brief concerning a protective order in this action. And I thought that the most efficient way to proceed is just to tick through the items one by one. For some I just have comments, for others I have some questions, as well, and then give you my guidance.

And then we can talk about the next step, whether the next step is just to submit a proposed order reflecting what I say today. And I think that likely is the next step.

In general, my view is that the two-tiered model protective order for this district for trade secrets and such is the correct presumptive starting spot, not because this case is about trade secrets but just because it seems like discovery in this case is likely to involve highly-confidential matters that deserve to have that second level of protection.

And so I'm going to start out with that premise. That said, I'm not wedded to that particular protective order, just I think that's an appropriate starting point.

So in general, I want to go through in the order in which plaintiffs have listed the disputed items in the protective order and that would start with Paragraph 3.2.

I do not agree with the defendants' proposed addition that if the accuracy of information can be confirmed only through the review of protected material, then otherwise public information somehow becomes secret. If there are unsubstantiated media speculations or rumors that are in the media, then they're out there and they don't become protected material just because confirmation of the truth of them depends on protected material.

Of course, that doesn't mean that the protected material becomes unprotected. Whatever's in there is still confidential and protected, but it doesn't reach out and tag information that's already in the public domain.

But I had a question about another addition that defendants had to Paragraph 3.2 which is that -- and I'm looking at the redline at ECF Number 192-1 that, "The protections conferred by this stipulated protective order, however, do not cover the following information."

And then subparagraph A is, "Any information that is in the public domain at the time of disclosure to a receiving

party or becomes part of the public domain after its disclosure to a receiving party as a result of publication not involving a violation of this stipulated protective order."

And then the defendants added the words "or another court's order." And I'm having trouble grasping the meaning and effect of that addition, and I'm wondering if there's someone on the defense side who can talk me through that.

**MS. SIMONSEN:** I'd be glad to do that. This is Ashley Simonsen from Covington & Burling for the Meta defendants and speaking on behalf of the defendants.

So as Your Honor pointed out, the highly-confidential model order already exempts material that's made public through a violation of the protective order entered by this Court from public domain material. And so we simply propose extending that to material that enters the public domain through the violation of another court's order.

And Meta in particular has had experience with this in prior litigation referred to as the "643 litigation" in California state court. The plaintiffs in that case leaked Meta's confidential documents in violation of the protective order in that case. And under the plaintiffs' proposed approach here, that material would simply have been fair game by plaintiffs in any other litigation to use.

And, indeed, the plaintiffs in the Cambridge Analytica litigation attempted to use that material to take the position

that because it had been leaked, it was public and fair game. And Meta did take that dispute to the Court to Magistrate Judge Corley and requested a modification of the protective order in that case to add a provision just like this that said simply because something enters the public domain by virtue of a protective order violation, that doesn't mean that the plaintiffs can use it.

And the court in that case did adopt that requested modification, and that was the In re Facebook, Inc. Consumer Privacy User Profile Litigation. And the reasoning there, which makes good sense, is that if a party could leak confidential information and then it suddenly became part of the public domain, notwithstanding that it violated a court's order, it would condone that conduct.

That's what Magistrate Judge Corley reasoned, it would encourage similar behavior by future litigants, and it would dis-incentivize defendants from producing confidential documents. So that is the basis for that request, Your Honor.

**THE COURT:** Okay. Thank you.

In the letter brief, I didn't see plaintiffs contesting that particular addition, but maybe I should get confirmation. So I'll ask plaintiffs, do you contest to that addition?

**MR. WARREN:** Yes, we do contest it. And I think our lack of addressing it in writing was just for limitations of space. I think the issue that we have with it is that it puts us in a

position of if another group of plaintiffs or another set of counsel violates the protective order, that's not something that we have any control over.

If it's an order in a different matter and different litigation involving different parties and counsel, to your point, once material gets out in the public domain, it's out in the public domain.

I do think in terms of the creating incentives and dis-incentives, if that litigant and group of litigants were to violate another protective order, presumably they would face sanctions in that matter. But it shouldn't really prejudice us if it winds up that information's in the public for no fault of our own, then it kind of is what it is.

Now I don't disagree that if we were somehow responsible for that, then that's a different matter. But that really ought to be limited to this action, I suppose arguably the JCCP and we would be willing to extend this provision to cover that matter, as well.

**THE COURT:** Oh, so is there a parallel JCCP proceeding in state court?

**MR. WARREN:** Yes, Your Honor.

**THE COURT:** Okay. Well, I'm going to keep the defendants' addition of the words "or another court's order" in Paragraph 3.2. However, Mr. Warren, I do recognize your valid point that you can't be held accountable for things that

other people do.

So I guess the effect of that is that if something is leaked into the public domain in violation of another court's order, then I think it still counts as protected material since it's not deemed public. But when it comes time to punish somebody for violating a protective order, there would need to be a showing of wrongfulness.

And if it's not the fault of the plaintiffs in this case, then I think all I would say is you can't use this material or it's deemed non-public. But I wouldn't punish or sanction anybody if you didn't do anything wrong.

And I take it, Ms. Simonsen, from your nodding that you're not asking that I would punish or sanction the plaintiffs here for something that -- for bad conduct committed by different plaintiffs in other -- different plaintiffs' counsel in other cases.

**MS. SIMONSEN:** Absolutely not.

The point is simply that material shouldn't lose its protected status if it's leaked to the public by virtue of a violation of a protective order in another case.

**THE COURT:** Okay.

**MS. SIMONSEN:** Which would be the fault of the plaintiffs in that case.

**MR. WARREN:** Your Honor, if I may?

**THE COURT:** Sure.

**MR. WARREN:** My only sort of amendment here is that the breadth of the language in another court's order, it's not limited to another court's protective order or even situations where the court has determined that another protective order has been violated.

So I would just worry that it might be up to this sort of -- it might create conflict and just needless disputes between the parties as to whether another court's order has been violated in some other matter when that hasn't even been adjudicated in that other matter.

So if we could perhaps change the language to state that it's in confirmed violation of another court's protective order or something to that effect, I think it could be helpful.

**THE COURT:** I don't think that language is necessary, but I do appreciate the point that you make. When there's a reference or "or another court's order," I would expect the aggrieved party to go to that other court first and get a determination by that court that its order has been violated.

I don't want to be put in the position of reaching out and deciding that another court's order has been violated, and I don't think that the defendants' addition puts me in that position. I would just wait to see if another court has determined that its order has been violated and then I would, if that were determined to be the case, then I would say the

material is not public.

And then, again, when it comes to sanctions or punishment, I wouldn't blame plaintiffs' counsel here for things done by other people because that's not your fault. All that would happen is the protected status of the material would remain in place.

Okay, so that's what I'm doing with 3.2. I'm keeping the language "or another court's order," but I'm going to strike the addition at the end about information in the public domain becoming confidential if protected material is used to confirm the accuracy of it.

Let's go then to the next addition which is Paragraph 6 which appears to strip non-parties such as the press of the ability to challenge confidentiality designations.

Now I realize that what the press would typically challenge is a sealing order because they would know about what's filed in the case and what's been filed or they wouldn't know about what's been filed under seal but they would see that redactions have been made and that it's more unusual to challenge confidentiality designations independent of things that are filed. But in theory, they could do so.

So let me turn to the defense. For Paragraph 6.1, they're proposing to strike the words "party or non-party" and just allow any party to challenge the designation. And then I think that -- yeah, similarly, Paragraph 2.13 modifies the

definition of non-party to be just people from whom discovery has been sought or other material has been produced. And that, of course, would exclude the press, as well.

So let me turn to the defendants. What's the reason for those proposed edits?

**MS. SIMONSEN:** Certainly, Your Honor.

The definition of non-party as used in the highly-confidential model order is really quite broad. It could be literally interpreted to create a unique right for third parties who are completely uninvolved in the litigation to come in and challenge confidentiality, not only as Your Honor pointed out, of material that has been sought to be sealed which is therefore part of the court record but even, for instance, documents that have been simply produced in discovery that no party intends to use in the litigation, that plaintiffs are not even challenging the confidentiality of.

And so we would delete that reference to non-party to make clear that non-parties completely divorced from the litigation can't come in and seek to challenge defendants' confidentiality designations.

Now I would point out, Your Honor, that there is quite a large volume of anticipated discovery in these cases. The defendants have already produced a large volume of material pursuant to Judge Gonzalez Rogers' order in order to permit the plaintiffs to use certain information to prepare their

master complaint.

And our concern here is that empowering non-parties potentially under a reading of the highly-confidential order to come in and challenge confidentiality designations would essentially be requesting advisory opinions on the confidentiality of defendants' documents regardless, again, of whether they would ever be used in the litigation or whether plaintiffs seek to challenge their confidentiality.

And I would note, Your Honor, that in the case that plaintiffs cite in support of their view that non-parties should be able to come in and essentially challenge any designation, that decision was -- that's the <u>In re National Prescription Opiate Litigation</u> case. Very very distinct circumstances where media outlets actually, first of all, intervened in the lawsuit to enforce public records requests that had been made to state and local government entities, which were the plaintiffs in those cases, for data that had come from the federal government.

And that was all pursuant to a process contemplated by the protective order in that case. And here, by contrast, the plaintiffs are not government entities. We're not talking about information that they've received from another government entity that might be subject to a public records request.

So the case that they cite does not support the

proposition for which they cite it. And it's not surprising that there are a number of highly-confidential premised orders entered in the Northern District of California that exclude this definition of non-party for this -- presumably for this very reason.

Now I would say, Your Honor, that perhaps we could think about some language that might address the point that you made which is that simply narrowing and making clarifying the circumstances under which a non-party might be able to come in and challenge. So that would be, for instance, with respect to court records materials actually sought to be seamed in the litigation, for example. And we'd be glad to go back and meet and confer with plaintiffs on that, try to come up with sort of a compromise approach here.

**THE COURT:** All right. Let me hear from the plaintiffs on this idea.

**MR. WARREN:** Thank you, Your Honor. A few points.

We think the language as it exists in the model order is simple and sufficient. To the point about the opioids litigation, we have a situation here where the lawsuit is attracting quite a bit of media attention and quite a bit of public attention because of the scope of the crisis that young people are facing due to their addiction to social media.

The materials that the defendants have produced to date have largely been materials that were requested by state

attorneys general and produced during those investigations. It stands to reason that those state attorneys general could very well have an interest in those materials becoming part of the public record. However, they were largely designated by defendants under a sort of stipulated and pre-protective order, if you will.

But it's easy to imagine a circumstance in which governments might want to come in as non-parties to challenge the designation of that discovery material because the public has a right to know about the sources of what's essentially a public-health crisis.

We don't think that a non-party coming in to request the de-designation of material produced in discovery would amount to an advisory opinion. It wouldn't be any more of an advisory opinion than plaintiffs seeking to challenge a designation prior to material being used in an actual court filing.

As far as the cases and the examples that defendants cite in their brief, they cite two, Davis v. Pinterest and Newman v. Google. We went back and checked those protective orders, and both actually define a challenging party as "a party or non-party that challenges the designation of information." So we don't even see their examples as being supportive of the point that they're citing them for.

The bottom line here, this is just a highly -- there's a

lot of public interest around this litigation. We think non-parties should have the right to step in and contest over designation of material if that were to happen.

**THE COURT:** All right. Go ahead, Ms. Simonsen.

**MS. SIMONSEN:** Thank you, Your Honor.

With respect to Mr. Warren's first point on the state attorneys general, to the extent that they have documents that defendants have produced, they of course in the course of their own investigations and negotiations with defendants can negotiate with respect to the confidentiality of those materials.

I am speaking off the top of my head here, but I think that if they wanted to move to unseal those materials or make them public, that is presumably something they could do by filing an action in court to unseal those materials. They wouldn't need to intervene in this lawsuit where those materials simply happen to also have been produced to do that.

If they did intervene in this lawsuit, I think that's a very different circumstance from a non-party that has not intervened coming in and seeking to simply unseal materials the defendants have produced. They happen to have the documents which puts them in a very different position.

I think the other point that I would make is that Mr. Warren said that it would amount -- it would not amount to an advisory opinion. I would submit that it would. I think just

based on comments that plaintiffs' counsel, including Mr. Warren, have made in the course of these cases, my understanding is that they have an intention themselves to potentially encourage non-parties to come in and request Your Honor's time and attention evaluating confidentiality de-designations for materials that they may never have any intention of using in these cases.

It's essentially a standing issue. The public really doesn't have an interest in coming in and challenging confidentiality of tens of thousands, potentially hundreds of thousands of documents that have nothing to do with and will not actually end up being use d with respect to the parties' claims and defenses in this case.

And that's part of what we're concerned with protecting against here. So I think, again, we could probably go back and find some kind of -- try to find some kind of compromise. We can talk about the state attorneys general in particular. I do know that one concern that Judge Gonzalez Rogers raised at the very outset of these cases was the state attorneys general being very concerned about the confidentiality of their investigations and the materials that were produced to them by the defendants potentially being compromised and made public.

And so I actually think that some of their concerns may be the opposition of what Mr. Warren is predicting.

**THE COURT:** All righty. Well, for now, I'm going to leave in the language that any party or non-party can challenge a confidentiality designation both in Paragraph 6.1 and then rejecting the defendants' addition to Paragraph 2.13.

If this becomes a big issue that ends up consuming a lot of the Court's time with non-parties coming in to make designations, I may revisit this. I don't want to be spending a lot of time reviewing confidentiality designations separate from motions to seal. That's not a good use of the Court's time.

And I would expect most of these challenges to be brought by the parties to the case. But there could be I guess attorneys general or members of the media who may have an interest here, and I don't want to close them out right at the outset.

So for the time being, I'm going to keep in the ability of non-parties to challenge designations and then I can learn from experience and if this becomes a problem going forward or ends up consuming too much of the Court's time, then I may need to revisit that issue.

But for the time being, I will preserve the ability of non-parties to challenge confidentiality designations.

The next issue is data security, the new Paragraph 7.2 -- hold up while I pull this up on my screen next to me.

I have to say that to the extent that the new Paragraph

7.2 is different from what's in the model order, I think it's vague. So why don't -- who on the defense wants to talk to me about the data security paragraph?

**MS. SIMONSEN:** I'm glad to address that, Your Honor.

So the highly-confidential model order here requires storage of data simply in a secure manner, and we seek three clarifications to that language. So, first of all, just a more specific requirement for an information security program that is consistent with standard industry practices.

That type of program is absolutely essential here given the type of information that is implicated by the plaintiffs' claims. And --

**THE COURT:** Let me ask there. Are we going to have satellite litigation over what standard industry practices are?

**MS. SIMONSEN:** I don't think so, Your Honor. I think it's easily met by retaining an e-discovery vendor that is sort of known to meet those practices. There is -- there's an ABA Formal Opinion 477R that sets out information that really is subject to reasonable industry standard information security requirements.

And I think that simply -- what we want to just ensure happens is that we're not relying on such a vague definition like secure manner and instead are relying on industry standard practices. I don't anticipate that there's going to

be disputes over this between the parties insofar as plaintiffs retain an e-discovery vendor that complies with industry standard practices.

Certainly, I think this is an area where to the extent that that becomes an issue, perhaps this needs to be revisited. But this is simply to just put a little bit more meat on the bone, so to speak, of that secure manner language that we see in the highly-confidential model order.

**THE COURT:** Well, sure. I understand that an e-discovery vendor is going to follow standard industry practices and, more than that, we'll know where they are. But I would also expect that plaintiff -- the documents aren't only going to reside with the vendor.

Presumably as plaintiffs work on the case and they write briefs and they confer with each other, especially since they're at multiple law firms, they're going to be emailing documents to each other, they're going to have the documents on their laptop, they're going to be working from home and storing stuff there.

It's not that the documents are not going to reside exclusively with the e-discovery vendor. And so then we get into what are the standard industry practices for how you log onto your laptop or what security do you have for your email system. And I don't know that for lawyers and law firms that is as well defined.

Can you speak to that issue?

**MS. SIMONSEN:** Yeah, absolutely, Your Honor.

I think it is well defined for lawyers and law firms. And I'm glad that raised this because I think defendants' perspective would be that plaintiffs absolutely should not be working from home and storing stuff on their home laptops. They should be viewing defendants' confidential materials in a secure cloud-based e-discovery vendor where the materials cannot be subject to compromise. They also should not be emailing documents to one another.

I will tell you, Your Honor, that Meta is my client. When we're talking about documents that are Meta's documents with respect to this case, we're not emailing them to each other. We are referring to them by control number in a secure database. That's how important the security of this type of information is to these defendants.

And so it's important that those industry standards --

**THE COURT:** When you say "this type of information," you mean literally every single email designated confidential? All of them have to be on a cloud-based computer system? We can't suffer the situation in which even one confidential email is on someone's laptop?

**MS. SIMONSEN:** There are provisions in the protective order for the circumstances where, for instance, materials need to be used in connection with depositions, they need to

be -- there's a provision for the storage of hard-copy versions of materials, for example.

I'm not saying they can never be taken out of that database. But in the ordinary course, that's where they would be stored. And they would be used as necessary for litigation, again, things like depositions. Of course, if they need to be downloaded in order to be redacted to then be filed with a court filing, that is of course acceptable.

But in the ordinary course for the storage of these materials, yes, they should be housed in a very secure manner in a secure likely cloud-based e-discovery vendor systems.

**THE COURT:** Where does it say in your proposal that, oh, of course, for depositions and work on the case, you can download things and use them then, we're just talking about the general storage?

**MS. SIMONSEN:** Let me find that, Your Honor.

**THE COURT:** And I'm looking at ECF 192-1, which is your redline of their proposal.

**MS. SIMONSEN:** So with respect to, for instance, paper format, that's at the bottom of Page 11.

**THE COURT:** Not paper.

**MS. SIMONSEN:** Oh, well, I bring that up simply because with respect to depositions, of course, paper copies may be needed to the extent those depositions are in person. And so that's another form of storage of those materials.

And then there is in connection with the definitions of how confidential and highly-confidential information may be disclosed, there are examples of how it can be disclosed, and that includes disclosing it, for example, to the receiving parties' outside counsel, right. There are individuals to whom it can be disclosed.

There's a dispute over this, but three of the defendants would say up to two designated house counsel. Experts can receive the material.

**THE COURT:** Well, but that's who gets the access to it. That's not how you access, can you -- do we have some kind of implied understanding that by certain purposes, you can have things on your laptop or email them with your co-counsel?

**MS. SIMONSEN:** Well, and if more clarity is needed with respect to the limited circumstances under which materials may be emailed, I think we can certainly try to add some more detail around that.

I think that even when it comes to email, for instance, there are industry standard practices for securing information. For instance, when material does need to be shared with specific designated individuals, it should be shared through a secure FTP file-sharing program, right, as opposed to it can't be sent, for instance, through a Gmail account. That would be an example of an industry standard practice for securing information when it needs to be emailed.

**THE COURT:** Right.

**MS. SIMONSEN:** And I --

**THE COURT:** Okay. Sorry to interrupt, but I think I'd like to hear from the plaintiffs since I've heard from the defense.

**MS. McNABB:** Yes. Good morning, Judge Hixson. Kelly McNabb from Lieff Cabraser. I'll address this topic for the plaintiffs.

We agree with Your Honor that the language that defendants have proposed here is vague. I think conversation this morning has demonstrated how there can be disputes that -- unnecessary disputes that arise because of the proposed language.

Plaintiffs have retained an e-vendor or an e-discovery vendor who uses an Amazon Web Services or what's referred to as AWS data platform. This is very standard and common in the e-discovery world. And the platform as well as the vendor complies with certain standard and security certifications.

With respect to the law firms and plaintiffs' counsel, we each, each law firm has its own information technology security. We take our obligation to treat this information confidentially and to avoid any sort of data security issues seriously. We think that the language in a secure manner is sufficient. It's in both the -- both of the model protective orders in this district in which plaintiffs' counsel regularly

practice in and have complied with this provision in many other litigations.

It's not necessary. We don't feel it's necessary to include industry standard language in there that just opens the door for disputes on what exactly does that mean and going down a rabbit hold that really isn't necessary when we're taking our obligation seriously.

We understand that some of the information that will be disclosed in this litigation is sensitive and confidential. And we intend to comply with a protective order and securing data in a secure manner.

**THE COURT:** All righty. So I'm going to reject the defendants' proposed data security paragraph without prejudice to them later proposing something better.

At a high level, I think that at a protective order needs to be clear and it needs to be clear in terms of the words that are in it. And I think the defendants' proposed addition is quite unclear, and I think it's -- the language is vague and it's a stalking horse for two unstated things.

The first unstated belief is that the parties should store their documents on a cloud-based e-discovery vendor. I realize this is suggested in the second sentence as a manner in which the receiving party may comply with the data security provision. But I think that the unstated belief here is that they must do this.

And then that's coupled with a second unstated belief that, oh, of course, you can use particular documents on your laptop or email them in a secure manner in the normal way that you would to prepare for depositions. But that really isn't stated either.

And so there's just language about the standard industry practice, but what exactly you're supposed to do and how you're supposed to store the documents or use them in day-to-day workings isn't really spelled out here. And I don't want some kind of implied understanding that you're supposed to have them on a cloud vendor and then we all understand even though it's not really written anywhere that you can use them in the ordinary way to prepare for depositions or write motions or something like that.

We shouldn't have to have secret understandings because often those turn out not to be understandings. The defense may have a view that, oh, of course, you can do something but maybe a different defendant disagrees and it won't be clear to the plaintiffs.

So for now, I'm not going to agree with the proposed data security paragraph, but if the defense wants to go back to the drawing board and come up with something that's more specific and accurately conveys what you are intending as a practice, you can do that now. That won't stop me from entering a protective order with the standard language about secure

access. I'm just saying that down the road I would be open to modifying it if the defense can propose something more precise after you've met and conferred with the plaintiffs.

**MS. SIMONSEN:** If I may, Your Honor, just to clarify.

The idea behind this standard is it is to set forth a framework under which the security of a program is to be evaluated. The idea is not to set forth sort of the specific thing that you have to do in every circumstance. And that's based on that ABA formal opinion that I mentioned which recommends an actual program for protecting client data.

So the idea is to clarify that what constitutes a lawyer's reasonable efforts to prevent the access or disclosure of data, that that depends on the sensitivity of the information, the likelihood of disclosure without additional safeguards, the cost and difficulty of additional safeguards. So there is actually guidance that can be turned to on what is meant by industry standard practices and an industry standard program.

I would submit, Your Honor, that to the extent industry standard is considered to be vague, we actually have guidance on what that means. The term "secure," I would submit invites much more room for disagreement than does a term that actually has a formal opinion by the ABA backing what it means.

But understood that Your Honor may simply want to enter the order as-is and potentially revisit down the road if it

becomes an issue. And we will consider whether we can propose more specific language.

**THE COURT:** Okay. Thank you.

The next one is restrictions on experts to review confidential information. And that's both Paragraph 2.9 and 7.7. Let me pull those up.

There are a couple of issues here. One is in the definition of an expert. The defense had proposed to add the word "past or" meaning that the expert is not a past or current employee of a party or of a party's competitor.

I'm going to strike the word "past" because that could include like everybody, anybody who's familiar with the industry. There's a large chance they would have at some point in their career worked for one of the parties or of the parties' competitor. It's hard to know how someone could be an expert really if they had never worked for anybody in the industry.

And I also think that when it's a past employee, the danger of compromising information is reduced. But let me turn to Paragraph 7.7.

Let me turn to plaintiffs and ask you most of what is in Paragraph 7.7(a) is in the model order for highly-confidential information. And then the second paragraph that they've added, that the defense has added seems to actually reduce the required disclosures when the expert can't make them because

of a confidentiality obligations. So it seems to scale back the disclosure obligations.

So maybe I'll hear from the plaintiff what's wrong, how do you see the new Paragraph 7.7(a) as differing from the model order?

**MR. WARREN:** Thank you, Your Honor.

As an initial matter, I would note that the defendants do not appear to be in agreement with one another on 7.7. I believe Snap has proposed to use the alternative language also contained in the model order, and that's at Footnote 7 of the trade secrets model order. And it appears on Page 16 of the document I believe you're looking at, Alternative to Section 7.7.

We think that language from the model order gets pretty close to what is appropriate in this case. In other words, the model order has alternatives, right. It's not one and done. There's different ways to come at this.

And we think the clarity that there doesn't need to be disclosure of the identity of an expert as long as they're not currently working for one of the other defendants, that seems sufficient. We have several concerns with the way the other approach proceeds.

First of all, it would require us to identify the experts that we have as non-testifying experts, and that creates a real situation where we may be in a position of having to

disclose attorney work produce if those experts are never people we plan to put on the stand. And that is an issue that other courts have sort of considered and addressed and looked disfavorably including Corley v. Google, which is a case that defendants cite in their portion of the joint statement.

It talks about disclosure of non-testifying experts as impinging on, quote, protected work product and being unnecessary without a showing of, quote, substantial need by defendants. So that --

**THE COURT:** Well, on that point, I think that you're going to be asking for or maybe have already received and certainly will be receiving very sensitive information belonging to the defendants. And they want to know who's getting this stuff, like who has received this.

And why isn't that reasonable? Why shouldn't they at least know this is where this stuff has gone? They do have a concern that this stuff could show -- could be leaked on social media, it could show up somewhere. And if they have no idea where their materials went, then it's just how disclosures were made is -- they would have nobody to even figure that out.

I'm not suggesting that your people are going to be careless and leak things. It's just they do have a concern about algorithms and stuff and how -- being disclosed to the public. And if they just don't even know the universe of

people who got this highly-confidential information, I don't know, that seems quite a big ask.

**MR. WARREN:** Well, Your Honor, I think if that disclosure is limited to current employees of other defendants and competutors in the way that you had previously suggested that the term expert would be narrowed, I think that is appropriate. But if it's any past employee of anyone that's in any competitive positioning with respect to the defendants, then that's really all of our experts, right. There's no limits on that.

And effectively, we would be forced to disclose the identity of any expert that we're working with testifying or non-testifying even if they previously worked for a competitore 20 years ago and even if the nature of the competition had nothing to do with the products and algorithms at issue in this case.

That feels --

**THE COURT:** Sorry, you're conflating two different issues. One was that the word "past," the defendants were proposing to modify the definition of an expert to disable you from hiring somebody who had ever been an emplyee of the defendant or one of their competitors. And then I struck that. I said, no, you can't be disabled from hiring such people as experts.

That's just entirely different from the disclosure

obligation which would be anybody that you want to turn over their confidential materials to.

**MR. WARREN:** Right. And our concern there, Your Honor, is simply that we would be in a position of having to reveal far too much of our legal strategy and our attorney work product in having to reveal the identities of any testifying or non-testifying consultant or expert that we choose to retain, even if they're never going to be appearing in court or at deposition or in any public-facing way.

That's a real concern to us given that we don't really know what the bounds of highly-confidential information are going to be in this case and defendants haven't really provided us with any clarity around that.

We have tabled the issue of source code. I think with respect to source code, this is probably a provision that we could agree to. But -- and so what we're talking about here is non-source code highly confidential information. And I don't even really have a clear understanding as to what that is.

My concern is that anything that concerns the business strategy of one of the defendants would wind up being designated as highly confidential, putting us in a position of having to disclose the identities of everyone.

So we think the burden ought to be on defendants to justify a provision that impinges on our work product in such

an onerous manner. But they haven't done that other than to just say, you know, our stuff is super secret.

**THE COURT:** All right. Let me hear from the defense.

**MS. SIMONSEN:** Thank you, Your Honor. A few points.

First of all, as Your Honor observed, this provision is in the highly confidential model that this Court has endorsed in cases that involve exactly the type of information that Your Honor recognized will be an issue in these cases, and so it is presumptively reasonable.

And if you take a look at the Google Assistant Privacy Litigation case, in that case, the Magistrate Judge Keulen recognized that simply disclosing the identity of an expert does not impinge on work product protection. Rule 26 does not prohibit the discovery of the identity of experts. That's a quote from that case. The only thing that it restricts is the discovery of facts and opinions. I understand that the plaintiffs have cited the Corley case. That case is distinguishable.

Multiple experts had already refused to work as an expert for Google in that case. Very different circumstances than the vague types of concerns that plaintiffs have raised here. They are not precluded from using experts simply because they're going to have to disclose to us those to whom they are going to disclose our highly confidential information. There is simply no support as the Google Assistant Privacy

Litigation court found for an argument that identification of an expert pursuant to this provision of the protective order would somehow reveal the facts and opinions known to that expert, which appeared to be of concern to the court in Corley.

Backing up the moment to Section 7.7(a). I wanted to clarify, Your Honor, that the words passed as it relates to the experts that may not be retained by another party are in the highly confidential model order. Those are not words that defendants added. They are part of the model order for cases involving highly confidential information that will be at issue here.

And again, that makes that provision presumptively reasonable once it has been recognized that the highly confidential model is the one that should apply. Now, I think there is real concern if plaintiffs are allowed to hire past employees of a defendant or its competitors from serving as experts for plaintiffs or for other defendants. You know, simply asserting that it would severely limit their ability to retained qualified experts with absolutely no showing that it has actually restrain their ability to retain qualified experts, is not enough to meet the good cause standard that they must meet if they are requesting a departure from the highly confidential models definition of expert.

And it's actually in the Corley case that Magistrate

Judge Lloyd held and recognized that the court has repeatedly ruled -- this is the Northern District of California -- that it is usually improper to hire an opponent's former employee as an expert, because such an expert is substantially likely to inflict unfair prejudices, which the former employer cannot realistically discover, or guard against.

And so in the Corley case, the court agreed with Google, that the plaintiffs could probably find computer science professors, for example, who could be capable experts in the case, and that it would create an unnecessary risk of competitive harm if the court permitted the plaintiffs to hire the former employees of Google's competitors as experts. So I think for all of those reasons, both of these provisions, which again, are standard, routinely employed provisions of the highly confidential model in cases like this should be adopted.

**THE COURT:** All righty. I see -- I pulled up the model protective order and I see that you're correct that the past language is normally included.

The problem we're having on the facts of this case is that this is an MDL proceeding against an entire industry. And so disabling the plaintiffs from hiring as an expert, anybody who as a past employee of any of the defendants, or of any of the competitors of the defendants, that sweeps too broadly.

It means that nobody who has ever worked in this industry could be employed as an expert. And I think that that really kneecaps the plaintiffs in a way that's inappropriate. But with respect to the disclosures in the proposed 7.7 paragraph that defendants have requested, I think those are appropriate.

And again, I think, given the sensitive nature of the information that the defendants either have produced or are likely to produce, they're entitled to know who has this. And I don't think that disclosing the identities of all non-testifying experts, reveals privileged or work product information. This doesn't require disclosure of their work or their opinions or anything like this.

But I think defendants are entitled to know who has their material, and they're entitled to the other information in Paragraph 7.7(a), so they can make an appropriate challenge. If there's a basis to do so, to the retention of an expert. I think they do have an important stake. Without this information, there's no way they could meaningfully challenge somebody as an expert, even if they had a legitimate and good basis to do so.

I think so I'm going to agree with the defendants about Paragraph 7.7(a), as well as the I guess it's included in 7.7(a), their next paragraph about what to do if a noncompete or I'm sorry -- if a nondisclosure obligation prevents the experts on making the require disclosure in the first

paragraph or 7.7(a).

**MR. WARREN:** Your Honor, may be heard very briefly?

**THE COURT:** Sure.

**MR. WARREN:** The defendants have added language to the model or regarding what needs to be disclosed. Language concerns, any patents or patent applications in which the expert is identified as an inventor or applicant, is involved in prosecuting or maintaining or has any pecuniary interest. That's not a language that appears in the model.

We don't see that as being necessary or pertinent. It really seems more like an effort to have our potential experts maybe be dissuaded from signing up with us. This isn't a patent case, and we just don't see that information as being necessary.

**THE COURT:** Yeah. You're right, that that patent language is not likely in the model order. But I think in the context of this case, it's most likely to be disclosed, it's legitimate information for the defendants, you know, to inform whether they want to make a challenge, and whether there's a basis for a challenge to an expert. So I'm going to agree that that language can be included.

**MS. SIMONSEN:** (Indiscernible) --

**MR. BEISNER:** Your Honor, if I may just --

**THE COURT:** Sure.

**MR. BEISNER:** I'm sorry, Your Honor. John Beisner for

Snap. I think we understand your ruling. I just wanted to note for the record that we as defendants, were not in agreement with the -- as you put it, the defendants' position on that, and we do not think these disclosures should be required. But we hear your ruling on this. And actually now I just want just to note that for the record.

**THE COURT:** Okay. Thank you for that clarification. I appreciate that.

**MS. SIMONSEN:** Your Honor, if I may just go back for a moment to the past employees of a party or its competitor. Your Honor, noted that your concern is with the entire industry of former employees being off limits. Would it be acceptable to Your Honor, it seems there may be a recognition that at least past employees of the defendants themselves should not be able to be hired as experts for the plaintiffs or for other defendants, which would really pose a great deal of risk to the -- and compromise their confidential information. I wonder if Your Honor would be open to using language past employees of a party and then simply striking or its competitor.

**THE COURT:** I'm not willing to do that in the definition of an expert precisely because the defendants appear to include the entire social media industry. However, you know, one reason for your proposed Paragraph 7.7(a), is that when the plaintiffs come forward and say, here's a proposed expert

that we want to give your confidential materials to, that's when you can make a challenge that is particular to that expert.

So if they were to come forward with a past employee of one of the defendants, and you have good reason to believe that person might pose a risk to you, that's the time at which you can make the challenge. In other words, I'm just unwilling to agree that as a principle, there can never be an expert, who was a past employee of one of the defendants. I'm not going to embrace that.

But that's without prejudice to your objecting under your Paragraph 7.7. If there is a particular past employee, and you have reason to think that that person might not be appropriate as an expert, so I hope that makes sense.

**MS. SIMONSEN:** Understood, Your Honor.

I would just simply point out that that really the four defendants in this case do not represent the entire industry. There are a large number of other companies that provide online communication services, social media services. Just a few off the top of my head would be, you know, Twitter.

I mean, and the types of algorithms that plaintiffs are challenging here are used really across the internet. And I simply don't think it's the case that plaintiffs need someone who is a former employee of these particular defendants, right, in order to put forth an expert who can explain the

type of information, the types of algorithms, and, you know, data science issues that are going to be at issue in these cases.

**THE COURT:** Okay. Well, I appreciate your point that it's not the entire industry. So thank you for that clarification. I'm going to stand by my ruling though, that I'm not going to sweepingly say that no past employee of any defendant can be used as an expert. But that's without prejudice to making a showing. If there's a particular past employee, and you have good reason to think that that person would be problematic, then you could make such a challenge.

**MS. SIMONSEN:** Thank you, Your Honor.

**THE COURT:** The next issue is Paragraph 7.5. Let me just pull that up. If I understand correctly, there are two issues with 7.5. One is whether any in-house counsel can have access to highly confidential information. And at that point, I believe, TikTok, as opposed to the other defendants' proposals.

And then another issue is whether in a deposition, you can show anything to the witness, including highly confidential material that that person had never seen before. And so let me turn first to the in-house counsel issue. And let me hear from TikTok first.

**MS. FITERMAN:** Thank you, Your Honor. Amy Fiterman on behalf of TikTok. TikTok's proposal in this particular

situation is simply that the parties adopt the default language of the highly confidential order and Attorney Simonsen just moments ago, indicated in regard to Section 7.7, that as given that that was language that came out of the highly confidential order, which this Court has already indicated, should be appropriate for this case, that it was presumptively reasonable.

And that is what -- that is TikTok's position exactly, is that this is presumptively reasonable to keep extremely sensitive information out of the hands of in-house counsel. I --

**THE COURT:** Well, I want in-house counsel have to be meaningful participants in the case. They have to be able to read depositions and follow them and provide guidance to executives. Obviously, they can't disclose highly confidential information to their executives, but they need to be able to manage that outside counsel and provide appropriate legal advice to their clients.

And I'm worried that the defendants will designate so much as highly confidential, that if I say in-house counsel, I can't see any of that. I'm just worried about their ability to manage their case and provide guidance to their client. So can you speak -- please speak to that concern?

**MS. FITERMAN:** Certainly, Your Honor. Well, as an initial matter, over designation of documents is highly

confidential or even confidential, is inappropriate, and all parties should be striving to follow their obligations under what their designations are. So the parties as an initial matter, to the extent there is a highly confidential competitor designation, it needs to be made in good faith to that point.

But to the point of in-house counsel being able to be active participants in the litigation, that is true, but that is the case in all litigation. And the case law surrounding whether in-house counsel can have access to highly confidential competitor or attorney's eyes only designated material doesn't draw a black and white line in that respect. And in fact, the case law suggests, in particular under the brown bag ruling that the risk of disclosure has to be weighed against the prejudice to the receiving party.

And so that's really the rule that we need to be following here and what we need to be looking at in this particular situation. And in this particular situation, in this litigation, the prejudice to the receiving party and simply not being -- having in-house counsel not being able to see attorney's eyes only or highly confidential information, does not overwhelm or negate the risk of disclosure.

Here we have parties who are all competitors, and they are -- not only are they competitors, but they are competitors we would all agree in a highly competitive space and a highly

public space within that competition.

And so the very nature of the documents that are going to be produced in this case, given the allegations that the plaintiffs have made, are necessarily going to put documents produced that concern ways that all of these various services function. And so the need to protect that information TikTok suggests is going to outweigh any of that prejudice to any receiving party.

And courts have agreed with that by noting that if you can't show prejudice, there are various ways that no prejudice is demonstrated. One of those is where all of the parties are represented by highly competent outside counsel. That is absolutely the case in this litigation. All of the defendants are represented by very competent counsel who represent defendants in this particular industry all the time. And so that should be something that is taken into consideration.

Additionally, in this particular case, unlike all of the cases that have been cited by the other codefendants in this case in support of their position here is the defendants do not have cross claims against each other in this case. We're all defendants, but nobody is making claims against each other, unlike other trade secret cases where this provision is usually used, or can be used, where the parties are actually competing against each other.

And so in-house counsel and being able to effectively

direct the prosecution of their case is in need of the other parties' highly confidential documents. In this particular case, the other defendants have made no showing whatsoever, that they need these documents in order to prepare a defense in this case.

Every defendant has to defend their own service, their own platform. And so allegations being made against other defendants and their platforms is not relevant or cogent to the defenses that any other defendant is going to be making in this case.

So that's a very important distinction, in that any in-house counsel who wants to be a, you know, an integral part of their defense, there's absolutely -- and they have not shown any need for highly confidential or attorney's eyes only documents that would be used only for the most highly sensitive information.

And the prejudice to the potential disclosure of those documents, you know, TikTok's documents within Snap, within Meta, within Google is such a risk, that it simply outweighs any other prejudice that might be received by -- you know, be purported to the receiving party. And that was outside counsels' guidance, that all can be worked through, Your Honor.

**THE COURT:** All right. Thank you. Let me hear from the other defendants on this point.

**MS. HARDIN:** Yes. Ashley Hardin, Your Honor, from Williams & Connolly, on behalf of YouTube. The issue here is balancing. I agree with Ms. Fiterman about that. You have to balance the risk of an inadvertent disclosure of sensitive information. But you also have to balance that against the issue that Your Honor so aptly pointed out, which is the in-house counsel is really the manager of these litigations. They are the client, and they need to have a full scope, a full picture of the information here.

And I heard Ms. Fiterman speak a lot about risk of disclosure, but she didn't mention any of the safeguards that the defendants are willing to put in here, which is a safeguard even above what is required and what is mentioned in the highly confidential model.

What we are -- what Meta and YouTube and Snap are proposing is that the Court adopt the optional language in the highly confidential model, which would allow up to two in-house counsel to receive the highly confidential information of the other defendants. But those two in-house counsel could not be competitive decision makers at their respective companies.

And what that means is that they would not, for example, have responsibility for things like pricing product or service development, contracting, intellectual property. They would instead be the in-house counsel who are responsible for

managing and advising on the litigation. But even above and beyond that, the defendants are willing to engage in even more restrictions in order to address the concerns that TikTok has identified, which is for example, we would only have -- in-house counsel would only have access to the highly confidential material of other defendants on a third-party secure platform and the access would be read only. It would not be unfettered access. We are not asking for access for in-house counsel to source code as well.

And in addition to that, as part of the access, in-house counsel would have to agree to be bound by the protective order. They would have to identify themselves by name. And they would have to identify their job description so that the Court can evaluate whether or not they are in fact, competitive decision makers. And there is a process for contesting that particular in-house counsel that would have access.

We think that those protections more than adequately take care of the concern of the risk of disclosure. And in cases routinely allow in-house counsel who are not competitive decision makers to have access to this type of information. And they do that because for the very reason that because of who they are, the risk of disclosure is quite low.

I haven't really heard an articulation of what the risk is other than the fact that these are defend these are

competitors, which is of course true, but it's going to be true in many cases in which this optional language is used. And the optional language is just as presumptively valid as the other language that is found in the model. So it's not that this is somehow a new or novel ask.

And in terms of why counsel need -- in-house counsel need this information, in addition to what Your Honor identified as just the basic managerial aspect of the litigation, in this particular case, there is joint briefing has been ordered, and the parties must work together. They're already in the process of doing that. Motions to dismiss are due very soon.

And in order for in-house counsel to be able to even review the documents, the briefs that are being submitted on their own behalf, someone at in-house -- at the companies needs to review that material. Otherwise, given the sealing order in this case, not even a redacted version of briefs would be available to anyone in-house for 10 to 12 days.

We think that's untenable in a case of this magnitude and of this importance, and in a case where there is such not only essential work that has to go on between defendants, but a required working together.

So in the cases that we've cited, Your Honor, I won't repeat them, that allow this type of access, on the contrary, TikTok has not cited a single case where in-house counsel who are not competitive decision makers have been denied access to

this type of material. The two cases they cite; the Pinterest case and the Adobe Systems case adopted this provision that in-house counsel would have access to highly confidential material if they qualified as noncompetitive decision makers.

And the issue in those two cases was whether or not the particular in-house counsel were in fact noncompetitive decision makers. And in one case, the Pinterest case, the court said yes, in fact, they are. Their purview is much greater. They do involve things like intellectual property, contracting, marketing. And then in the Adobe Systems case that wasn't even an in-house counsel, it was an as a counsel to an outside party, a trade organization.

So we think they the protections are reasonable in this case. And in order to maintain the interest of in-house counsel to have a full picture of the litigation, it's necessary in this case, Your Honor.

**MS. FITERMAN:** Your Honor, might I just address a few things in that regard that counsel said I hadn't addressed yet?

**THE COURT:** I need to wrap up this hearing by 10. Because I have another thing at 10. But I understood -- I'm going to follow the approach recommended by the majority of the defendants. I appreciate your arguments, and thank you for them.

**MS. FITERMAN:** Thank you, Your Honor. Can I just ask one

quick question? Section 2.3 with regard to competitive decision making. TikTok's other position was that if the Court is inclined to go with the majority view on this, that it should still strike Section 2.3, the definition of competitive decision making because it does not follow case law.

It doesn't include people who are making legal decisions, and brown bag makes it very, very clear that legal advice is included in competitive decision making. So the way that this has been defined in this proposed protective order goes contrary to the case law on this subject.

And there are courts that have decided that the parties can have certain in-house counsel review, highly competitive information, but struck the definition of competitive decision making out of the actual protective order itself, because that's a case-by-case decision that would have to be made, understanding who the in-house counsel was with regard to case law that defines what competitive decision making is.

And I referenced the Phillips v. Global Medical Imaging, 343 F.R.D. 59 (2002). So we would secondarily request, Your Honor, that we strike Section 2.3 if we're going to go with the majority's position on this.

**THE COURT:** Then that would leave the term competitive decision making undefined, which would be unacceptable because we wouldn't know what it means.

**MS. FITERMAN:** But there is, Your Honor, the various under the U.S. Steel in brown bag, they have defined what competitive decision making is. And that is not what this Section 2.3 holds out as the proper definition under the case law. That's the point.

**THE COURT:** I don't want to have a term that's undefined. That's very important. That governs in-house counsel access. I have no definition of what it means and the answer to be oh, go do some legal research and review the case law, you know, come up with something. I don't think that provides appropriate guidance.

**MS. FITERMAN:** Your Honor, could we use guidance from U.S. Steel then rather than the definition that that the other party has put together that we believe doesn't follow that?

**THE COURT:** I think Paragraph 2.3 is fine.

**MS. FITERMAN:** Thank you, Your Honor.

**THE COURT:** Do plaintiffs have a view on the in-house counsel issue, or do you not care?

**MR. WARREN:** We do not have a proverbial dog in the fight, Your Honor.

**THE COURT:** Okay. You do have a dog in the fight, however, on who can be shown highly confidential documents at depositions. And I think you believe that can be -- that it should be any witness. Is that right?

**MR. WARREN:** Well, not quite, Your Honor. The way we've

set it out, is that it can be a witness to whom disclosure is reasonably necessary, who signs Exhibit A, and agrees to be bound. But there are actually further limits to that as well in what we have set out in 7.4, which is struck through in ECF 192-1, and that prohibits the disclosure of documents to either the individual plaintiffs or officers, directors, and employees of another defendant.

**THE COURT:** Okay. I'm going to go with a proposal recommended by the majority of the defendants, which is that as far as witnesses, it can be the author or recipient of a document containing the protected material, and any custodian or other person who otherwise possessed or knew the information contained in the protected material.

I think the purpose of a deposition is to find out what the witness knows and to cross-examine the witness about what they know, but not to introduce highly confidential information to somebody who wasn't aware of it already. I don't think that's an appropriate use of highly confidential information. And I'll note that the defendant's proposal seems to be more in keeping with the model order.

So I'm going to go with the majority of the defendants' proposals on who could have access to highly confidential information, I realized I missed an issue, which is in Paragraph 7.3, that the bulk of the defendants would like insurance representatives to be able to see regular

confidential information, not highly confidential, just regular confidential, and TikTok is opposed to this. So let me hear from Tech Talk on this point.

**MS. FITERMAN:** Thank you, Your Honor. And I'll be brief understanding the time. TikTok's position, Your Honor, is that insurers are not parties to this and the other defendants have cited no case law that indicates that a court has ever allowed insurers to have access to confidential information outside of agreement amongst the parties.

And so we think the case law in this particular instance, is absolutely on the side of keeping insurers out of the protective order of being able to see confidential information.

And, also, in regard to Section 13.2, the other defendants have indicated that the insurer should be the only ones who have the ability to keep confidential information past the prescribed time period after a case is terminated in which normally parties should have to either destroy or return confidential information, the suggestion being that insurers need to be able to keep those as a part of their files.

TikTok is opposed to that as well, for the reasons previously stated that insurers shouldn't then -- one, they're not even parties, but then they shouldn't be treated differently and be able to keep confidential documents for an inarticulate amount of time after a matter has ended.

**THE COURT:** Where are you pointing to the insurer language with regard to retaining documents after the case is over?

**MS. FITERMAN:** Section 13.2.

**THE COURT:** Oh, I see.

**MS. FITERMAN:** And to the extent, Your Honor, that other in-house counsel, you know, have indicated that for in-house counsel, they would put parameters and protections around highly confidential information so that it might only be seen on a shared site, and they wouldn't actually get possession of any of this material.

At the very least, since that's going to be in the protective order at this point, the same, if we're going to even allow insurers to see confidential information, which we argue they should not be able to, they certainly shouldn't be able to take copies of those documents, put them in their files and not have to destroy or return them after the matter is closed.

**THE COURT:** All right. Let me hear from the majority of the defendants briefly on their insurance issue.

**MS. SIMONSEN:** Yes, just briefly, Your Honor. There's an obvious distinction between highly confidential competitor information that we're asking to in-house counsel to be able to see versus confidential information, which is at issue with respect to the insurance disclosure issue.

On the point about retaining the information indefinitely, which is I believe what TikTok had stated in the letter briefing, the insurers are not permitted to retain it indefinitely. They must return or destroy the information within 60 days of the resolution of any insurance coverage litigation arising from the matter, or at the end of any legal regulatory, or contractual obligations the insurers may have.

And that's necessary, because insurers often need to retain client materials for regulatory reasons, for instance, if they're later audited. And so they need to preserve the documents, but beyond the end of any underlying litigation. On the broader point of why they need this access, policyholders have a contractual obligation to cooperate with their liability insurers so that the insurers have sufficient information to know whether they should agree to fund defense costs, settlements, et cetera.

And without providing access to litigation materials that may contain the party's confidential information, the insurers could take the position that they lack the information necessary to fund or even consent for a party to pay defense or liability costs, including settlement costs. So their lack of information -- access to this information could give rise to arguments that the defendants breached their insurance policies and void the insurance coverage. And --

**THE COURT:** I think I read it. Thank you.

**MS. SIMONSEN:** Okay.

**THE COURT:** And plaintiffs, do you care about this issue?

**MR. WARREN:** We do not, Your Honor.

**THE COURT:** Okay. I'm going to go with the position advocated by the majority of the defendants that for regular confidential information they can turn it over to their insurance representatives, and then the proposed Paragraph 13.2 is acceptable. Let's see. We've got I think, two more issues. One is the definition of source code that is proposed in Section 2. Just pulling it up, 2.22.

I'm going to strike the definition of source code in Paragraph 2.22. Not because I have an opinion about whether it's correct or not, but because my understanding is there's going to be a separate protective order governing source code, and I think you should define it if they're not here.

But let me ask defendants. Do you agree that will be a separate protective order governing source code?

**MS. SIMONSEN:** We do, Your Honor. And we're happy to define it in that order.

**THE COURT:** Okay. Good. The last issue then, is Paragraph 12.4, which is export controls. And pull that one up. Let me ask defendants, I view this as doing two things.

The first two sentences look to me like a restatement of existing obligations where it says, "Disclosure of protected material shall be subject to all applicable laws and

regulations, et cetera." And the next sentence says, "Receiving party shall comply with all applicable export control laws and regulations."

I don't think I need to say in a protective order applicable laws are applicable. If they apply, then they apply, but we need to restate other laws in this protective order. So let me ask the defendants. For the first two sentences of Paragraph 12.4, is that anything more than a restatement of existing law?

**MS. MACHOCK:** Samantha Machock from Wilson Sonsini on behalf of YouTube speaking on behalf of the defendants.

No. I think the first two sentences are just intended to clarify that yes, the parties will comply with all applicable laws, and they're drawn -- that concept is drawn from the model order.

**THE COURT:** Okay. Thank you. I don't think we need to include those sentences. And then the remainder of this is says, "No particular material may leave the territorial boundaries of the United States or be made available to a foreign national who's not lawfully admitted," et cetera, and so on. And restricting where the material can be viewed.

Look, I understand that highly confidential documents, very sensitive documents, computer algorithms, are likely to be produced in this case, and it may be that some of the materials produced by the defendants need to comply with

materials like this. My problem with the way that the remainder of Paragraph 12.4 is drafted is that it applies to all protected material, every single email that has the word confidential stamp on it, everything.

And I don't like the idea there just because the case involves some highly sensitive information that therefore we ratchet every single confidential material to the highest degree. I don't like doing that. So I'm not going to include the balance of Paragraph 12.4 that subjects all protected material to these restrictive conditions.

However, as I've said with other things, if the defendants want to come back after this order is entered, and propose something narrower to certain kinds of protected material, where you think this extra level of protection is necessary, that I would want you to meet and confer with the plaintiffs, and I'd be willing to take a look at that.

I'm just not willing to do this sweepingly to all of the protective material that's produced in the case. I think that that is overbroad. So for those two reasons, I'm not adopting Paragraph 12.4.

**MS. HARDIN:** May I speak, Your Honor, on this?

**THE COURT:** Sure.

**MS. HARDIN:** Because this is actually a -- this is a really important provision. And the reason that it sweeps broadly now is because plaintiffs have not engaged and have

refused to engage about source code. And without a clear definition of source code, as well as a clear definition of highly confidential information, it is not possible to cabin this.

We are open -- defendants have expressed in meet and confers that we are absolutely open to cabining this as some of the precedent cases we have cited have done, to highly confidential competitor and source code information. But those terms must be defined. And we cannot cabin this without clear definition of those terms.

And I would just point out that this provision, and the way it is drafted tracks -- it's many cases that have entered this almost, you know, either identical language, or materially identical language. And it's important to how this more detailed language that defendants have, because these are extremely, extremely complex and technical regulations. And the penalties for noncompliance are severe, and they're severe for defendants if plaintiffs violate them without our knowledge.

So Microsoft, for example, was just sanctioned $3.3 million, based on disclosures made by non-parties that Microsoft didn't even have any knowledge about. And the reason the sanctions were, "only 3.3 million" was because Microsoft didn't know that the disclosures occurred in violation of export control laws.

So what our -- just to give you a big picture, what our provision is attempting to accomplish is providing very clear guidance to all parties and experts and anyone else who might get access to this information about what compliance with export control laws mean, because these are extremely technical --

**THE COURT:** Counsel, it's not true --

**MS. HARDIN:** Yeah.

**THE COURT:** -- that every single email that someone designates as confidential, is governed by export control laws. That's just not true.

**MS. HARDIN:** Absolutely. I agree with you.

**THE COURT:** Provided the clarity -- but your clarity you provided is that absolutely everything that is considered protected materials is subject to these onerous restrictions about where it can be viewed. And that's a massive expansion at the export control laws. That's just not what they provide for.

So if you want if you have highly competitive, sensitive information, or again, source code really isn't at issue in this protective order, because you're going to have a separate protective order that deals with source code. But if there's other stuff, and you want a clear definition about what these laws apply to, and the plaintiffs aren't willing to meet and confer with you, then file a joint discovery letter brief and

put the language in front of me and I'll decide.

But Paragraph 12.4 doesn't give you that. The first two sentences just say applicable laws are applicable, and that doesn't provide anyone with guidance about anything. And then the remainder of the paragraph just says that all protected material are subject to these other restrictions. And that's just vastly overbroad, because it's not true that every single email that says you needed confidential, is worthy of that treatment.

So I'm not disagreeing with the principle that you've articulated, which is that it's important for export control laws to be complied with, and that the guidance should be provided. That would be good. But this paragraph -- this 12.4 paragraph doesn't provide that guidance.

So I think if you want more specific guidance, then you should meet and confer with the plaintiffs and file a joint discovery letter brief and have more precise language. It shouldn't just say applicable laws are applicable, and then no protected material of any type can be used in certain ways. That doesn't do the trick. So just --

**MS. SCULLION:** Can I -- I'm sorry.

**THE COURT:** Go ahead.

**MS. SCULLION:** No, I apologize. This is Jennifer Scullion for the plaintiffs.

Your Honor, we agree. We're absolutely willing to meet

and confer on this and agree with everything you just said here. One thing I would add is one thing that the defendants did take out from the language that's in the model protective order for trade secrets is that the producing party shall be responsible for identifying any such controlled technical data.

We agree these are important issues. We want to get it right. But that means we shouldn't have to guess and it also shouldn't be overbroad, as Your Honor has indicated. We'd love to meet and confer with defendants on this and get this right.

**THE COURT:** Okay. Then I think the parties should do that. So in fact, I'm going to go further. I'm going to order you to do that. I order the parties to meet and confer about all language regarding export controls. And then if you can't reach an agreement, file a joint discovery letter brief with competing language and put that in front of me.

**MS. SCULLION:** Thank you, Your Honor.

**MS. HARDIN:** Thank you, Your Honor.

**THE COURT:** I think I have ruled on everything teed up by the joint discovery letter brief.

**MS. SIMONSEN:** Your Honor, there's one remaining issue, which is -- and I know you're out of time, but just to flag it for you. It's Section 6.3 on shifting the burden for confidentiality challenges after --

**THE CLERK:** Excuse me. Judge, I just want to let you know, I've sent an email to the parties saying you're running a little late.

**THE COURT:** Thank you, Rose. I appreciate that.

**THE COURT:** Yes. Okay, you're right. I'm not going to adopt the burden shifting.

As plaintiffs point out, if they made 200 confidentiality challenges, and were right 90 percent of the time, but there's not a basis for shifting burden. If the number of challenges becomes excessive, then I may revisit this issue.

A lot of things we're doing with the protective order are based on experience and how things are often played out. And if the experience in this MDL proceeding turns out to be different from what I'm expecting, or unusual and more time consuming than what I'm expecting, then absolutely, I'll be willing to revisit issues.

But I don't think right at this juncture, I have a basis for shifting the burden. But I might later if there are more challenges. But thank you for bringing up that issue. You're right. That was teed up by the letter brief.

**MR. WARREN:** And Your Honor --

**MS. SIMONSEN:** Nothing from defense, Your Honor. Thank you.

**MR. WARREN:** I believe there's two other issues, hopefully quick. Also in 6.3, the defendants had requested a

change regarding the amount of time for a challenge. They changed it from 30 to actually I believe 21. And so that is pending for your resolution.

**THE COURT:** Okay. I'm going to stick with the 21 days, not the 30.

**MS. SIMONSEN:** Thank you, Your Honor. We would just ask if there are voluminous challenges to the confidentiality designations, to your point, that we'd be permitted to revisit the issue of whether additional time may be needed to respond.

**THE COURT:** Yes. If circumstances arise, you are free to revisit this.

**MR. WARREN:** And Your Honor, one other last issue. We would -- plaintiffs would ask, going back to the issue of showing witnesses highly confidential material. If there's a 30(b)(6) witness, we would ask the ability to show the 30(b)(6) witness highly confidential material from that party.

**THE COURT:** Well, let me hear from the defense. What do you think?

**MS. SIMONSEN:** I think the same provision should apply. It can be shown to them if they were someone who, you know, received or sent or knew about the information and/or possessed the document at issue. I will say I don't believe that this was teed up before this conference.

So I'm -- I think it's something that if plaintiffs want to propose this now, I think we'd have to meet and confer with

them on it. And maybe we cross this bridge when it becomes an issue. But my immediate reaction is that we should just stick with the language that Your Honor has already adopted.

**MR. WARREN:** Your Honor, the issue for us is if the defendants --

**THE COURT:** Hold up.

**MR. WARREN:** I'm sorry.

**THE COURT:** One thing that Ms. Simonsen said they carried the day, was that this wasn't teed up in the written briefing and the parties should meet and confer. I think that's a good idea.

**MS. SIMONSEN:** Thank you, Your Honor.

**MR. WARREN:** We will do so. Thank you.

**THE COURT:** So I'll stick with the existing defense language. And then I'll direct the parties to meet and confer about a 30(b)(6) witness and how we should handle that situation. I recognize that it's different, because even if that particular person hasn't seen something, it's likely the person who's the witness. So it's a different issue.

So I think the two sides should have think about it meet confer. If you can't reach agreement, then file a joint discovery letter brief.

**MR. WARREN:** Thank you, Your Honor. Appreciate it.

**THE COURT:** And plaintiffs, anything further that you'd like to raise this morning?

**MR. WARREN:** No, Your Honor. I believe that covers it.

**THE COURT:** Anything further from the defendants?

**MS. SIMONSEN:** Nothing from the Meta defendants' perspective. Thank you very much, Your Honor, for going through these issues with us. It's been very helpful.

**THE COURT:** Any other defendants?

**MR. BEISNER:** (Indiscernible).

**THE CLERK:** Mr. Beisner, we can't hear you.

**MR. BEISNER:** (Indiscernible).

**MS. BELL:** I believe he was saying nothing on behalf of Snap who I also represent.

**THE COURT:** All right. Thank you. Well, then, with the guidance provided, I would like plaintiffs to submit a proposed protective order in keeping with my rulings today. What I want you to do is based on my rulings today prepare a proposed protective order.

And then I want you to run up by defense counsel to see if they agree that your proposed order is consistent with my rulings today. And then if there is an agreement, then please go ahead and file the proposed protective order.

And if there's a dispute about whether the plaintiffs proposed or complies with my rulings today, then please submit competing versions with a joint discovery letter brief explaining why each of you thinks the other side is wrong.

**MR. WARREN:** Your Honor, if we are able to reach

agreement in the two meet and confers you've ordered, may we include that language in the proposal even though, you know, it's not something you've ruled on or addressed?

**THE COURT:** If you're able to reach an agreement, then that would be fine. Yes.

**MR. WARREN:** Thank you, Your Honor.

**THE COURT:** And then, just when you file something, please indicate whether the defendants agreed with what you're filing or whether they didn't, because then if they didn't, I'll look for a competing proposed order from the defendants.

**MR. WARREN:** Of course, Your Honor.

**THE COURT:** Anything on this process note the defendants would like to comment on?

**MS. SIMONSEN:** No, Your Honor.

**THE COURT:** All right. All right. Well, thank you, counsel. The matter is submitted and I look forward to receiving your upcoming filing either a proposed order that the defendants agree complies with today's rulings, or competing versions and then I'll sort that through. Thank you very much.

**COUNSEL:** Thank you, Your Honor.

**THE CLERK:** Thank you, everyone. We're off the record in this matter. Court is in recess.

(Proceedings adjourned at 10:09 p.m.)

---000---

**CERTIFICATE OF TRANSCRIBER**

I, DIPTI PATEL, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court for the Northern District of California of the proceedings take on the date and time previously stated in the above-entitled matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken.

I further certify that I am not financially nor otherwise interested in the outcome of the action.

DIPTI PATEL, CET-997

LIBERTY TRANSCRIPTS Date: April 19, 2023