**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: ROBLOX CORPORATION CHILD SEXUAL EXPLOITATION AND ASSAULT LITIGATION<br><br>This document relates to:<br><br>*John Doe L.S. as guardian of Jane Doe A.S v. Roblox Corp. et al.*, No. 3:25-cv-10607 **[A.S.]**<br><br>*Mary Doe, as next friend of Jane Doe v. Roblox Corp. et al.*, No. 3:25-cv-07291 **[M.D.]**<br><br>*T.T., as parent of D.H. v. Roblox Corp.*, No. 3:25-cv-10812 **[D.H.]**<br><br>*Mary Doe, as next friend of Jane Doe v. Roblox Corp. et al.*, No. 3:26-cv-00810 **[I.S.]**<br><br>*Jane Doe v. Roblox Corp. et al.*, No. 3:25-cv-03520 **[A.J.]**<br><br>*Jane Doe M.O. as guardian of Jane Doe J.H. v. Roblox Corp. et al.*, No. 3:26-cv-01681 **[J.H.]**<br><br>*Jane Doe. v. Roblox Corp. et al.*, No. 3:25-cv-05753 **[P.C.]** | MDL No. 3166<br>Case No. 3:25-md-03166-RS<br><br>**PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO COMPEL ARBITRATION** |

# TABLE OF CONTENTS

**Page**


INTRODUCTION ........ 1

STATEMENT OF FACTS ........ 3

I. Defendants profit from minor engagement and inadequate age verification. ........ 3

II. Defendants' platforms are, by design, addictive for children. ........ 5

III. Plaintiffs are children abused, exploited, and raped through Defendants' platforms. ........ 6

IV. Plaintiffs disaffirmed any agreements to arbitrate. ........ 8

LEGAL STANDARD ........ 9

ARGUMENT ........ 11

I. The EFAA Bars Enforcement of Any Arbitration Agreement Against Every Bellwether Plaintiff. ........ 11

A. The EFAA Applies Because Each Bellwether Case Relates to a "Sexual Assault Dispute" or "Sexual Harassment Dispute" ........ 12

1. *Every Plaintiff alleges a "sexual assault dispute."* ........ 13

2. *Alternatively, each Plaintiff alleges a "sexual harassment dispute."* ........ 19

B. The EFAA Does Not Require That the Defendant or its Employees Commit the Abuse. ........ 20

1. *The statute contains no defendant-or-employee limitation.* ........ 21

2. *Courts almost uniformly have rejected Defendants' interpretation.* ........ 22

3. *The legislative history supports Plaintiffs' position, not Defendants' limitation.* ........ 23

4. *No narrowing canon applies.* ........ 24

C. Defendants Cannot Escape the EFAA Through Post-Filing Clicks. ........ 25

1. *Defendants largely seek to enforce pre-dispute arbitration agreements, which the EFAA prohibits.* ........ 28

2. *Defendants have not shown a knowing waiver of a statutory right.* ........ 28

3. *Defendants obtained purported post-filing agreements from represented minors, without their counsel.* ........ 30

4. *Enforcing purported post-filing agreements would prevent effective vindication of Plaintiffs' EFAA rights.* ....31

D. Enforcing Any Post-Filing Agreement (Including Any Delegation Agreement) Would Be Unconscionable. ....32

1. *The purported agreements are procedurally unconscionable.* ....33

2. *The agreements are substantively unconscionable.* ....35

E. Roblox Does Not Present Sufficient Evidence of Any Post-Filing Agreement Accepted by Plaintiff J.H. ....35

II. Any Agreements Reached While Plaintiffs Were Minors Are Unenforceable Because Plaintiffs Have Disaffirmed Them. ....37

A. Plaintiffs' Disaffirmance Voids the Arbitration Agreements in Every Relevant State. ....38

B. Disaffirmance is a Question for the Court, Not an Arbitrator. ....39

C. Defendants' Arguments Against Disaffirmance Fail. ....43

1. *Plaintiffs' parents did not and could not bind them to arbitrate.* ....44

2. *Plaintiffs' continued use does not defeat disaffirmance* ....48

3. *False birthdates would not bar disaffirmance.* ....51

III. Roblox's Arbitration Clause and the "Mass Arbitration" Rules It Invokes Are Unconscionable. ....53

A. FedArb's Mass Arbitration Procedures Are Not Entitled to the FAA's Protections. 54

B. Absent FAA Preemption, Roblox's Arbitration Agreement is Clearly Unconscionable Under California Law. ....57

IV. Defendants Have Not Shown That Plaintiffs Agreed to Arbitrate. ....60

A. Defendants' Flows Did Not Provide Reasonably Conspicuous Notice. ....62

B. Plaintiffs Did Not Unambiguously Manifest Assent. ....65

CONCLUSION .... 67

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A. A. v. Roku, Inc.*,
2026 WL 1349064 (N.D. Cal. May 14, 2026) ....................46

*Abramson v. Juniper Networks, Inc.*,
115 Cal. App. 4th 638 (2004) ....................35

*Aguilar v. Midas Trucking*,
2025 WL 483699 (Cal. Ct. App. Feb. 13, 2025) ....................36

*Am. Exp. Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013) ....................31

*Angelilli v. Activision Blizzard, Inc.*,
2025 WL 524276 (N.D. Ill. Feb. 18, 2025) ....................42

*Antonetti v. Activision Blizzard, Inc.*,
764 F. Supp. 3d 1309 (N.D. Ga. 2025) ....................42

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) ....................55

*Avery v. TEKsystems, Inc.*,
165 F.4th 1219 (9th Cir. 2026) ....................26, 27, 33, 40

*B.D. v. Blizzard Entm't, Inc.*,
76 Cal. App. 5th 931 (2022) ....................62, 63

*B.F. v. Amazon.com Inc*,
858 F. App'x 218 (9th Cir. 2021) ....................50

*Bakersfield Coll. v. Cal. Cmty. Coll. Athletic Ass'n*,
41 Cal. App. 5th 753 (2019) ....................34

*Baltazar v. Forever 21, Inc.*,
62 Cal. 4th 1237 (2016) ....................35

*Basiente v. Glickman*,
242 F.3d 1137 (9th Cir. 2001) ....................23

*Baumeister v. Nouveau Essentials Mktg., LLC*,
2026 WL 2093903 (N.D. Cal. July 21, 2026) ....................62

*Bent v. Garland*,
115 F.4th 934 (9th Cir. 2024) ....................52

*Berg v. Traylor*,
148 Cal. App. 4th 809 (2007) ....................46

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) ....................62, 63, 64, 65

*Bielski v. Coinbase, Inc.*,
87 F.4th 1003 (9th Cir. 2023) ....................40, 41

*Bostock v. Clayton Cnty., Georgia*,
590 U.S. 644 (2020)....................24

*Boucher v. Alliance Title Co., Inc.*,
127 Cal.App.4th 262 (2005)....................50

*Bramley's Water Conditioning v. Hagen*,
27 Ohio App. 3d 300 (1985)....................39

*Bruce v. Adams & Reese, LLP*,
168 F.4th 367 (6th Cir. 2026)....................22, 25, 31

*Bulic v. Celebrity Cruises, Inc.*,
2025 WL 1783865 (S.D. Fla. June 27, 2025)....................12

*Burgess v. United States*,
553 U.S. 124 (2008)....................21

*Burnand v. Irigoyen*,
30 Cal. 2d 861 (1947)....................2, 49

*C.M.D. v. Facebook, Inc.*,
2014 WL 1266291 (N.D. Cal. Mar. 26, 2014) (Seeborg, J.), *aff'd*, 621 F. App'x 488 (9th Cir. 2015)....................48

*C.N. v. Sigma Delta Tau Soc'y*,
2026 WL 2855525 (N.Y. App. Div. Sept. 23, 2026)....................13, 18

*Camp v. Bank of Bentonville*,
230 Ark. 414 (1959)....................39

*Caremark, LLC v. Chickasaw Nation*,
43 F.4th 1021 (9th Cir. 2022)....................61

*Cascio v. Michael Jackson Co.*,
2026 WL 2337568 (C.D. Cal. Aug. 12, 2026)....................16

*Casey v. Superior Court*,
108 Cal. App. 5th 575 (2025)....................25

*Cedeno v. Sasson*,
100 F.4th 386 (2d Cir. 2024)....................32

*Celli v. Sports Car Club of Am., Inc.*,
29 Cal. App. 3d 511 (1972)....................39

*Chabolla v. ClassPass Inc.*,
129 F.4th 1147 (9th Cir. 2025)....................61, 64, 65

*Chavarria v. Ralphs Grocery Co.*,
733 F.3d 916 (9th Cir. 2013)....................31

*Chevron USA Inc. v. Plaquemines Par., La.*,
608 U.S. 1 (2026)....................21

*Childress v. Moore*,
2026 WL 1618598 (M.D. Fla. June 5, 2026)....................12, 21, 22

*Chin v. Thumbtack Inc.*,
2026 WL 807276 (N.D. Cal. Mar. 24, 2026) .......... 63

*Chui v. Chui*,
75 Cal. App. 5th 873 (2022) .......... 27

*Clark v. Tate*,
14 P. 761 (Mont. 1887) .......... 39

*Coinbase, Inc. v. Suski*,
602 U.S. 143 (2024) .......... 33, 40, 41, 43

*Combs v. Netflix, Inc.*,
180 F.4th 1201 (9th Cir. 2026) .......... 12, 21

*Comer v. Micor, Inc.*,
436 F.3d 1098 (9th Cir. 2006) .......... 10, 50

*Concat LP v. Unilever, PLC*,
350 F. Supp. 2d 796 (N.D. Cal. 2004) .......... 10

*Coughenour v. Del Taco, LLC*,
57 Cal. App. 5th 740 (2020) .......... 38, 39

*Courtright v. Epic Games*,
766 F. Supp. 3d 873 (W.D. Mo. 2025) .......... 42, 62

*Dacanay v. Mendoza*,
573 F.2d 1075 (9th Cir. 1978) .......... 27

*Dan's City Used Cars, Inc. v. Pelkey*,
569 U.S. 251 (2013) .......... 22

*Dasher v. RBC Bank (USA)*,
882 F.3d 1017 (11th Cir. 2018) .......... 30

*Daun v. Truax*,
56 Cal. 2d 647 (1961) .......... 66

*De Buono v. Nysa-Illa Med. & Clin. Servs. Fund*,
520 U.S. 806 (1997) .......... 21

*De Ridder v. Roblox Corp.*,
2025 WL 3537260 (N.D. Cal. Oct. 8, 2025) .......... 63

*Dean v. Holiday Inns, Inc.*,
860 F.2d 670 (6th Cir. 1988) .......... 27

*Delirium v. Dang*,
714 S.W.3d 640 (Tex. App. 2024) .......... 21, 22

*Delo v. Paul Taylor Dance Found., Inc.*,
685 F. Supp. 3d 173 (S.D.N.Y. 2023) .......... 13, 22

*Dilallo By & Through Dilallo v. Riding Safely, Inc.*,
687 So. 2d 353 (Fla. Dist. Ct. App. 1997) .......... 39

*Ding v. Structure Therapeutics, Inc.*,
755 F. Supp. 3d 1200 (N.D. Cal. 2024), *aff'd*, 187 F.4th 1231 (9th Cir. 2026) ..........13, 19, 29, 31

*Discover Bank v. Super. Ct.*,
36 Cal. 4th 148 (2005) ..........58

*Doe (J.K.) v. Celebrity Cruises, Inc.*,
792 F. Supp. 3d 1371 (S.D. Fla. 2025) ..........15

*Doe v. Epic Games, Inc.*,
435 F. Supp. 3d 1024 (N.D. Cal. 2020) ..........39

*Doe v. Gregory Scott Stephen*,
2020 WL 12309616 (S.D. Iowa Mar. 4, 2020) ..........39

*Doe v. Int'l Student Exch., Inc.*,
2026 WL 2110889 (C.D. Ill. July 22, 2026) ..........20

*Doe v. North Carolina State Univ.*,
125 F.4th 498 (4th Cir. 2025) ..........20

*Doe v. Roblox Corp.*,
602 F. Supp. 3d 1243 (N.D. Cal. 2022) ..........62, 63

*Doe v. Second St. Corp.*,
105 Cal. App. 5th 552 (2024) ..........12

*Douglass v. Pflueger Hawaii, Inc.*,
135 P.3d 129 (Haw. 2006) ..........38

*Doyle v. Giuliucci*,
62 Cal. 2d 606 (1965) ..........46

*Dunn v. Activision Blizzard, Inc.*,
749 F. Supp. 3d 976 (E.D. Ark. 2024) ..........42

*E.A.R.R. v. Roku, Inc.*,
2026 WL 369238 (C.D. Cal. Feb. 6, 2026) ..........48

*E.K.D. ex rel. Dawes v. Facebook, Inc.*,
885 F. Supp. 2d 894 (S.D. Ill. 2012) ..........51

*Ellison v. Brady*,
924 F.2d 872 (9th Cir. 1991) ..........20

*Evans v. Henry*,
230 S.W.2d 620 (Tex. Civ. App. 1950) ..........52, 53

*Famuyide v. Chipotle Mexican Grill, Inc.*,
2023 WL 5651915 (D. Minn. Aug. 31, 2023), *aff'd*, 111 F.4th 895 (8th Cir. 2024) ..........12

*Farnham v. Grindr, LLC*,
2025 WL 3062698 (M.D. Fla. Nov. 3, 2025) ..........23

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ..........20

*Fischer v. Kelly Servs. Glob., LLC*,
2024 WL 382181 (S.D. Cal. Jan. 31, 2024) ..... 23

*Flores v. New York Football Giants, Inc*,
150 F.4th 172 (2d Cir. 2025), *cert. denied*, 146 S. Ct. 2675 (2026) ..... 31

*French v. Roblox Corp.*,
2026 WL 2195890 (E.D. Pa. July 29, 2026) ..... 42, 48

*Fulton v. City of Phila.*,
593 U.S. 522 (2021) ..... 22

*G.G. v. Roblox Corp.*,
2026 WL 1615999 (N.D. Cal. June 5, 2026) ..... 62, 63

*G.G. v. Valve Corp.*,
2017 WL 1210220 (W.D. Wash. Apr. 3, 2017), *vacated in part*, 799 F. App'x 557 (9th Cir. 2020) ..... 51

*Garcia v. Cent. Coast Rest.*,
2019 WL 4601538 (N.D. Cal. Sept. 23, 2019) ..... 10

*Garcia v. Roblox Corp.*,
2026 WL 413636 (C.D. Cal. Feb. 11, 2026) ..... 51, 62

*Gelboim v. Bank of Am. Corp.*,
574 U.S. 405 (2015) ..... 56

*Gen. Dynamics Land Sys., Inc. v. Cline*,
540 U.S. 581 (2004) ..... 24

*Global Travel Marketing, Inc. v. Shea*,
908 So.2d 392 (Fla. 2005) ..... 47

*Godun v. JustAnswer LLC*,
135 F.4th 699 (9th Cir. 2025) ..... 61

*Grand Prospect Partners, L.P. v. Ross Dress for Less, Inc.*,
232 Cal. App. 4th 1332 (2015) ..... 3, 34

*Greenwood v. Cross Country Mortg., LLC*,
2026 WL 884171 (D.S.C. Mar. 31, 2026) ..... 12

*Greist v. LendUS, LLC*,
2025 WL 744040 (N.D. Cal. Mar. 7, 2025) ..... 36

*Grissom v. Beidleman*,
129 P. 853 (Okla. 1912) ..... 45

*Harden v. Am. Airlines*,
178 F.R.D. 583 (M.D. Ala. 1998) ..... 50

*Heckman v. Live Natin Ent., Inc.*,
120 F.4th 670 (9th Cir. 2024), *cert. denied*, 136 S. Ct. 96 (2025) ..... *passim*

*Henriott v. Main*,
225 Iowa 20 (1938) ..... 39

*Hines v. Nat'l Ent'mt Grp., LLC*,
140 F.4th 322 (6th Cir. 2025) ....................34

*Hohe v. San Diego Unified Sch. Dist.*,
224 Cal. App. 3d 1559 (1990) ....................46

*Holbrook v. Louisiana-Pac. Corp.*,
2015 WL 1291534 (N.D. Ohio Mar. 23, 2015) ....................50

*HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Assoc.*,
594 U.S. 382 (2021)....................25

*I.B. ex rel. Fife v. Facebook, Inc.*,
905 F. Supp. 2d 989 (N.D. Cal. 2012)....................49

*In re Checking Account Overdraft Litig.*,
307 F.R.D. 630 (S.D. Fla. 2015)....................32

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
55 F.3d 768 (3d Cir. 1995) ....................57

*In re Poly-America, L.P.*,
262 S.W.3d 337 (Tex. 2008)....................35

*In re Ring LLC Privacy Litig.*,
2021 WL 2621197 (C.D. Cal. June 24, 2021) ....................66

*In re StockX Customer Data Sec. Breach Litig.*,
19 F.4th 873 (6th Cir. 2021) ....................42

*J.A. v. Microsoft Corp.*,
2021 WL 1723454 (W.D. Wash. Apr. 2, 2021)....................41

*J.D.B. v. North Carolina*,
564 U.S. 261 (2011).................... *passim*

*J.R. v. Elec. Arts Inc.*,
98 Cal. App. 5th 1107 (2024) ....................38

*Jackson v. Amazon.com, Inc.*,
65 F.4th 1093 (9th Cir. 2023) ....................65

*Johnson v. Activision Blizzard, Inc.*,
2025 WL 679033 (E.D. Ark. Mar. 3, 2025) ....................42

*Johnson v. Everyrealm, Inc.*,
657 F. Supp. 3d 535 (S.D.N.Y. 2023) ....................13, 22, 25, 31

*K.F.C. v. Snap, Inc.*,
29 F.4th 835 (7th Cir. 2022) ....................42

*K.T. v. A Place for Rover*,
2023 WL 7167580 (E.D. Pa. Oct. 31, 2023) ....................16

*Kater v. Churchill Downs Inc.*,
423 F. Supp. 3d 1055 (W.D. Wash. 2019)....................34

*Keebaugh v. Warner Bros. Ent. Inc.*,
100 F.4th 1005 (9th Cir. 2024) .......... 62

*Kiefer v. Fred Howe Motors, Inc.*,
158 N.W.2d 288 (Wis. 1968) .......... 45, 53

*Kindred Nursing Centers Ltd. P'ship v. Clark*,
581 U.S. 246 (2017) .......... 9

*King v. Burwell*,
576 U.S. 473 (2015) .......... 20

*Lamb v. Midwest Mut. Ins. Co.*,
296 F. Supp. 131 (W.D. Ark. 1969) .......... 50

*Lamps Plus, Inc. v. Varela*,
587 U.S. 176 (2019) .......... 56

*Langstraat v. Midwest Mut. Ins. Co.*,
217 N.W.2d 570 (Iowa 1974) .......... 50

*Laver v. Credit Suisse Sec. (USA), LLC*,
976 F.3d 841 (9th Cir. 2020) .......... 10

*Lee v. Hibernia Sav. & Loan Soc'y*,
177 Cal. 656 (1918) .......... 48, 51

*Lee v. Ticketmaster LLC*,
817 F. App'x 393 (9th Cir. 2020) .......... 65

*Ligeri v. Amazon.com Inc.*,
2024 WL 3638241 (D. Conn. Aug 2, 2024) .......... 66

*Lim v. TForce Logistics, LLC*,
8 F.4th 992 (9th Cir. 2021) .......... 32, 33

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020) .......... 21

*M.D. v. Verizon Commc'ns Inc.*,
2025 WL 2712831 (E.D.N.C. Sept. 22, 2025) .......... 23

*MacGreal v. Taylor*,
167 U.S. 688 (1897) .......... 40, 45

Martinez v. Master Protection Corp.,
118 Cal. App. 4th 107 (2004) .......... 58

*Matullo v. Sky Zone Trampoline Park*,
276 A.3d 178 (N.J. Super. Ct. App. Div. 2022) .......... 53

*Melendez v. Ethical Culture Fieldston School*,
789 F. Supp. 3d 316 (S.D.N.Y. 2025) .......... 43

*Mellouli v. Lynch*,
575 U.S. 798 (2015) .......... 22

*Memmer v. United Wholesale Mortg., LLC*,
135 F.4th 398 (6th Cir. 2025) ....................29

*Mercado v. Roblox Corp.*,
2026 WL 2916377 (E.D. Pa. Sept. 28, 2026) ....................41

*Mercado v. Roblox et al.*,
2026 WL 2910175 (E.D. Pa. Sept. 25, 2026) ....................39

*Merritt v. Jowers*,
184 Ga. 762 (1937) ....................39, 51

*Michaelis v. Schori*,
20 Cal. App. 4th 133 (1993) ....................38

*Michaelson v. United States ex rel. Chicago, St. P., M. & O. Ry. Co.*,
266 U.S. 42 (1924)....................26

*Mitton v. State Bar of Cal.*,
71 Cal. 2d 525 (1969) ....................33

*Moreau v. Feld Ent., Inc.*,
2025 WL 2161706 (M.D. Fla. July 30, 2025) ....................50

*Morgan v. Sundance, Inc.*,
596 U.S. 411 (2022)....................10, 25, 26, 43

*Mossler Acceptance Co. v. Perlman*,
47 So. 2d 296 (Fla. 1950) ....................52

*Motorola Credit Corp. v. Uzan*,
388 F.3d 39 (2d Cir. 2004) ....................16

*Muller v. CES Credit Union*,
832 N.E.2d 80 (Ohio Ct. App. 2005)....................39

*Murphy v. Check'n Go of Cal., Inc.*,
156 Cal. App. 4th 138 (2007) ....................59

*N.L.R.B. v. SW Gen., Inc.*,
580 U.S. 288 (2017)....................24

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
514 U.S. 645 (1995)....................22

*Nat'l Found. For Cancer Res. v. A.G. Edwards & Sons, Inc.*,
821 F.2d 772 (D.C. Cir. 1987)....................10

*Nelson v. Cyprus Bagdad Copper Corp.*,
119 F.3d 756 (9th Cir. 1997) ....................29

*New Prime Inc. v. Oliveira*,
586 U.S. 105 (2019)....................25

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) ....................61

*Norcia v. Samsung Telecomms. Am., LLC*,
845 F.3d 1279 (9th Cir. 2017) ....................60

*NYC Mgm't Grp., Inc. v. Brown-Miller*,
2004 WL 1087784 (S.D.N.Y. May 14, 2004) ....................46

*Oberstein v. Live Nation Entertainment, Inc.*,
60 F.4th 505 (9th Cir. 2023) ....................61

*Off the Wall & Gameroom LLC v. Gabbai*,
301 So. 3d 281 (Fla. Dist. Ct. App. 2020) ....................52

*Omstead v. Dell, Inc.*,
533 F. Supp. 2d 1012 (N.D. Cal. 2008) ....................16

*Ontiveros v. DHL Exp. (USA), Inc.*,
164 Cal. App. 4th 494 (2008) ....................59, 60

*Orellana v. Roblox Corp.*,
769 F. Supp. 3d 1273 (M.D. Fla. 2025) ....................42

*PAK Foods Houston, LLC v. Garcia*,
433 S.W.3d 171 (Tex. App. 2014) ....................39

*People v. Brandao*,
203 Cal. App. 4th 436 (2012) ....................17

*People v. Hobbs*,
152 Cal. App. 4th 1 (2007) ....................17

*Platt v. Sodexo, S.A.*,
148 F.4th 709 (9th Cir. 2025) ....................31

*Polen v. API Grp. Life Safety USA, LLC*,
2025 WL 3251349 (D. Or. Nov. 21, 2025) ....................13, 19, 21, 22

*Pover v. Cap. Grp. Cos., Inc.*,
183 F.4th 1132 (9th Cir. 2026), *cert. pet. filed* (U.S. No. 26-267) ....................11, 31

*Prudential Bldg. & Loan Ass'n v. Shaw*,
119 Tex. 228 (Comm'n App. 1930) ....................39

*Prudential Ins. Co. of Am. v. Lai*,
42 F.3d 1299 (9th Cir. 1994) ....................29

*Putnal v. Walker*,
61 Fla. 720 (1911) ....................39

*Q.R. v. Multi Media LLC*,
823 F. Supp. 3d 1280 (D. Kan. 2026) ....................42

*Quality Motors v. Hays*,
225 S.W.2d 326 (Ark. 1949) ....................49

*R.A. v. Epic Games, Inc.*,
2019 WL 6792801 (C.D. Cal. July 30, 2019) ....................39, 49

*Ramirez v. Charter Commc'ns Inc.*,
16 Cal. 5th 478 (2024) .....60

*Reichert v. Rapid Invests., Inc.*,
56 F.4th 1220 (9th Cir. 2022) .....10

*Rent-A-Center, West, Inc. v. Jackson*,
561 U.S. 63 (2010).....40

*Richards v. Silver*,
433 So. 3d 433 (Fla. Dist. Ct. App. 2026) .....29

*Robidoux v. Rosengren*,
638 F.3d 1177 (9th Cir. 2011) .....27

*Rodriguez v. Reading Hous. Auth.*,
8 F.3d 961 (3d Cir. 1993) .....38

*Russell v. Citigroup, Inc.*,
748 F.3d 677 (6th Cir. 2014) .....30

*Russello v. United States*,
464 U.S. 16 (1983).....20

*S.G. v. Epic Games, Inc.*,
796 F. Supp. 3d 614 (N.D. Cal. 2025) .....46

*S.T.G. v. Epic Games, Inc.*,
752 F. Supp. 3d 1200 (S.D. Cal. 2024).....42

*Salgado v. Carrows Rests., Inc.*,
2021 WL 2199436 (Cal. Ct. App. June 1, 2021) .....33

*Scott ex rel. Scott v. Pacific W. Mountain Resort*,
834 P.2d 6 (Wash. 1992) .....46

*Sellers v. JustAnswer LLC*,
73 Cal. App. 5th 444 (2021) .....61

*Sims v. Everhardt*,
102 U.S. 300 (1880).....51

*Slaviero v. Baby List, Inc.*,
2026 WL 1097746 (N.D. Cal. Apr. 22, 2026) .....62

*Smith v. Adventure Air Sports Kennesaw, LLC*,
849 S.E.2d 738 (Ga. Ct. App. 2020).....52, 53

*Smoky, Inc. v. McCray*,
196 Ga. App. 650 (1990) .....39

*Smoot v. Ryan*,
187 Ala. 396 (1914) .....39

*Standard Motors, Inc. v. Raue*,
37 Ala. App. 211 (Ala. Ct. App. 1953).....39

*Tatum v. Montgomery Banking Co.*,
31 So. 2d 311 (Ala. Ct. App. 1947) ....................39

*Taylor v. Discord Inc.*,
2026 WL 2689815 (W.D. Wash. Sept. 14, 2026) ....................65

*Tays v. Johnson*,
173 Ark. 223 (1927) ....................39

*Tempest v. Safeway, Inc.*,
2025 WL 1953465 (N.D. Cal. July 16, 2025) ....................65

*Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., Inc.*,
925 F.2d 1136 (9th Cir. 1991) ....................42

*Tomlin v. Roblox Corp.*,
2026 WL 1412606 (E.D. Pa. May 20, 2026) ....................48, 51

*Topheavy Studios, Inc. v. Doe*,
2005 WL 1940159 (Tex. App. Aug. 11, 2005) ....................52

*Turner v. Tesla, Inc.*,
686 F. Supp. 3d 917 (N.D. Cal. 2023) ....................15, 22

*United States v. Aldrich*,
566 F.3d 976 (11th Cir. 2009) ....................15

*United States v. Berg*,
640 F.3d 239 (7th Cir. 2011) ....................19

*United States v. Butler*,
65 F.4th 199 (5th Cir. 2023) ....................14

*United States v. Pawlowski*,
682 F.3d 205 (3d Cir. 2012) ....................15

*United States v. Raiburn*,
20 F.4th 416 (8th Cir. 2021) ....................15

*United States v. Raynor*,
302 U.S. 540 (1938) ....................16

*United States v. Sanchez*,
30 F.4th 1075 (11th Cir. 2022) ....................15

*United States v. Shafer*,
573 F.3d 267 (6th Cir. 2009) ....................15

*Valve Corp. v. Abbruzzese*,
2026 WL 1481630 (W.D. Wash. May 27, 2026) ....................33

*Viking River Cruises v. Moriana*,
596 U.S. 639 (2022) ....................54, 56

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ....................56

*Wells Fargo Bank, N.A. v. Chapman*,
90 So. 3d 774 (Ala. Civ. App. 2012) ....................50

*Whalen v. Facebook, Inc.*,
2022 WL 19934419 (N.D. Cal. Apr. 11, 2022) ....................62

*Whittaker v. Roblox Corp.*,
2026 WL 2640984 (D. Colo. Sept. 2, 2026) ....................66

*Wilcox v. Valero Ref. Co.*,
256 F. Supp. 2d 687 (S.D. Tex. 2003) ....................33

*Williams v. Cnty. of San Diego*,
2020 WL 7318125 (S.D. Cal. Dec. 11, 2020) ....................66

*Williams v. Leon T. Shettler Co.*,
98 Cal. App. 282 (1929) ....................51

*Williams v. Moon Active Ltd.*,
811 F. Supp. 3d 1079 (N.D. Cal. 2025) ....................42

*Yeh v. Tesla, Inc.*,
2023 WL 6795414 (N.D. Cal. Oct. 12, 2023) ....................46

*Yei A. Sun v. Advanced China Healthcare, Inc.*,
901 F.3d 1081 (9th Cir. 2018) ....................26

*Ziboukh v. Whaleco, Inc.*,
795 F. Supp. 3d 349 (E.D.N.Y. 2025) ....................42

*Zivich v. Mentor Soccer Club, Inc.*,
82 Ohio St. 3d 367 (1998) ....................47

*Zoller v. GCA Advisors, LLC*,
993 F.3d 1198 (9th Cir. 2021) ....................28, 30

**Statutes**

18 U.S.C. § 2246 ....................14, 15, 20

18 U.S.C. § 2422 ....................19, 20

9 U.S.C. § 2 ....................9, 24

9 U.S.C. § 4 ....................67

9 U.S.C. § 401 .................... *passim*

9 U.S.C. § 402 .................... *passim*

9 U.S.C. § 6 ....................26

9 U.S.C. §§ 401-02 ....................11

Cal. Civ. Code § 1568.5 ....................47

Cal. Civ. Code § 1670.5 ....................60

Cal. Civ. Proc. Code § 340.1 ....................17

Cal. Fam. Code § 6710 ....................39, 48, 51

Cal. Fam. Code § 6712 ....................................................................................................51
Cal. Fam. Code § 6751 ....................................................................................................51
Cal. Penal Code § 11165.1................................................................................................17
Cal. Penal Code § 243.3....................................................................................................16
Cal. Penal Code § 261.......................................................................................................16
Cal. Penal Code § 311.3....................................................................................................18
Cal. Penal Code § 311.4...............................................................................................17, 18
Cal. Penal Code § 647.6....................................................................................................17
Mont. Code § 45-5-625.....................................................................................................18
Mont. Code § 45-5-701.....................................................................................................18
Mont. Code Ann. § 41-1-304............................................................................................39
Ohio Stat. § 2905.32 .........................................................................................................19
Ohio Stat. § 2907.323 .......................................................................................................19

**Other Authorities**

1 E. Allan Farnsworth, *Farnsworth on Contracts* .............................................................38
1 W. Blackstone, Commentaries on the Laws of England ..............................................2, 38
168 Cong. Rec. S626 (2022)........................................................................................11, 24
Connie Chang, *Why Kids Can't Quit Roblox*, The Atlantic (July 29, 2026) ..........................6
H.R. Rep. No. 117-234 (2022)........................................................................11, 23, 31, 35
Jedidajah Otte, *'A man approached him': parents describe their children's Roblox problems*, The Guardian (Apr. 14, 2025) .........................................................................................6
Olivia Carville & Cecila D'Anastasio, *Roblox's Pedophile Problem*, Businessweek (July 22, 2024) ..............................................................................................................................3
Pub. L. 117-90, 136 Stat. 26 ..............................................................................................22

**Rules**

Fed. R. Civ. P. 17.......................................................................................................27, 66
Fed. R. Civ. P. 23.......................................................................................................26, 33

## INTRODUCTION

Roblox and Discord want to force child rape survivors into secret, binding arbitration so that these tech companies' intentional and reckless misconduct in profiting from the exploitation and abuse of children never sees the light of day. Seven young people, all abused as children and all but one still a minor, seek their day in court to hold Roblox and Discord accountable before a jury for the sexual abuse that their platforms foreseeably caused. Each plaintiff was a child when a predator found them on Roblox and began grooming them. Seven were then moved to Discord, where predators coerced them into producing sexual images of themselves, some by coercing them to touch themselves sexually on camera. Some were then lured or taken from their homes and raped; another was lured to a meeting and physically sexually assaulted before police intervened. One was impregnated.

These attacks were no unavoidable accident or isolated incident. Roblox and Discord built lucrative platforms—self-proclaimed virtual playgrounds—that depended on children using them. Rather than protecting those children, Defendants chose growth over safety, opening those playgrounds to adult predators and allowing those predators to hold themselves out as children to innocent, unsuspecting kids. For years, Roblox and Discord have known about this dangerous activity yet, until recently, required no meaningful age or identity verification. Instead, they designed their products to keep children maximally engaged and, in Roblox's case, even rejected safety measures its own employees proposed because those measures would slow growth. All the while, these companies assured parents that their platforms were safe.

Now Roblox and Discord seek to hide these children's cases, and the true dangers of their platforms, from public view in secret arbitration and to strip these children of their rights to a jury trial. Congress has foreclosed that result. In the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act (EFAA), Congress gave survivors of sexual assault and sexual harassment the right to have their cases heard in court, notwithstanding whatever arbitration clause they may have accepted. 9 U.S.C. § 402(a). Congress gave survivors this right because forced arbitration keeps corporate misconduct hidden, denies accountability, and leaves future survivors unwarned. And Congress directed courts, not arbitrators, to decide whether the EFAA applies. *Id.* § 402(b).

In addition to the EFAA's sweeping protections, states bar companies from taking advantage of children through contract. It is bedrock law that "an infant can neither aliene his lands, nor do any legal act, or make a deed, nor indeed any manner of contract, that will bind him." 1 W. Blackstone, Commentaries on the Laws of England, at *464-65 (quoted in *J.D.B. v. North Carolina*, 564 U.S. 261, 273 n.6 (2011). Defendants targeted kids for profit, a business decision that has consequences: "One deals with infants at his peril." *Burnand v. Irigoyen*, 30 Cal. 2d 861, 866 (1947). Accordingly, minors may disaffirm their contracts, including arbitration agreements, and minor Plaintiffs have done so here.

Defendants' therefore motions fail for four independent reasons. *First*, the EFAA bars arbitration of every bellwether case. Each case relates to a "sexual assault dispute"—some Plaintiffs were raped, others were coerced into sexual self-touching on camera, and the rest were coerced into producing sexual images, which constitutes sexual abuse of a child under the law of every relevant state. Nothing in the statute limits it to cases against the abuser or the abuser's employer, as Defendants claim. Nor can Defendants escape the EFAA by asserting (and submitting dubious evidence) that a child might have clicked through the same arbitration terms that the EFAA renders unenforceable after she had already sued to vindicate her right to a judicial forum. Defendants' position that the survivors' rights to a federal forum can vanish at any point during these proceedings makes chaos and a mockery of the EFAA and the judicial system. And any attempt to bind survivors, most of them children, to arbitration after litigation has begun—when they are represented by counsel and (in some instances) guardians—would be unconscionable.

*Second*, any arbitration agreement, and any clause purportedly delegating arbitrability to an arbitrator, has been disaffirmed. Under California law, which Defendants chose in their own terms, a minor may void contracts made as a child, either before turning eighteen or within a reasonable time afterward. Every minor Plaintiff has disaffirmed their purported contracts with Defendants as a whole and the arbitration and delegation clauses specifically, so the Court, not an arbitrator, decides disaffirmance. Neither California law nor the law of any Plaintiff's home state lets continued use or a child's unverified, purportedly false birthdate defeat that right. And even if a parent had agreed to Defendants' terms (a factual claim that is unproven and disputed by Plaintiffs' parents themselves),

the children, not the parents, are the parties to those contracts, and they remain free to disaffirm.

*Third*, the "mass arbitration" and "expedited arbitration" rules in Roblox's terms are unconscionable. They force sexual assault plaintiffs into secret mass- and class-like procedures without due process protections and then into follow-on, individual proceedings without any right to discovery or even briefing. Roblox's kangaroo court is not the type of traditional, bilateral arbitration protected by the Federal Arbitration Act.

*Fourth*, and in any event, Defendants cannot show that any Plaintiff agreed to arbitrate in the first place. Defendants' screenshots reveal that the companies buried their complex, technical terms in small and faint text amid colorful game imagery. Even if such presentation would suffice to put an adult on inquiry notice, it fails scrutiny when considering the "age, education, intelligence, business acumen and experience" of the minors in this litigation. *Grand Prospect Partners, L.P. v. Ross Dress for Less, Inc.*, 232 Cal. App. 4th 1332, 1352 (2015). Defendants' fallback argument fares no better: continued use alone cannot bind someone who never had notice of the terms.

The Court should deny both motions.

## STATEMENT OF FACTS

### I. Defendants profit from minor engagement and inadequate age verification.

Roblox's business depends on children, whom it calls "a unique strategic asset."[1] Indeed, "[u]nlike other mass-market social media apps, which bar kids under 13 or shunt them into sanitized versions, Roblox was made for children." Olivia Carville & Cecila D'Anastasio, *Roblox's Pedophile Problem*, Businessweek (July 22, 2024).[2] When the company went public in 2021, more than half of its daily users were under 13.[3]

Roblox's stock, in turn, rises and falls with children's engagement. When that engagement slowed in 2022, the stock fell 83 percent. Then growth surged: By 2025, daily users had grown nearly

[1] Arbitration Bellwether Common Pleading, Dkt. No. 395 ("Com. Pl.") ¶¶ 17, 160

[2] https://www.bloomberg.com/features/2024-roblox-pedophile-problem/

[3] Com. Pl. ¶¶ 15, 160.

fivefold since 2020, and that summer the stock hit an all-time high.[4] Roblox executives, insiders, and backers have since sold billions in stock.[5] CEO David Baszucki alone has made hundreds of millions of dollars, including those sales under a trading plan Baszucki specifically adopted in November 2024—immediately after the company came under scrutiny with a public report exposing fifty or more groups soliciting child sexual abuse material on the platform.[6]

Roblox took these profits by sacrificing children. As Roblox well knows, child-safety measures necessarily reduce unfettered child engagement, and, thus, threaten the business. When Roblox employees proposed parental approval for children under 13 and pop-up safety warnings, executives rejected both, because they would slow sign-ups and engagement.[7] A five-year-old can join Roblox by simply providing a birthdate (any birthdate) and selecting a username and a password. And until November 2024, Roblox's default settings let any adult privately message any child.[8]

All the while, Roblox told parents its platform was safe. Baszucki called it "a beacon for safety and civility." Its own reports of suspected child sexual exploitation to the National Center for Missing & Exploited Children rose from 675 in 2019 to about 24,522 in 2024—roughly 67 a day. Asked about predators on Roblox, he said: "We think of it not necessarily just as a problem, but an opportunity as well."[9]

Facing government enforcement actions and a wave of lawsuits, Roblox was finally forced to spend on safety. In October 2025, it raised its planned capital spending by $158 million for safety and infrastructure. The stock fell sharply that day—exactly what Barclays had predicted when it said that spending on safety was Roblox's "downside case."[10]

Discord has followed the same path. As young users flooded the platform during the pandemic,

[4] *Id.* ¶¶ 15-17, 160-62.

[5] *Id.* ¶ 162.

[6] *Id.*

[7] *Id.* ¶¶ 113-14, 168.

[8] *Id.* ¶¶ 5, 19, 24, 26, 113-14, 159, 168-69, 194.

[9] *Id.* ¶¶ 31-53, 164, 214.

[10] *Id.* ¶ 163.

Discord's monthly users nearly tripled, from 56 million in 2019 to 150 million in 2022. They now exceed 200 million. Discord's valuation, meanwhile, rose from $3.4 billion in June 2020 to $14.5 billion in 2021, and revenue quadrupled from $150 million in 2020 to $600 million in 2024. In January 2026, Discord confidentially filed for an IPO.[11]

Discord's value likewise depends on user growth, including among children, and Discord designed its platform accordingly. Discord does not verify users' ages or identities. By default, anyone who shares a Discord server (i.e., an online community space) with a child can message that child. Even Discord's purported parental tools protect user growth: teen users themselves decide these controls, and parents cannot see their children's messages. Yet Discord has long assured parents and the public that it is safe for children, even while knowing that its platform is rampant with sexual predators. After a researcher, whom Discord had hired, reported failures in its age verification, Discord rejected the proposed fixes and kept promoting its commitment to safety. Discord did not make teen safety settings the default worldwide until February 2026, after being sued by the State of New Jersey. When the Senate sought testimony about child exploitation, CEO Jason Citron refused to accept service of a subpoena. The Senate had to send U.S. Marshals to serve him.[12]

It is little wonder, then, that Roblox and Discord do not want these sexual assault cases litigated in open court.

**II. Defendants' platforms are, by design, addictive for children.**

By business necessity and by design, both Roblox and Discord are addictive for children. Defendants' own submissions show that even plaintiffs who have suffered the worst trauma a child can suffer on Defendants' platforms, and who have bravely elected to exercise their statutory rights to seek redress through an arduous litigation process, may be unable to stay away from these platforms. For example, Roblox contends that one Plaintiff (A.J.) has played Roblox for 2,718 hours since filing her lawsuit, equating to on average 7.5 hours a day for 362 days in a row. That same Plaintiff explains in her declaration that "I continued to use these platforms after I was sexually exploited because I was

[11] *Id.* ¶¶300-02.

[12] *Id.* ¶¶ 245-46, 248-56, 292-98, 302-06, 310.

experiencing, and am still experiencing, immense trauma. These platforms were my primary means of communicating with friends and coping with my trauma." A.J. Decl. ¶ 8.[13]

Indeed, for many children, Roblox and Discord have become their primary means of social interaction with friends and peers. Com. Pl. ¶ 2. When parents try to protect their children by depriving them of these apps, many experience severe reactions. *See*, *e.g.*, Dkt. No. 399 ("A.J. Compl.") ¶ 30. It has also been widely alleged and reported that Defendants' platforms are intentionally designed to be addictive for users, especially children. *See*, *e.g.*, Connie Chang, *Why Kids Can't Quit Roblox*, The Atlantic (July 29, 2026);[14] *Ann Arbor Public Schools, Michigan v. Meta Platforms, Inc. et al.*, No. 4:26-cv-02324, Dkt. No. 1, Attachment A at ¶¶ 10-32 (Discord), 33-44 (Roblox) (N.D. Cal. March 17, 2026). Roblox, in particular, has been associated with "staggering levels of addiction … in … children." Jedidajah Otte, *'A man approached him': parents describe their children's Roblox problems*, The Guardian (Apr. 14, 2025).[15] Discord, too, includes "features engineered to attack, capture, and addict youth." *Ann Arbor Public Schools*, Doc. No. 1, Attachment A at ¶ 13.

Addiction is a feature, not a bug. Roblox tells investors that, though it can deploy "anti-addiction rules" and "parental consent requirements," Roblox Corp., Form 10-K, at 14 (Feb. 18, 2025), it declines to do so because such measures "may limit the use of our Platform or reduce our overall demand," Roblox Corp., Form 10-Q, at 68 (May 1, 2025). It instead rewards consecutive days of use and pays developers by engagement time. *Anderson v. Roblox Corp.*, No. 2:25-cv-02413 (E.D. La.), Am. Compl. ¶¶ 142, 148. Discord does much the same. *See Ann Arbor Public Schools*, Doc. No. 1, Attachment A at ¶ 13.

## III. Plaintiffs are children abused, exploited, and raped through Defendants' platforms.

Defendants' conduct had predictable consequences for the children that their business models intentionally targeted. Plaintiffs are children (one now a young adult) who, as minors, were sexually groomed and exploited on platforms that Defendants, designed, operated, and marketed specifically

---

[13] Citations to "Decl." refer to the Declarations in Support of Plaintiffs' Omnibus Opposition to Defendants' Motions to Compel Arbitration, filed concurrently with this brief.

[14] https://www.theatlantic.com/family/2026/07/roblox-kids-gaming-mechanics-gambling/688095/

[15] https://www.theguardian.com/technology/2025/apr/14/parents-describe-children-roblox-problems

to reach children. Theirs are only eight of the tragic stories that led to this MDL.

**I.S. ("Plaintiff F")**[16] began playing Roblox when she was 9. Dkt. No. 400 ("I.S. Compl.") ¶ 11. When I.S. was 11, she met an adult predator on Roblox who falsely presented himself as a peer, but who was in fact a sex offender on probation for online solicitation of a minor. *Id.* ¶ 14. He persuaded her to communicate with him on Discord, where the grooming escalated to exchanging sexually explicit material. *Id.* ¶¶ 15, 16. The predator then coerced I.S. to meet him in person, abducted her, bound her, and raped her. *Id.* ¶ 17. When he returned her home, they continued to communicate on Discord. *Id.* ¶¶ 18-20. Two weeks later, the predator abducted I.S. again. *Id.* ¶ 20. After searching I.S.'s devices, law enforcement identified the predator and rescued I.S. from his attic. *Id.* ¶ 21. As a result of the assaults, I.S. became pregnant and underwent an abortion. *Id.* ¶ 22.

**D.H. ("Plaintiff D")** began playing Roblox when she was 8. Dkt. No. 396 ("D.H. Compl.") ¶ 10. When D.H. was 13, she met a 37-year-old male predator on Roblox who falsely presented himself as a peer. *Id.* The predator groomed D.H. on Roblox for months, buying gifts, engaging in romantic roleplaying, and requesting and sending explicit material to D.H. *Id.* ¶ 11. He then convinced D.H. to meet him in person, abducted her, and violently sexually abused and raped her over a three-day period until she escaped. *Id.* ¶ 12.

**P.C. ("Plaintiff E")** began playing Roblox when she was 10 and using Discord when she was 12. Dkt. No. 397 ("P.C. Compl.") ¶¶ 11, 12. When P.C. was 13, she met an adult predator on Roblox who falsely presented himself as a peer. *Id.* ¶ 13. The predator groomed P.C. on both platforms, using "Robux" (Roblox's currency system) to foster P.C.'s dependency on him and coercing P.C. to exchange sexually explicit material. *Id.* ¶¶ 13, 15. He then convinced P.C. to meet him in person, abducted her, and attempted to rape her. *Id.* ¶ 16. Law enforcement arrived during the encounter, finding P.C. in a state of semi-nudity and extreme distress. *Id.*

**M.D. ("Plaintiff H")** began playing Roblox when she was 4. Dkt. No. 398 ("M.D. Compl.") ¶ 11. When M.D. was 9, she met a 46-year-old male predator on Roblox who falsely presented himself

[16] This brief refers to Plaintiffs by their initials but will cross-reference Defendants' designations (Plaintiff A, B, etc.) where necessary to avoid confusion. *See also* Appendix (listing all Plaintiffs' initials, Defendants' identifiers, respective case numbers, and motions at issue).

as a peer. *Id.* ¶ 13. The predator groomed M.D. on Roblox, then directed her to Discord. *Id.* The predator used tactics, such as offering Robux, to coerce her into sending sexually explicit material. *Id.* ¶ 14. He then blackmailed M.D. into making more videos of explicit behaviors, including touching her genitals, inserting a hair brush into her vagina, and reenacting videos of child rape. M.D.'s parents learned about her abuse from law enforcement. *Id.*

**A.J. ("Plaintiff A")** began playing Roblox when she was 12 and using Discord when she was 15. A.J. Compl. ¶¶ 11, 19. A.J. met an adult predator on Roblox who falsely presented himself as a peer. *Id.* ¶ 22. The predator directed A.J. to Discord, where he coerced her into sending sexually explicit material and masturbating on video while he watched. *Id.* ¶¶ 23, 24. The abuse—which included sending explicit material to A.J., distributing A.J.'s explicit material to other predators, threats, and blackmail—lasted six months. *Id.* ¶¶ 24-25.

**J.H. ("Plaintiff C")**, another minor, was targeted by online predators she met on Roblox. Dkt. No. 432 ("J.H. Compl.") ¶ 14. They directed her to Discord, where they coerced her into exchanging sexually explicit material. *Id.* J.H.'s mother learned about J.H.'s abuse from law enforcement. *Id.*

**A.S. ("Plaintiff G")** was 13 when she met an adult predator on Roblox who falsely presented himself as a peer. Dkt. No. 403 ("A.S. Compl.") ¶ 13. The predator groomed A.S. and directed her to Discord, where he coerced A.S. into sending him sexually explicit material, which he kept on Discord. *Id.* ¶¶ 13, 14. During a telephone call, the predator directed A.S. to touch herself sexually; she complied. *Id.* ¶ 13. When the predator told A.S. that he possessed her family's personal information, she contacted law enforcement. *Id.* ¶ 14.

**A.W. ("Plaintiff B")** voluntarily dismissed his case on October 23, 2026. Dkt. No. 477.

## IV. Plaintiffs disaffirmed any agreements to arbitrate.

To the extent that any agreement to arbitrate was formed when Plaintiffs signed up for or used Roblox or Discord, each minor Plaintiff disaffirmed those agreements by filing suit, by expressly disaffirming any purported agreements in their complaints, and by doing so again in the declarations attached to this brief. *See* J.H. Decl. ¶ 6 ("I disaffirm all contracts I may have entered with Roblox at any time, including specifically any arbitration agreement and any delegation provision in those

contracts."); D.H. Decl. ¶ 6 ("I disaffirm all contracts I may have entered with Roblox at any time, including specifically any arbitration agreement and any delegation provision in those contracts."); P.C. Decl. ¶ 6 ("I disaffirm all contracts I may have entered with Discord at any time, including specifically any arbitration agreement and any delegation provision in those contracts."); I.S. Decl. ¶ 6 ("I disaffirm all contracts I may have entered with Discord at any time, including specifically any arbitration agreement and any delegation provision in those contracts."); A.S. Decl. ¶ 8 ("I disaffirm all contracts I may have entered with Roblox and Discord at any time, including specifically any arbitration agreement and any delegation provision in those contracts."); M.D. Decl. ¶ 8 ("I disaffirm all contracts I may have entered with Roblox and Discord at any time, including specifically any arbitration agreement and any delegation provision in those contracts.").

All Plaintiffs have also sworn that they do not currently use Defendants' platforms. *See* A.J. Decl. ¶¶ 6–7 ("I stopped using Roblox before signing this declaration and do not currently use that platform. I stopped using Discord before signing this declaration and do not currently use that platform."); J.H. Decl. ¶ 5 ("I stopped using Roblox before signing this declaration and do not currently use that platform."); D.H. Decl. ¶ 5 ("I stopped using Roblox before signing this declaration and do not currently use that platform."); P.C. Decl. ¶ 5 ("I stopped using Discord before signing this declaration and do not currently use that platform."); I.S. Decl. ¶ 5 ("I have not used Discord at any time since the filing of this lawsuit."); A.S. Decl. ¶¶ 6–7 ("I have not used Roblox at any time since the filing of this lawsuit. I have not used Discord at any time since the filing of this lawsuit."); M.D. Decl. ¶¶ 6–7 ("I stopped using Roblox before signing this declaration and do not currently use that platform. I have not used Discord at any time since the filing of this lawsuit.").

## LEGAL STANDARD

Under the Federal Arbitration Act (FAA), arbitration agreements are "valid" and "enforceable" to the same extent as any other contract, which means they are *in*valid and *un*enforceable on the same grounds other contracts would be. 9 U.S.C. § 2; *see also, e.g.*, *Kindred Nursing Centers Ltd. P'ship v. Clark*, 581 U.S. 246, 251 (2017) ("A court may invalidate an arbitration agreement based on generally applicable contract defenses[.]") (internal quotation marks omitted).

Courts apply "a standard similar to the summary judgment standard" when "deciding a motion to compel arbitration." *Garcia v. Cent. Coast Rest.*, 2019 WL 4601538, at *2 (N.D. Cal. Sept. 23, 2019) (Seeborg, J.). In particular, the "moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of" the evidence "which it believes demonstrates the absence of a genuine issue of material fact." *Id.* (internal quotation marks omitted). The party seeking to arbitrate "must prove by a preponderance of the evidence that the parties formed an agreement to arbitrate." *Reichert v. Rapid Invests., Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022). Where the motion "is opposed on the ground that no agreement [to arbitrate] was made, the benefit of all reasonable doubts and inferences should be given to the" plaintiff opposing arbitration. *Garcia*, 2019 WL 4601538, at *2. "Only when there is no genuine issue of material fact concerning the formation of an arbitration agreement should a court decide as a matter of law that" one exists. *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 804 (N.D. Cal. 2004).

Defendants cite a "federal policy favoring arbitration," Roblox Mot. at 20; Discord Mot. at 16, but the Supreme Court has explained that "[t]he policy is to make arbitration agreements as enforceable as other contracts, but not more so." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022) (internal quotation marks omitted). The "federal policy is about treating arbitration contracts like all others, not about fostering arbitration." *Id.*; *see also Nat'l Found. For Cancer Res. v. A.G. Edwards & Sons, Inc.*, 821 F.2d 772, 774 (D.C. Cir. 1987) ("The Supreme Court has made clear that" the FAA's policy "is based upon the enforcement of contract, rather than a preference for arbitration as an alternative dispute resolution mechanism.") (quoted with approval in *Morgan*, 596 U.S. at 419-19). So, for example, when the question is "whether a particular *party* is bound by an arbitration agreement," any "liberal federal policy . . . is inapposite." *Comer v. Micor, Inc.*, 436 F.3d 1098, 1104 n.11 (9th Cir. 2006); *accord Garcia*, 2019 WL 4601538, at *2. Instead, "ordinary contract principles determine who is bound." *Comer*, 436 F.3d at 1104 n.11 (citation omitted).

Finally, as a federal statute, the FAA's mandate may be "overridden by contrary congressional command." *Laver v. Credit Suisse Sec. (USA), LLC*, 976 F.3d 841, 845 (9th Cir. 2020) (citation omitted). Such a command may be express or implicit. *See Pover v. Cap. Grp. Cos., Inc.*, 183 F.4th

1132, 1140 (9th Cir. 2026) ("[W]here a provision in an arbitration agreement forbids the assertion of certain statutory rights, preventing the vindication of those rights, courts will invalidate the provisions on public policy grounds.") (internal quotation marks omitted), *cert. pet. filed* (U.S. No. 26-267).

## ARGUMENT

### I. The EFAA Bars Enforcement of Any Arbitration Agreement Against Every Bellwether Plaintiff.

On March 3, 2022, Congress amended the FAA by enacting the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act ("EFAA"). Passed with overwhelming bipartisan support, the EFAA provides that arbitration agreements are *not* enforceable in cases related to a sexual-assault or sexual-harassment dispute. 9 U.S.C. §§ 401-02. Its purpose was to "restore[s] access to justice for millions of victims of sexual assault or harassment who are currently locked out of the court system and are forced to settle their disputes against companies in a private system of arbitration that often favors the company over the individual." H.R. Rep. No. 117-234, at 4 (2022).

Congress was particularly concerned with corporations using arbitration to hide their misconduct. H.R. Rep. No. 117-234 at 4, 6. It found that "forced arbitration makes it more likely that corporate harms and abuse will go unchallenged" and hidden from public view, *id.* at 5, 12, allowing companies "to evade oversight and accountability," *id*. at 6. Without public accountability, companies that find it more profitable to ignore or, worse, facilitate sexual exploitation than prevent it have little incentive to change, and "future victims" receive no warning about these "dangerous companies." *Id.* at 4-5; *see* 168 Cong. Rec. S626 (2022) (statement of Sen. Dick Durbin) (stating it is "essential that [a] company's conduct in enabling the abuse and harassment . . . be brought to light, not covered up").

The EFAA restores accountability by giving survivors the right to proceed in a public forum:

> Notwithstanding any other provision of [the Federal Arbitration Act], at the election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute, . . . no predispute arbitration agreement . . . shall be valid or enforceable with respect to a case which . . . relates to the sexual assault dispute or the sexual harassment dispute.

9 U.S.C. § 402(a).[17] A "sexual assault dispute" is "a dispute involving a nonconsensual sexual act or sexual contact, as such terms are defined in section 2246 of title 18 or similar applicable Tribal or State law, including when the victim lacks capacity to consent." *Id.* § 401(3). A "sexual harassment dispute" is "a dispute relating to conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law." *Id.* § 401(4).

By its terms, the EFAA's applicability "shall be determined by a court, rather than an arbitrator, . . . irrespective of whether the agreement purports to delegate such determinations to an arbitrator." 9 U.S.C. § 402(b); *Bulic v. Celebrity Cruises, Inc.*, 2025 WL 1783865, at *5, n.2 (S.D. Fla. June 27, 2025) ("[T]he EFAA provides that its applicability 'shall be determined by a court, rather than an arbitrator,' even where the agreement contains a delegation clause."). Courts thus often decide EFAA questions first and reach other challenges only if the EFAA does not apply.[18]

### A. The EFAA Applies Because Each Bellwether Case Relates to a "Sexual Assault Dispute" or "Sexual Harassment Dispute"

Under the EFAA, "applicability hinges on the facts alleged." *Childress v. Moore*, 2026 WL 1618598, at *4 (M.D. Fla. June 5, 2026) (cleaned up). Each Plaintiff here alleges facts that relate to a sexual assault dispute, a sexual harassment dispute, or both.

Defendants contest the applicability of the EFAA for only three: J.H., A.S., and P.C. Roblox Mot. at 38-39; Discord Mot. at 32-34. They argue that J.H. and A.S. allege coerced sexually explicit images without specifying self-touching, and that P.C. alleges only an attempted assault, and that such conduct is outside the EFAA. That argument fails on the facts and the law. On the facts, it overlooks

[17] The EFAA applies to "any dispute or claim that arises or accrues on or after [March 3, 2022]." *Combs v. Netflix, Inc.*, 180 F.4th 1201, 1202 (9th Cir. 2026) (citing 9 U.S.C. § 401 note). Defendants do not challenge that all bellwether Plaintiffs' disputes "arose" after March 3, 2022, nor could they.

[18] *E.g.*, *Famuyide v. Chipotle Mexican Grill, Inc.*, 2023 WL 5651915, at *4 (D. Minn. Aug. 31, 2023), *aff'd*, 111 F.4th 895 (8th Cir. 2024) ("Because the Court concludes that the EFAA applies, the Court need not consider the remainder of the parties' arguments."); *Doe v. Second St. Corp.*, 105 Cal. App. 5th 552, 563 (2024) ("Because the trial court concluded that the arbitration agreement was barred by the EFAA, it did not consider other arguments raised by the parties regarding the existence and enforceability of the arbitration agreement."); *Greenwood v. Cross Country Mortg., LLC*, 2026 WL 884171, at *5 (D.S.C. Mar. 31, 2026) ("Because Greenwood brings at least one claim relating to a sexual harassment dispute, the arbitration agreement is unenforceable as to the entire case . . . . It is unnecessary for the Court to address Greenwood's remaining objections concerning the motion to compel [arbitration].").

that A.S. was coerced into self-touching, and that P.C.'s allegations support a reasonable inference of sexual contact. On the law, coerced sexually explicit images like J.H.'s, even if they do not involve self-touching, relate to a sexual assault dispute or a sexual harassment dispute, both of which the EFAA covers on equal terms. The same is true of the images involving A.S., even if the Court were to conclude that her allegations of self-touching are insufficiently pleaded.

If the Court finds any Plaintiff's allegations of EFAA-covered conduct insufficient, it should grant leave to amend. *See Ding v. Structure Therapeutics, Inc.*, 755 F. Supp. 3d 1200, 1219-20 (N.D. Cal. 2024) ("[I]f the Court had agreed with Defendants that Plaintiff's complaint did not plausibly allege a sexual harassment claim, it would have given Plaintiff leave to amend to fully set out her allegations (and caused of action) to support her assertion she has EFAA covered claims."), *aff'd*, 187 F.4th 1231 (9th Cir. 2026).

**1. *Every Plaintiff alleges a "sexual assault dispute."***

Congress drafted the EFAA "to broadly prevent the enforcement of predispute arbitration agreements in legal proceedings that have a logical connection or nexus to an expansive category of sexual assault or sexual harassment disputes . . . ." *C.N. v. Sigma Delta Tau Soc'y*, 2026 WL 2855525, at *3-4 (N.Y. App. Div. Sept. 23, 2026). The statute offers survivors several paths to its protection. Its definition of "sexual assault dispute" is disjunctive, reaching conduct defined in federal law "or" in "similar applicable Tribal or State law." 9 U.S.C. § 401(3). It requires only a dispute "involving" such conduct, and the "plain meaning of the term 'involving' . . . is broad," encompassing "a dispute that in some way includes or concerns sexual assault." *Polen v. API Grp. Life Safety USA, LLC*, 2025 WL 3251349, at *3 (D. Or. Nov. 21, 2025).

The statute's incorporation of state and tribal laws must also be read broadly because Congress determined that "sexual assault and harassment cases belong, as a category, in courts." *Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535, 552 n.14 (S.D.N.Y. 2023) (holding that the EFAA incorporates "local laws" as well). In particular, there is no requirement that the plaintiff actually allege a claim under the source of law that defines "sexual act," "sexual contact" or "sexual harassment." *See Delo v. Paul Taylor Dance Found., Inc.*, 685 F. Supp. 3d 173, 181 (S.D.N.Y. 2023) ("[T]here is nothing in

the text of the EFAA that suggests its applicability hinges on how a claim is labeled.”). For example, civil plaintiffs generally have no cause of action under Title 18 of the U.S. Code or state criminal law, but it is indisputable that those laws can define conduct that triggers the EFAA’s protections.

Plaintiffs’ allegations satisfy the EFAA. Plaintiffs D.H. and I.S. allege a “sexual act” under 18 U.S.C. § 2246(2). Plaintiffs A.S., M.D., A.J., and P.C. allege “sexual contact” under 18 U.S.C. § 2246(3). And J.H. (and, if necessary, A.S.) allege conduct that constitutes sexual abuse under “similar applicable . . . State law, including when the victim lacks capacity to consent.” 9 U.S.C. § 401(3).

***a. Sexual act.*** A “sexual act” includes “contact between the penis and the vulva or the penis and the anus,” “the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object” with the requisite intent, and “the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years” with the requisite intent. 18 U.S.C. § 2246(2).

- **D.H. (Plaintiff D):** The adult predator abducted D.H., took her to his home in Tennessee, and violently raped her over three days. D.H. Compl. ¶ 12.
- **I.S. (Plaintiff F):** The adult predator abducted I.S., bound her hands with a leather belt, and raped her repeatedly. I.S. Compl. ¶ 17. He kept communicating with her on Discord and later abducted her again. *Id.* ¶¶ 18-20. A sexual assault examination after his arrest revealed that he had impregnated her. *Id.* ¶ 22.

Because D.H. and I.S. allege “sexual acts,” they both allege a covered “sexual assault dispute.”

***b. Sexual contact***. “Sexual contact” includes “the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.” *Id.* 18 U.S.C. § 2246(3). Courts universally agree that this definition includes sexual self-touching by the perpetrator or the victim. *See*, *e.g.*, *United States v. Butler*, 65 F.4th 199, 203 (5th Cir. 2023) (“We are persuaded by our sister circuits. The plain meaning of ‘sexual contact’ includes masturbation, because that act necessarily entails the ‘intentional touching . . . of the genitalia . . . of *any* person with an intent to . . . arouse or gratify the sexual desire of *any* person.’ And that is so whether the act is performed by the defendant or by the victim.”) (emphasis in original; internal citation omitted). Congress

confirmed that reading by limiting a "sexual act" to "the touching 'of *another* person' while extending "'sexual contact'" to the touching "'of *any* person.'" *Id.* (comparing 18 U.S.C. §§ 2246(2)(D) and 2246(3)).[19] Coercing a minor to create and send masturbatory images is thus "conduct constituting . . . a sexual assault dispute." 9 U.S.C. § 402(a).

- **A.S. (Plaintiff G):** The adult predator coerced A.S. into sending him sexually explicit images of herself. A.S. Compl. ¶ 13. He also "directed Plaintiff to touch herself sexually" and she "succumbed to his pressure." *Id.* Roblox interprets A.S.'s allegations narrowly, but under both pleading standards and the summary-judgment-like analysis that governs motions to compel, the Court must construe all reasonable inferences in the light most favorable to the non-moving party. *See*, *e.g.*, *Turner v. Tesla, Inc.*, 686 F. Supp. 3d 917, 922 (N.D. Cal. 2023).

- **M.D. (Plaintiff H):** The adult predator coerced M.D. into sending sexually explicit images and videos of herself. M.D. Compl. ¶¶ 13-14. The videos show M.D. touching her vagina and genital area, licking her nipple, and exposing her vagina to the camera. *Id.* ¶ 14. He also directed her to tie herself up and insert a hairbrush into her vagina. *Id.*

- **A.J. (Plaintiff A):** The adult predator coerced A.J. into sending sexually explicit images of herself and masturbating on video while he watched. A.J. Compl. ¶¶ 21-24.

- **P.C. (Plaintiff E):** The adult predator lured P.C. to a restaurant near her home, took her to a nearby location, and attempted to rape her. P.C. Compl. ¶ 16. When law enforcement arrived mid-attack, they found P.C. shirtless, with bruises on her arms and legs. *Id*. The only reasonable inference from those facts is that the predator intentionally touched her breasts, inner thighs, or buttocks, at least through her clothing. That is "sexual contact" even if the rape was not completed. 18 U.S.C. § 2246(3).

Each of these four Plaintiffs thus alleges a covered sexual assault dispute.

***c. Similar state law.*** The EFAA also reaches "a nonconsensual sexual act or sexual contact, as such terms are defined in . . . similar applicable Tribal or State law, including when the victim lacks capacity to consent." 9 U.S.C. § 401(3). A plaintiff need not show that the conduct violates a particular state statute, or that the state law mimics Title 18's terminology. The dispute need only "include[] or relate[] to conduct that meets . . . similar definitions in Tribal or State law." *Doe (J.K.) v. Celebrity Cruises, Inc.*, 792 F. Supp. 3d 1371, 1380 (S.D. Fla. 2025). And, "similar" does not mean "identical."

[19] Every federal court of appeals to consider this question has agreed that "sexual contact" encompasses masturbation by the perpetrator or the minor victim. *See United States v. Sanchez*, 30 F.4th 1075, 1076 (11th Cir. 2022) (victim); *United States v. Raiburn*, 20 F.4th 416, 422-24 (8th Cir. 2021) (perpetrator and victim); *United States v. Pawlowski*, 682 F.3d 205, 212-13 (3d Cir. 2012) (perpetrator); *United States v. Shafer*, 573 F.3d 267, 273-74 (6th Cir. 2009) (victim); *United States v. Aldrich*, 566 F.3d 976, 979 (11th Cir. 2009) (perpetrator).

*See*, *e.g.*, *United States v. Raynor*, 302 U.S. 540, 547 (1938) ("Similarity is not identity, but resemblance between different things."). Not all statutes will match, of course; Roblox points out that one court has held that alleged violations of a state's human-trafficking and wiretapping statutes, where a defendant secretly filmed pet sitters, do not constitute "sexual harassment." *See K.T. v. A Place for Rover*, 2023 WL 7167580, at *5 (E.D. Pa. Oct. 31, 2023). But the EFAA's language remains broad. In *Cascio*, for example, the court assessed a "sexual assault dispute" by looking to California's definitions of sexual battery and rape. *Cascio v. Michael Jackson Co.*, 2026 WL 2337568, at *4 (C.D. Cal. Aug. 12, 2026) (citing Cal. Penal Code §§ 243.3, 261). Plaintiffs J.H. and A.S. meet the definition of "sexual assault dispute" in this way.

- **J.H. (Plaintiff C):** Predators coerced J.H., then 15, into sending sexually explicit material of herself. J.H. Compl. ¶ 14. The investigation involved the National Center for Missing and Exploited Children (NCMEC) and Internet Crimes Against Children (ICAC) Task Force. *Id.*
- **A.S. (Plaintiff G)**: As explained above, A.S.'s complaint alleges sexual contact. But even if the Court were to agree with Defendants that the complaint does not allege sexual contact, A.S. was still coerced into sending sexually explicit material of herself. A.S. Compl. ¶ 13.

That conduct is sexual abuse, i.e., "a nonconsensual sexual act," 9 U.S.C. § 401(3), under any potentially applicable state's law—whether California, whose law Defendants agree applies, or Montana and Ohio, where J.H. and A.S., respectively, reside.

***California***. Defendants, who are both headquartered in California, *see*, *e.g.,* J.H. Compl. ¶¶ 5-6, have waived any argument that California law does not apply to the relevant questions raised by the motions to compel. *See* Roblox Mot. at 20 n.14 (disclaiming the need for any choice-of-law analysis); Discord Mot. at 17-18 (same). Waiver aside, and assuming a contract was formed, *see infra* § IV, Defendants' choice-of-law provisions render California law at least potentially applicable. *See* Discord Mot. 15 ("[E]ach version [of Discord's terms] also provides that California law will govern any disputes that arise."); Jit Decl. Ex. 41 at § 12 ("[T]he Roblox Terms are governed by the laws of the State of California without regard to conflict of law principles."); *see also Omstead v. Dell, Inc.*, 533 F. Supp. 2d 1012, 1015 (N.D. Cal. 2008) (valid choice-of-law clause determines law applicable to question of validity of arbitration clause); *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 50 (2d Cir. 2004) ("[A] choice-of-law clause in a contract will apply to disputes about the existence or validity of

that contract.").

J.H. and A.S. allege conduct constituting "sexual assault" under California law. California defines "sexual assault" to include "conduct in violation of" enumerated offenses, Cal. Penal Code § 11165.1(a), including child molestation under Penal Code Section 647.6. Another provision defines "childhood sexual assault" to include any act that "would have been proscribed by" Section 647.6 or "any sexual conduct as defined in paragraph (1) of subdivision (d) of [Penal Code] Section 311.4." Cal. Civ. Proc. Code § 340.1(c). Plaintiff J.H. alleges conduct that would violate Penal Code Sections 647.6 and 311.4.

Section 647.6 punishes "[e]very person who annoys or molests any child under 18 years of age." Cal. Penal Code § 647.6(a)(1). It "does not require a touching," only "(1) conduct a normal person would unhesitatingly be irritated by, and (2) conduct motivated by an unnatural or abnormal sexual interest in the victim." *People v. Brandao*, 203 Cal. App. 4th 436, 440 (2012) (citations and internal quotation marks omitted); *accord* CALCRIM No. 1122 (Section 647.6 requires: "1. The defendant engaged in conduct directed at a child; 2. A normal person, without hesitation, would have been disturbed, irritated, offended, or injured by the defendant's conduct; [and] 3. The defendant's conduct was motivated by an unnatural or abnormal sexual interest in the child, but not does not require that the child actually be touched."). In *Brandao*, for example, a coach was convicted under Section 647.6 for sending sexually charged text messages to a 15-year-old player. 203 Cal. App. 4th at 439-40. Coercing a child into producing sexually explicit images is a violation of Section 647.6. And it is "nonconsensual" because these children "lack[ed] capacity to consent." 9 U.S.C. § 401(3); *see* CALCRIM No. 1122 ("It is not a defense that the child may have consented to the act.").

Section 311.4, for its part, punishes "[e]very person who, with knowledge that a person is a minor under 18 years of age . . . persuades, induces, or coerces a minor under 18 years of age . . . to engage in either posing or modeling alone or with others for purposes of preparing any representation of . . . sexual conduct," which includes "masturbation" and "exhibition of the genitals or public or rectal area for the purpose of sexual stimulation of the viewer. . . ." Cal. Penal Code § 311.4(b)-(d); *see* CALCRIM 1144; *People v. Hobbs*, 152 Cal. App. 4th 1, 4 (2007) (affirming conviction under

§ 311.4 where defendant filmed girls "chang[ing] into and out of their bathing suits"). Coercing a child to create sexually explicit images of herself is exactly what the statute forbids.

Finally, Cal. Penal Code Section 311.3(c)(5) defines "sexual conduct" to include "[e]xhibition of the genitals or the public or rectal area of any person for the purpose of sexual stimulation of the viewer." The conduct alleged by J.H. and A.S. satisfies that provision as well.

***Montana (J.H.)***. The result is the same under the laws of J.H.'s home state. Montana defines "sexual abuse of children" to include "knowingly, by any means of communication, including electronic communication or in person, persuad[ing], entic[ing], counsel[ing], coerc[ing], encourag[ing], direct[ing], or procur[ing] a child under 16 years of age . . . to engage in sexual conduct, actual or simulated, or to view sexually explicit material or acts for the purpose of inducing or persuading a child to participate in any sexual activity that is illegal." Mont. Code § 45-5-625(1)(c). It also prohibits "us[ing] . . . a child in an exhibition of sexual conduct," and "record[ing] a child engaging in sexual conduct . . . ." *Id.* § 45-5-625(1)(a)-(b). "Sexual conduct" includes the "lewd exhibition of the genitals, breasts, pubic or rectal area, or other intimate parts of any person," and the "depiction or observation of a child in the nude or in a state of partial undress" for sexual purposes. *Id.* § 45-5-625(6)(d)(i)(F), (ii). Montana deems a person "less than 16 years old" to be "incapable of consent." *Id.* § 45-5-501(1)(b)(iv). In addition, Montana law defines "sexually explicit performance" to include "a live, public, private, photographed, recorded, or videotaped act or simulated act intended to arouse or gratify the sexual desire of any person." *Id.* § 45-5-701(12).

Each of these laws treats an adult's online sexual exploitation of a child as a sexual offense against that child, without regard to physical contact. And because J.H. was a child who lacked capacity to consent, the conduct was nonconsensual as a matter of law, which is exactly the circumstance Congress addressed in the EFAA, 9 U.S.C. § 401(3). Requiring a particular kind of physical touching would defeat Congress's intent "to broadly prevent the enforcement of predispute arbitration agreements in legal proceedings that have a logical connection or nexus to an expansive category of sexual assault or sexual harassment disputes . . . ." *C.N.*, 2026 WL 2855525, at *4.

***Ohio (A.S.).*** Similarly, Ohio defines as a "sex offense" the "illegal use of a minor … in nudity-

oriented material or performance." Ohio Stat. § 2907.323. This statute provides that no person shall "create, direct, produce, or transfer any material or performance that shows the minor . . . in a state of nudity." *Id.* § 2907.323(A)(1). Ohio law also makes it a crime to "knowingly recruit, lure, [or] entice" another person to "engage in a performance that is obscene, sexually oriented, or nudity oriented, or be a model or participant in the production of material that is obscene, sexually oriented, or nudity oriented." *Id.* § 2905.32(A)(1); *see also id.* § 2905.32(A)(2) (similar proscription where the victim is a minor). Ohio labels this offense a "sexually oriented offense." *Id.* § 2950.01(A)(11). Once again, then, Ohio law treats an adult's online sexual exploitation of a child as a "sex offense" or "sexually oriented offense" against that child, without regard to physical contact. And because A.S. was a child who lacked capacity to consent, the conduct was nonconsensual as a matter of law, the exact circumstance Congress addressed in the EFAA.

***d. Each case "relates to" the sexual assault dispute.*** The sexual abuse that Plaintiffs suffered is not peripheral to these cases—it is their core. Plaintiffs allege that Roblox and Discord caused that abuse by designing platforms that facilitate sexual abuse and then marketing them as safe for kids. "The statute's language, by its plain terms, is not limited only to 'claims' or even only to 'sexual [assault] claims.'" *Ding*, 755 F. Supp. 3d at 1218. "Instead, Congress used the broader word 'case' and qualified it with 'relates.'" *Id.*; *see also Polen*, 2025 WL 3251349, at *3. Because every claim seeks to hold Defendants liable for the abuse, each case is itself the sexual assault dispute.

### 2. *Alternatively, each Plaintiff alleges a "sexual harassment dispute."*

At minimum, Plaintiffs' dispute relates to conduct "alleged to constitute sexual harassment under applicable Federal, Tribal, or State law." 9 U.S.C. § 401(4).

Federal law, specifically 18 U.S.C. § 2422(b), makes it a crime to use interstate commerce to "knowingly persuade[], induce[], entice[], or coerce[] any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense . . . ." The statute "targets the sexual grooming of minors as well as the actual sexual exploitation of them," focusing on "the intended effect on the minor . . . ." *United States v. Berg*, 640 F.3d 239, 252 (7th Cir. 2011). That conduct parallels conduct covered by civil laws against sexual

harassment. *See, e.g.*, *Ellison v. Brady*, 924 F.2d 872, 875-76 (9th Cir. 1991); *Doe v. North Carolina State Univ.*, 125 F.4th 498, 505-06 (4th Cir. 2025) (recognizing grooming as sexual harassment in the context of Title IX because "the goal of grooming is to exploit a position of power or trust to coerce a victim to engage in sexual activities").

Plaintiffs' allegations fall within federal criminal law addressing sexual harassment of minors. The EFAA reaches such laws because its text covers conduct alleged to constitute sexual harassment under federal or state law without limitation—not just civil statutes, and not just statutes about workplace harassment. 9 U.S.C. § 401(4). The EFAA's "sexual assault" clause thus targets serious criminal conduct and expressly incorporates the criminal definitions in 18 U.S.C. § 2246. Read alongside it, the EFAA's adjacent "sexual harassment" clause naturally encompasses criminal as well as civil misconduct. A contrary reading would create an odd loophole, forcing survivors of serious criminal harassment into arbitration while protecting victims of civil harms. *See King v. Burwell*, 576 U.S. 473, 486 (2015) (courts must read words "in their context and with a view to their place in the overall statutory scheme") (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).

Plaintiffs allege that predators used interstate commerce to coerce them, as children, into sexual activity, exploiting their vulnerability and emotional attachment. That is conduct encompassed by Section 2422(b). Each case thus relates to a sexual harassment dispute.

**B. The EFAA Does Not Require That the Defendant or its Employees Commit the Abuse.**

Roblox and Discord would limit the EFAA to cases in which the defendant or its employees committed the abuse. "The short answer is that Congress did not write the statute that way." *Russello v. United States*, 464 U.S. 16, 23 (1983). Congress enacted the EFAA to remove from mandatory arbitration *all* "case[s]" that are "*relate[d] to*" any "disputes *involving*" sexual assault or harassment. 9 U.S.C. §§ 401(3)-(4), 402(a) (emphases added). For that reason, the vast majority of courts that have addressed the issue have rejected Defendants' reading of the EFAA. *See*, *e.g.*, *Doe v. Int'l Student Exch., Inc.*, 2026 WL 2110889 (C.D. Ill. July 22, 2026).

**1. *The statute contains no defendant-or-employee limitation.***

Neither "defendant" nor "employee" appears anywhere in the EFAA's text. *See* 9 U.S.C. §§ 401, 402. "[A]bsent provisions cannot be supplied by the courts." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020) (cleaned up). That alone defeats Defendants' argument.

***a. "Sexual assault dispute."*** Defendants say this phrase describes the parties' controversy, not the underlying facts, and thus that the defendant must have committed the assault for the EFAA to apply. But "sexual assault dispute" includes no such requirement. And because "sexual assault dispute" is a defined term, the Court must apply Congress's definition. *See Burgess v. United States*, 553 U.S. 124, 129-30 (2008). That definition, *i.e.*, "a dispute involving a nonconsensual sexual act or sexual contact," 9 U.S.C. § 401(3), "requires only that the *dispute itself* involve sexual assault or contact—not that the defendant caused or engaged in the sex act." *Polen*, 2025 WL 3251349, at *4; *see Childress*, 2026 WL 1618598, at *5-7; *Delirium v. Dang*, 714 S.W.3d 640, 649 (Tex. App. 2024).

Nor do Defendants find support in the cases about when a dispute "arises." The Ninth Circuit has held that a "dispute requires some aspect of opposition or disagreement between the parties." *Combs v. Netflix, Inc.*, 180 F. 4th 1201, 1205 (9th Cir. 2026) (internal quotation marks omitted). That rule addresses timing, not who committed the assault. Plaintiffs and Defendants plainly have disputes, and those disputes "involv[e]" sexual assault. Nothing more is required. *See Polen*, 2025 WL 3251349, at *4 ("The statute is unambiguous in requiring only that there be a dispute with the defendant involving a nonconsensual sexual act or contact.").

***b. "Relates to."*** Defendants fare no better with § 402(a)'s requirement that the "case . . . *relate[] to* the sexual assault dispute." 9 U.S.C. § 402(a) (emphasis added). The phrase "relating to," as courts have long acknowledged, "sweeps broadly." *Chevron USA Inc. v. Plaquemines Par., La.*, 608 U.S. 1, 11 (2026) (citing decades of case law). "One thing can relate to another even if the connection is 'indirect'" or lacks a "strict causal relationship." *Id.* (citing cases). Defendants' own cases agree that the phrase is "clearly expansive," *De Buono v. Nysa-Illa Med. & Clin. Servs. Fund*, 520 U.S. 806, 813 (1997), and excludes only connections that are "tenuous, remote, or peripheral."

*Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) (citation omitted); *see also Mellouli v. Lynch*, 575 U.S. 798, 811 (2015); *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 661 (1995).

Plaintiffs' cases fall well within the phrase "relating to." Congress applied the EFAA to any "case," rather than any claim, that relates to a sexual assault dispute so that survivors could bring all their claims together. *See Bruce v. Adams & Reese, LLP*, 168 F.4th 367, 381-84 (6th Cir. 2026); *Turner*, 686 F. Supp. 3d at 927; *Johnson*, 657 F. Supp. 3d at 559-61; *Delo v. Paul Taylor Found., Inc.*, 685 F. Supp. 3d 173, 180-81 (S.D.N.Y. 2023). Here, every single claim seeks to hold Defendants liable for Plaintiffs' sexual abuse. There can be no serious argument, then, that these cases do not relate to the sexual assault dispute.

In the end, Defendants' proposed limitation is not about the relationship between the case and the dispute. It is about the relationship between the defendant on the one hand and the assault or direct assailant on the other. But the statute requires none. *See Delirium TV*, 714 S.W.3d at 649 (the EFAA does not "specify anything about how the assault must have occurred, or who perpetrated the assault").[20]

**2. *Courts almost uniformly have rejected Defendants' interpretation.***

Courts have repeatedly recognized that the EFAA "is unambiguous in requiring only that there be a dispute with the defendant involving a nonconsensual sexual act or contact." *Polen*, 2025 WL 3251349, at *4; *see also Delirium TV*, 714 S.W.3d at 649 ("EFAA doesn't "specify anything about how the assault must have occurred, or who perpetrated the assault"); *Childress*, 2026 WL 1618598, at *5 (rejecting third-party-perpetrator limitation because "it requires rewriting the statute—either by eliminating or adding words").

Courts have therefore rejected Roblox and Discord's argument to the contrary every time Roblox and Discord have raised it. In denying Roblox's motion to compel arbitration in *Doe v. Roblox Corp.*, the court explained that "[i]t would have been a simple task for Congress to expressly limit the

[20] A title cannot "override the plain words of [its] text." *Fulton v. City of Phila.*, 593 U.S. 522, 536-37 (2021) (citation omitted). And the short and full titles of the EFAA say nothing about who committed the assault. Pub. L. 117-90, 136 Stat. 26.

EFAA to employment disputes, and/or to assaults/harassment perpetrated by employees at a business premise, had that been Congress' intent." No. 25-CIV-01193, at 6 (Super. Ct. San Mateo Cty. Nov. 17, 2025). In another case, a state trial court held that the language of the EFAA is "clear and controlling" and contains no such limitation. *Doe v. Roblox Corp.*, No. 25-CIV-05901, at 6 (Super. Ct. San Mateo Cty. Feb. 23, 2026) (Roblox); *Doe v. Roblox Corp.*, No. 25-CIV-05901, at 6 (Super. Ct. San Mateo Cty. Feb. 23, 2026) (Discord).[21]

In the two out-of-circuit decisions Defendants cite, the courts added their limitation based on their perception of congressional intent, even as one of the courts conceded that the EFAA's text does not support it. *See M.D. v. Verizon Commc'ns Inc.*, 2025 WL 2712831, at *2 (E.D.N.C. Sept. 22, 2025) (recognizing that the "case relates to a sexual harassment dispute" but asserting, "based on Congressional intent," that "the EFAA should not apply" anyway); *Farnham v. Grindr, LLC*, 2025 WL 3062698, at *2 (M.D. Fla. Nov. 3, 2025) (relying solely on *M.D.*). But the best evidence of congressional intent is the statute's text, which all courts agree is not so limited. *See Basiente v. Glickman*, 242 F.3d 1137, 1142 (9th Cir. 2001).

**3. *The legislative history supports Plaintiffs' position, not Defendants' limitation.***

Congress passed the EFAA because it was worried that "forced arbitration makes it more likely that corporate harms and abuse will go unchallenged," that forced arbitration lets businesses "opt[] out of the legal system altogether and misbehav[e] without reproach," and that it "prevent[s] future victims from being warned about dangerous companies." H.R. Rep. No. 117-234, at 4-6. None of those concerns depend on whether the defendant or its employee was the direct assailant as opposed to, for example, the entity that enabled or facilitated the abuse. Forcing these cases into arbitration would "shield[] from public scrutiny" the evidence that Roblox and Discord knew that the design and marketing of their platforms created a powerful tool for predators, failed to take simple steps to protect children, and all the while assured parents the platforms were safe. *Id.* at 3. Parents would not know

---

[21] The Court may consider these unpublished state court decisions (Huyett Decl., Exs. 1-3) as persuasive authority. *Fischer v. Kelly Servs. Glob., LLC*, 2024 WL 382181, at *7 (S.D. Cal. Jan. 31, 2024) (collecting cases).

to keep their children from these platforms, children would keep being abused, and the companies would continue "without reproach." *Id.* at 5-6. That is what Congress acted to prevent.

The EFAA's sponsor explained that "the bad actors aren't just at workplaces," but specifically warned about apps: "That terms and conditions box that we have all simply checked off after downloading an app . . . might just have an arbitration clause hiding in it, ready to strip away your right to go to court if you have been sexually harassed or sexually assaulted." 168 Cong. Rec. H986 (statement of Rep. Bustos); *see also Roblox*, No. 25-CIV-05901, at 6-8 (Roblox) (relying on that history); *Roblox*, No. 25-CIV-05901, at 6-8 (Discord) (same).

Defendants cannot identify a single legislator who wanted to limit the EFAA to assaults by the defendant or its employees. Instead, they cherry-pick examples from the House Report, which also mentioned no defendant-or-employee limitation, and ignore the sponsor's warning about apps. Statutes routinely reach beyond the examples that might have prompted them. *See also Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 592 n.5 (2004) ("mistake" to narrowly interpret text to cover only "the relatively narrow class of cases that prompted Congress to address their subject matter"); *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 644 (2020) (similar). In any event, the floor debate that Defendants mention concerned whether *non*-sexual harassment claims could be joined, an issue that the senators debated, *see* 168 Cong. Rec. at S626 (Sen. Durbin); *id.* at S627 (Sen. Kristen Gillibrand), and which the enacted text ultimately resolved in favor of the whole "case." *See N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 306 (2017) ("What Congress ultimately agrees on is the text that it enacts, not the preferences expressed by certain legislators."). No one in that debate suggested that a survivor must sue the assailant or the assailant's employer to stay in court.

**4. *No narrowing canon applies.***

Lastly, Defendants ask the Court to read the EFAA narrowly because, in their view, it is an exception to the FAA. That premise is wrong. The EFAA is part of the FAA, not an exception. Congress codified it as chapter 4 of Title 9 and amended the FAA's core enforcement provision to say so. Arbitration agreements are now enforceable under the FAA "save upon such grounds as exist at law or in equity for the revocation of any contract or *as otherwise provided in chapter 4*." 9 U.S.C.

§ 2 (emphasis added). When a case falls within chapter 4, the FAA itself makes the arbitration agreement unenforceable. There is no competing FAA policy for the Court to weigh. And even if the Court were to treat the EFAA (incorrectly) as an exemption, exemptions get their "ordinary meaning," which forecloses Defendants' argument for all the reasons above. *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113(2019); *see also HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Assoc.*, 594 U.S. 382, 396 (2021) ("[S]tatutory exceptions are to be read fairly, not narrowly, for they are no less part of Congress's work than its rules and standards—and all are worthy of a court's respect.") (internal quotation marks omitted).

Nor does the liberal policy favoring arbitration justify a narrow reading of the statute. That policy, even when applicable, is "about treating arbitration contracts like all others, not about fostering arbitration." *Morgan*, 596 U.S. at 418. And for cases within chapter 4 (the EFAA), Congress made even that policy inapplicable. *See Casey v. Superior Court*, 108 Cal. App. 5th 575, 585 (2025) ("[T]he EFAA rejects the policy of favoring enforceability of arbitration agreements, and replaces it with a rule of *unenforceability*[.]"); *Bruce*, 168 F.4th at 385 (similar); *Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d at 560 (similar).

**C. Defendants Cannot Escape the EFAA Through Post-Filing Clicks.**

Defendants contend that five Plaintiffs (A.J., J.H., D.H., P.C., and M.D.) forfeited their rights under the EFAA by purportedly using the platforms and accepting arbitration agreements while their suits were pending. But by filing their complaints, Plaintiffs elected to exercise their EFAA right to proceed in court. *See* 9 U.S.C. § 402(a). These survivors did not reverse that election by later clicking through the same or similar terms or continuing to use the platform.

It is worth pausing to consider the extraordinary implications of Defendants' argument. Plaintiffs' position gives effect to the EFAA—a plaintiff cannot be forced into arbitration after electing to litigate her sexual-assault or sexual-harassment dispute in federal court, full stop. According to Defendants, however, a federal court must stay a pending case and order the parties to arbitration, no matter how late in the day the arbitration agreement was purportedly accepted. These bellwether cases are at the early stages of litigation, but Defendants' theory does not in any way depend on that fact.

There is no limiting principle: according to Defendants, the jury could be sitting in the box, and opening statements set to begin, but everything must be brought to a halt because the plaintiff clicked a box on Defendants' platforms.

Even putting the EFAA aside, nothing in the broader FAA statute requires such an absurd result. As discussed, the FAA places arbitration agreements "upon the same footing as other contracts." *Morgan*, 596 U.S. at 418 (citation omitted). No court would enforce a contract that would so disrupt the course of litigation contemplated by the Federal Rules of Civil Procedure and courts' inherent powers to control proceedings, powers that pre-existed the FAA and that Congress must be presumed to have meant to leave undisturbed. *See Avery v. TEKsystems, Inc.*, 165 F.4th 1219, 1230 (9th Cir. 2026) ("[A]rbitration agreements can be invalidated based on federal procedural rules."); *Michaelson v. United States ex rel. Chicago, St. P., M. & O. Ry. Co.*, 266 U.S. 42, 65-66 (1924) (explaining the "settled law" that certain powers are "inherent in all courts," that "[t]he courts of the United States, when called into existence and vested with jurisdiction over [a] subject, at once become possessed of the power," and that "the attributes which inhere in that power and are inseparable from it can neither be abrogated nor rendered practically inoperative").

For example, if a litigant announced to the court that, moments before trial, the opposing party had agreed to a forum selection clause, under no circumstances would the court entertain a motion to transfer, even though forum selection clauses are no less enforceable than arbitration agreements. *See, e.g.*, *Yei A. Sun v. Advanced China Healthcare, Inc.*, 901 F.3d 1081, 1088 (9th Cir. 2018). The FAA itself provides that any motion to compel arbitration "shall be made and heard in the manner provided by law for the making and hearing of motions" generally. 9 U.S.C. § 6. The statute thereby bars any "custom-made rules" that "tilt the playing field" either "in favor of (or against) arbitration." *Morgan*, 596 U.S. at 419. It looks no more favorably on defendants who contrive to subvert the normal rules of litigation and the FAA itself, which includes the rights granted in the EFAA.

This is particularly so here because Plaintiffs are (mostly) minors, who Rule 17 requires the Court "to protect." Fed. R. Civ. P. 23(d)(1)(B). "District courts have a special duty, derived from Federal Rule of Civil Procedure 17(c), to safeguard the interests of litigants who are minors." *Robidoux*

*v. Rosengren*, 638 F.3d 1177, 1181 (9th Cir. 2011). The court "must appoint a guardian ad litem—or issue another appropriate order—to protect a minor . . . who is unrepresented in an action." Fed. R. Civ. P. 17(c)(2). By appointing a guardian ad litem, the court delegates authority to protect the minor's interests in connection with the litigation, *see Chui v. Chui*, 75 Cal. App. 5th 873, 898-99 (2022), but the court retains ultimate responsibility to protect the minor's interests. "In the context of proposed settlements in suits involving minor plaintiffs," for example, "this special duty requires a district court to 'conduct its own inquiry to determine whether the settlement serves the best interests of the minor.'" *Robidoux*, 638 F.3d at 1181 (citation omitted).

It follows that the Court has a duty to guard against rights-destroying agreements that Defendants purport to extract directly from Plaintiffs—who are represented both by guardians ad litem and by counsel—and refuse to enforce them if they are coercive, misleading, or violate ethical or other rules, including those discussed below. *See Dean v. Holiday Inns, Inc.*, 860 F.2d 670, 673 (6th Cir. 1988) ("[T]he general rule hold[s] that settlement of a minor's claim *or agreements or waivers affecting a minor's rights or interests* are always subject to approval or amendment by the court with jurisdiction to pass on such agreements or actions.") (emphasis added) (citing additional cases); *Dacanay v. Mendoza*, 573 F.2d 1075, 1079 (9th Cir. 1978) ("It is an ancient precept of Anglo-American jurisprudence that infant and other incompetent parties are wards of any court called upon to measure and weigh their interests. . . . While the infant sues or is defended by a guardian ad litem or next friend, every step in the proceeding occurs under the aegis of the court."). And "there would be no point to" this "broad authority . . . if the authority stopped when a party's misleading communications with [minors] resulted in an agreement before the district court intervened." *Avery*, 165 F.4th at 1228-29.

Make no mistake: if Defendants prevail on this point, they will seek to compel a case out of court and into arbitration any time they can plausibly claim that a young child has "accepted" an agreement to arbitrate simply by clicking a box on the internet—no matter the stage of the litigation. To the extent these children struggle to stay off these platforms, and their parents struggle to prevent them from doing so, that is because Roblox and Discord have designed platforms that foster

problematic and addictive use and lack effective means for parents to control their children's use. These design aspects are not accidental—they are key to Defendants' business models. It would be ironic indeed if Defendants were permitted to leverage the insidious design of their platforms to *further* harm children by depriving them access to court for the egregious harms they have already suffered.

The broader point aside, in the particular context here—mostly minors alleging sexual assault cases—Defendants' argument fails for four independent reasons.

**1. *Defendants largely seek to enforce pre-dispute arbitration agreements, which the EFAA prohibits.***

The EFAA voids "any agreement to arbitrate a dispute that had not yet arisen at the time of the making of the agreement." 9 U.S.C. §§ 401(1), 402(a). That describes the agreements Roblox seeks to enforce. By its own account, Roblox "does not seek to enforce new terms. It seeks to enforce the same terms Plaintiffs "previously accepted." Roblox Mot. at 27 n.18. The relevant term, the arbitration agreement, "has not changed since August 1, 2023," before any Plaintiff sued. *Id*. at 19.

Roblox cannot convert that pre-dispute agreement into a post-dispute one by pointing to later clicks or continued use. Re-accepting identical terms cannot add anything to a previously existing bargain. If it could, any company could nullify the EFAA by periodically re-presenting its pre-dispute arbitration clause to users who had sued, and any customer or employee who keeps a relationship with the defendant could lose her federal right with a single click.

The same is true of Discord's 2024 terms, which took effect at least a year before any plaintiff sued. *See* Discord Mot. at 26; Robbins Decl. ¶ 14. A new acknowledgement of pre-dispute terms is still governed by a pre-dispute arbitration agreement. Discord's later 2025 terms are unenforceable for the reasons that follow.

**2. *Defendants have not shown a knowing waiver of a statutory right.***

Even if a post-filing click could resurrect a voided agreement, it would not reach these pending cases. Where federal statutes like the EFAA "explicitly limit the enforcement of arbitration agreements," arbitration may only be compelled, if at all, upon a "knowing[] and explicit[]" waiver of the right to a judicial forum. *Zoller v. GCA Advisors, LLC*, 993 F.3d 1198, 1201 (9th Cir. 2021). Absent

a knowing and explicit waiver, no agreement is formed because the plaintiff "could not have understood" that the agreement would apply to those statutorily guaranteed rights. *Id*. at 1202. In cases like these, that heightened standard effectuates the "public policy of protecting victims of sexual discrimination and harassment," a policy "at least as strong as [any] public policy in favor of arbitration." *Prudential Ins. Co. of Am. v. Lai*, 42 F.3d 1299, 1304-05 (9th Cir. 1994); *see Nelson v. Cyprus Bagdad Copper Corp.*, 119 F.3d 756, 762 (9th Cir. 1997). And this rule must apply with greater force under the EFAA, which amended the FAA to give survivors "a genuine choice whether to pursue their claims in a court of law." *Ding v. Structure Therapeutics, Inc.*, 187 F.4th 1231, 1234 (9th Cir. 2026); *see also Memmer v. United Wholesale Mortg., LLC*, 135 F.4th 398, 412 (6th Cir. 2025). Plaintiffs had already made that choice.

Defendants' contrary rule would let any defendant erase that choice by again presenting arbitration terms during litigation—including to unsuspecting children. Children "characteristically lack the capacity to exercise mature judgment," *J.D.B.*, 564 U.S. at 273, so they are especially vulnerable to this ploy. But Defendants' rule would reach far beyond children. A tenant who sues her landlord for sexual assault would forfeit her forum by renewing her lease online. A teacher who sues a supervisor for sexual harassment would forfeit hers by signing next year's contract. An election of a federal right is not so fragile; to the contrary, the EFAA gives survivors "'a real choice' to bring their claims in court." *Ding*, 187 F.4th at 1237-38 (citation omitted) (refusing to let a plaintiff "lose her ability to have her sexual harassment claim heard in court before she knows she has such a claim"). That is not to say a survivor can never waive her EFAA rights. She could do so, for example, in a settlement negotiated by counsel. *See Richards v. Silver*, 433 So. 3d 433, 439 (Fla. Dist. Ct. App. 2026). But the waiver must be knowing and explicit, as it would have to be in that scenario. *Roblox.*, No. 25-CIV-05901, at 8-9 (Discord) (requiring knowing waiver in these circumstances).

Defendants cannot show a knowing waiver of the EFAA for a case already underway. Indeed, Defendants have never provided sufficient notice of their arbitration terms. *See infra* § IV.A. But even putting that aside, Roblox's relevant terms all look forward—users give up "the right to file a lawsuit" over disputes "you may have" with Roblox. *E.g.*, Jit Decl. Ex. 47 at § 13. They say nothing about

pending cases, the EFAA, or sexual assault claims. Discord's 2025 terms purport to reach claims already "asserted," Robbins Decl. Ex. H at ECF p.95, but that only proves the point. A clause drafted to capture pending suits, delivered via a pop-up screen to represented minors, is the opposite of a knowing waiver. *See Zoller*, 993 F.3d at 1200, 1204-05 (finding knowing waiver because plaintiff could consult counsel, received a disclosure that her statutory claim "may be arbitrated . . . if the parties have agreed to arbitrate it, and then signed multiple documents). No survivor (adult or child) clicking through a sign-in screen has thereby "indicated a specific intent to submit her already-pending lawsuit . . . to arbitration." *Doe*, No. 25-CIV-05901, at 9 (Discord).

**3. *Defendants obtained purported post-filing agreements from represented minors, without their counsel*.**

Every bellwether Plaintiff was represented by counsel when Defendants presented arbitration terms to them after their suits were filed. That alone defeats any claim that Plaintiffs agreed to arbitrate pending cases. When a defendant presents a litigation-ending agreement directly to a litigant "actively represented by counsel as to the very issues raised," there is no "meeting of the minds" to arbitrate the pending case. *Dasher v. RBC Bank (USA)*, 882 F.3d 1017, 1021 (11th Cir. 2018). Mutual assent is, of course, a generally applicable requirement of contract law. The Sixth Circuit has likewise read terms much like Roblox's to reach only future claims, because a represented plaintiff who signed "without consulting counsel and carr[ied] on with the lawsuit as before" could not have understood them to cover his suit. *Russell v. Citigroup, Inc.*, 748 F.3d 677, 680-82 (6th Cir. 2014). Both courts noted that dealing directly with a represented party about a pending case could offend ethics rules. *Id*. at 680; *Dasher*, 882 F.3d at 1023-24.

Plaintiffs' case is even stronger in that respect. Most Plaintiffs were minors, all were represented, and all had already invoked a federal right to a judicial forum and invoked the Court's protections under Rule 17. Worse still, Defendants knew exactly who these users were—they had identified their accounts through court-ordered discovery in this MDL. If *Russell* and *Dasher* found no mutual assent, Defendants cannot show it here.

### 4. *Enforcing purported post-filing agreements would prevent effective vindication of Plaintiffs' EFAA rights.*

Because enforcement would defeat the very right that Plaintiffs have already exercised, the Court must decline to enforce any new arbitration agreement. The effective-vindication doctrine permits courts to "invalidate agreements that prevent the 'effective vindication' of a federal statutory right," and it "certainly cover[s] a provision in an arbitration agreement forbidding the assertion of certain statutory rights." *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 235-36 (2013); *see also Pover*, 183 F.4th at 1140 ("[W]here a provision in an arbitration agreement forbids the assertion of certain statutory rights, preventing the vindication of those rights, courts will invalidate the provisions on public policy grounds.") (internal quotation marks omitted). The Ninth Circuit recently applied this rule to strike an arbitration agreement that barred representative ERISA actions Congress had authorized. *See Pover*, 183 F.4th at 1140-43; *see also Platt v. Sodexo, S.A.*, 148 F.4th 709 , 721-22 (9th Cir. 2025) (same); *Flores v. New York Football Giants, Inc*, 150 F.4th 172, 186 (2d Cir. 2025), *cert. denied*, 146 S. Ct. 2675 (2026) (applying the effective vindication doctrine where the arbitral forum would be insufficient to vindicate statutory rights); *Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916, 927 (9th Cir. 2013) (distinguishing *Italian Colors* and applying the effective vindication doctrine to hold invalid an agreement whose terms effectively precluded access to arbitration).

The case for this doctrine is again stronger here because, in enacting the EFAA, Congress knew it was changing the status quo. Congress enacted the EFAA to "restore access to justice" for survivors "locked out of the court system." *Ding*, 187 F.4th at 1237 (quoting H.R. Rep. No. 117-234, at 4); *see Bruce v. Adams & Reese LLP*, 168 F.4th 367, 384-85 (6th Cir. 2026). And it did so by amending the FAA itself, overriding any policy favoring arbitration for these disputes. *See Bruce*, 168 F.4th at 385; *Johnson*, 657 F. Supp. 3d at 560 (that "the EFAA amended the FAA directly" "reinforces Congress's intent to override" policies which in other contexts may favor arbitration). The Court would undo the very choice that Congress gave these Plaintiffs if it were to allow Defendants to divest Plaintiffs of their chosen forum by reintroducing—mid-litigation—essentially the same arbitration terms Plaintiffs elected to avoid. Slipping a broad arbitration clause into online terms after a survivor has invoked her

EFAA right to a judicial forum is precisely the "sort of farce" the effective-vindication doctrine exists to reject. *Cedeno v. Sasson*, 100 F.4th 386, 396 (2d Cir. 2024) (citation omitted).

### D. Enforcing Any Post-Filing Agreement (Including Any Delegation Agreement) Would Be Unconscionable.

Congress guaranteed, and Plaintiffs elected, a judicial forum for their sexual-assault disputes. No rational person, informed of the EFAA and advised by counsel, would trade an already exercised federal right to pursue their significant sexual-assault lawsuits in a federal forum in order to engage in online games and chats. *See*, *e.g.*, Roblox Mot. at 14 (alleging that J.H. forfeited her EFAA rights by playing Roblox for all of five hours). Yet that is the trade that Defendants purport to have engineered. They pushed arbitration terms on represented plaintiffs, most of them children, without their counsel's knowledge, as the price of continued access to their platforms. That is the paradigm of an unconscionable bargain.

As noted, Defendants do not contest the application of California law to these issues (and their own terms invoke that law).[22] Arbitration agreements are unenforceable in California, as elsewhere, on generally applicable grounds such as unconscionability, which has a procedural and substantive element. *See Lim v. TForce Logistics, LLC*, 8 F.4th 992, 1000 (9th Cir. 2021). The "more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Heckman v. Live Natin Ent., Inc.*, 120 F.4th 670, 688 (9th Cir. 2024), *cert. denied*, 136 S. Ct. 96 (2025) (citation omitted). If there is "substantial procedural unconscionability, even a relatively low degree of substantive unconscionability may suffice to render the agreement unenforceable." *Id.* (citation and alteration omitted).

The Court, not an arbitrator, must decide this challenge. The delegation clauses that Defendants invoke—which are themselves part of arbitration agreements supposedly accepted post-filing—suffer

---

[22] Even under the analysis of each Plaintiff's home state's laws, the results would be the same. Those laws all recognize unconscionability as a generally applicable defense with procedural unconscionability, substantive unconscionability, or both, and the state-law differences in how those elements interact are immaterial because Plaintiffs' showing on both is extreme. *See In re Checking Account Overdraft Litig.*, 307 F.R.D. 630, 653-54 (S.D. Fla. 2015) (grouping states by these elements).

from the same defects as the agreements as a whole: "the delegation clause and the arbitration agreement as a whole are both unconscionable." *Heckman*, 120 F.4th at 689; *see also Avery*, 165 F.4th at 1233 ("Here, Plaintiffs did challenge the validity of the delegation provision at issue through their challenge to the entire Agreement under FRCP 23(d). Where a challenge applies equally to the whole contract and to an arbitration or delegation provision, a court must address that challenge. Thus, the district court did not err in deciding Plaintiffs' challenge to the Agreement and not delegating the issue to the arbitrator.") (internal quotation marks and citation omitted). As explained more thoroughly in Section II.B, *infra*, under the Supreme Court's decision in *Suski*, this Court "must address th[e] challenge." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 151 (2024). And those defects "serve to make the entire agreement unconscionable." *Heckman*, 120 F.4th at 688.

**1. *The purported agreements are procedurally unconscionable.***

Procedural unconscionability arises from "an inequality of bargaining power that results in no real negotiation and an absence of meaningful choice." *Lim*, 8 F.4th at 1000 (citation omitted). These agreements show oppression and surprise well beyond an ordinary contract of adhesion.

***a. Defendants sidestepped counsel.*** Black-letter law requires that the "consent of the opposing attorney" be obtained "before any direct communication is made with the opposing party." *Mitton v. State Bar of Cal.*, 71 Cal. 2d 525, 534 (1969). Yet Defendants delivered agreements meant to extinguish Plaintiffs' chosen forum not to counsel but to Plaintiffs themselves, while Defendants' own counsel were litigating against Plaintiffs' counsel. Courts have refused to enforce agreements affecting a pending suit obtained this way. A California court, for example, has held that "it is unconscionable to circumvent [known] counsel, and without said counsel's knowledge, extract a waiver of [the plaintiff's] right to litigate that dispute in court." *Salgado v. Carrows Rests., Inc.*, 2021 WL 2199436, at *5-6 (Cal. Ct. App. June 1, 2021); *see also Valve Corp. v. Abbruzzese*, 2026 WL 1481630, at *10 (W.D. Wash. May 27, 2026) (forum-selection agreement presented to represented parties was procedurally and substantively unconscionable); *Wilcox v. Valero Ref. Co.*, 256 F. Supp. 2d 687, 691 (S.D. Tex. 2003) ("The Court refuses to believe that a defendant can implement . . . binding arbitration, once a plaintiff has already initiated a lawsuit against a defendant. If a defendant were allowed to do

such, a defendant could essentially change the rules in the middle of the game and prevent a plaintiff from having his day in court."); *Kater v. Churchill Downs Inc.*, 423 F. Supp. 3d 1055, 1062 (W.D. Wash. 2019) ("Many courts have found that a defendant's attempt to foist a new arbitration provision on putative class members is an improper communication. In addition to the post-complaint timing of the communication, courts focus on the potential to mislead and whether putative class members are at risk of forfeiting their rights without really knowing what they are.").[23]

***b. Most Plaintiffs were children.*** Procedural unconscionability turns in part on the parties' "age, education, intelligence, business acumen and experience." *Grand Prospect Partners, L.P. v. Ross Dress for Less, Inc.*, 232 Cal. App. 4th 1332, 1352 (2015); *see also*, *e.g.*, *Hines v. Nat'l Ent'mt Grp., LLC*, 140 F.4th 322, 328 (6th Cir. 2025) (similar). Children like Plaintiffs could hardly have less bargaining power against large corporations like Defendants, so this factor alone is also dispositive of procedural unconscionability here.

***c. Adhesion and market power***. That the terms were take-it-or-leave-it establishes procedural unconscionability in California as well. *See Bakersfield Coll. v. Cal. Cmty. Coll. Athletic Ass'n*, 41 Cal. App. 5th 753, 762 (2019). Defendants have made extensive efforts to dominate children's lives online. Three-quarters of American children ages 9 to 12 play Roblox regularly, Com. Pl. ¶ 2, and Discord "has exploded in popularity among young users," *id.* ¶ 244. Even if these kids did knowingly accept any post-filing agreement (they did not), they may well have felt compelled to accept or cut themselves off from their peers. *See Heckman*, 120 F.4th at 682.

***d. Surprise***. Nothing in Roblox's terms disclosed that acceptance would reach claims already filed, waive EFAA rights, or affect this litigation at all. Discord's 2025 terms purport to reach claims "asserted," Robbins Decl. Ex. H at ECF p. 95, but that language says nothing about the EFAA or pending suits, and it was buried in the agreement. A litigant who has filed a federal lawsuit does not expect that clicking "agree" in order to keep playing a game or chatting with friends will end her suit.

[23] Defendants may protest that they did not know which of their users were represented Plaintiffs. But as sophisticated data companies, they should have known. And, in any event, procedural unconscionability focuses on the objective circumstances, not subjective intent. *See*, *e.g.*, *Heckman*, 120 F.4th at 681-82.

***e. No meaningful choice***. Defendants assume Plaintiffs could have simply walked away. But Defendants design their platforms to addict children. One party may not render another unable to walk away and then cite that inability as proof of voluntary assent.

**2. *The agreements are substantively unconscionable.***

A term is substantively unconscionable if it is "overly harsh or one-sided." *Heckman*, 120 F. 4th at 683 (citation omitted). And when "there is substantial procedural unconscionability, even a relatively low degree of substantive unconscionability may suffice to render the agreement unenforceable." *Id.* (internal quotation marks omitted). Any post-filing agreements are substantively unconscionable in three ways.

*First*, the agreements would extinguish the federal forum Plaintiffs already elected. A term requiring a party to forgo statutory rights is substantively unconscionable. *See In re Poly-America, L.P.*, 262 S.W.3d 337, 349-53 (Tex. 2008).

*Second*, Plaintiffs received nothing in return. Continued access to a free platform is not consideration for abandoning a filed federal action. The bargain runs entirely one way. *See Abramson v. Juniper Networks, Inc.*, 115 Cal. App. 4th 638, 665-66 (2004) (arbitration provisions "entirely lacking in mutuality and basic fairness" are substantively unconscionable).

*Third*, enforcing the agreements would impose the secrecy Congress condemned. *See*, *e.g.,* Jit Decl. Ex. 47 § 13.b.iv (current Roblox terms requiring that "the arbitration proceeding and all records pertaining to it . . . will be confidential"). Congress enacted the EFAA because it found that "secretive, closed, and private" arbitration of these disputes was "designed . . . to evade oversight and accountability." H.R. Rep. No. 117-234, at 6. Enforcement would hide what Defendants knew about the sexual exploitation of children on their platforms, and what they chose not to do. *See*, *e.g.*, *Baltazar v. Forever 21, Inc.*, 62 Cal. 4th 1237, 1244 (2016) (Substantive unconscionability includes "terms that …. contravene the public interest or public policy. . . .") (citation omitted).

**E. Roblox Does Not Present Sufficient Evidence of Any Post-Filing Agreement Accepted by Plaintiff J.H.**

The "party seeking arbitration bears the burden of proving the existence of a valid arbitration

agreement . . . ." *Greist v. LendUS, LLC*, 2025 WL 744040, at *4 (N.D. Cal. Mar. 7, 2025) (internal quotation marks omitted) (denying motion to compel arbitration where defendant's "declaration for the underlying facts" was insufficient). Roblox attempts to prove that certain Plaintiffs continued to use its platform after filing suit, and thereby agreed to its terms, by producing a mess of data that requires technical expertise to understand. But as shown in the Declaration of Justin Seitz, a technical expert, that data has serious flaws. And at least in the case of Plaintiff J.H., those flaws leave Roblox unable to prove that she continued to use the platform after filing suit at all, even for the relatively de minimis amount of time Roblox says she did.

Roblox does not assert that J.H. signed up for a new Roblox account after filing her lawsuit, or even that she purchased Robux or redeemed a gift card. Rather, Roblox asserts that J.H. used a Roblox account for all of five hours after filing her complaint, and in so doing, "agreed to the Terms by Blocker Card at least once" (which is a clever way of saying "once"). Roblox Mot. at 14. But there is no evidence beyond say-so that J.H. clicked "I agree" on a Blocker Card. Roblox's declarant asserts only that "Account Records" show that J.H.'s account did so, but the "Account Records" are merely a page of incomprehensible computer code. *See* Jit Decl., Ex. 3 (citing Ex. 59 at RBLX-MDL-00152251); *id.*, Ex. 59 at RBLX-MDL-00152251. Ms. Jit does not explain what any of this code means, or even assert personal knowledge of those facts. *See Aguilar v. Midas Trucking*, 2025 WL 483699, at *6-8 (Cal. Ct. App. Feb. 13, 2025) (denying motion to compel where movant's declarant attached "the online record purportedly showing the date and time Aguilar assented to the arbitration agreement," but "provided no information about how the online record . . . was generated or even what system generated it").

The Seitz Declaration identifies several gaps in the data on which Ms. Jit purports to rely. For example, Roblox has not produced any data to prove "whether the user and owner of the account," i.e., J.H., "was behind the Blocker Card click." Seitz Decl. ¶ 24(b). Roblox, which openly and thoroughly tracks its users, should have that data. *See id*. Roblox has similarly failed to lay any foundation for the tracking data it has chosen to produce, such as geolocation through IP address. *See id*. ¶ 24(a). And that data is anomalous. For J.H.'s account, Roblox's first data production shows an

IP address in Lewiston, Montana, yet Roblox's second data production places the same IP address in Jackson, Mississippi. *See id.* ¶ 24(d)(i). Such anomalies render this data unreliable in general. But the anomalies only increase when it comes to Roblox's specific data about J.H.'s purported platform usage. For example, that data shows multiple "login timestamps" set to 00:00, suggesting that J.H. repeatedly logged onto the platform at midnight on the dot. *See id.* ¶ 28. That looks less like human activity than what Seitz explains as "automated usage"—in other words, a bot, and possibly one that accessed J.H.'s account unauthorized. *See id.* ¶ 18(a). As Seitz notes, Roblox experienced several security incidents while J.H. was using the platform. *See id.* ¶ 25. Roblox has also provided no IP-address data to corroborate the date that it claims J.H. last accessed the platform (September 13, 2026). *See id.* ¶ 29. In short, even if J.H. could somehow relinquish her EFAA rights simply by continuing to use the platform (for five hours), Roblox offers no reliable basis to conclude that she did.

The Court can and should separately deny Defendants' motions for a host of legal reasons, including because the EFAA grants Plaintiffs the right to proceed in court, Plaintiffs have not waived that right, and, as seen below, Plaintiffs have disaffirmed any arbitration agreements they purportedly signed. The Court therefore need not wade into the data that Defendants have chosen to produce for J.H. or any other Plaintiffs' accounts. As Defendants' submissions show, resolving these account-usage questions would involve thorny issues, not only about what specific details minor plaintiffs might be able to recall from their online activity years ago, but also about the reliability of Defendants' highly technical data, which the Court would need to resolve in every case. In the face of the EFAA, Defendants should not be allowed to use such questionable data to keep cases like J.H.'s out of court.

## II. Any Agreements Reached While Plaintiffs Were Minors Are Unenforceable Because Plaintiffs Have Disaffirmed Them.

All Plaintiffs were minors when they purportedly agreed to arbitrate before filing suit, so California law, as well as the law of every other relevant state, permits them to disaffirm those contracts. Because Plaintiffs have disaffirmed both the entire contracts and the arbitration and delegation clauses specifically, disaffirmance is an issue for the Court, not an arbitrator. And the Court should resolve it in Plaintiffs' favor because each minor Plaintiff has validly disaffirmed. That some

Plaintiffs continued using Defendants' platforms, or purportedly may have entered false birthdates, does not defeat disaffirmance. Nor does Roblox's theory that parents agreed to its terms on their children's behalf, which they did not do.

### A. Plaintiffs' Disaffirmance Voids the Arbitration Agreements in Every Relevant State.

Defendants do not dispute that Plaintiffs, because they contracted as minors, may disaffirm contracts. Nor could they. *See J.D.B*, 564 U.S. at 273 & n.6 (collecting common-law authorities). The "law has historically reflected the . . . assumption that children characteristically lack the capacity to exercise mature judgment and possess only an incomplete ability to understand the world around them." *Id.* at 273. Children thus bear several legal disqualifications, including "limitations on their ability to . . . enter a binding contract enforceable against them." *Id.*[24]

The "limits on children's capacity under the common law 'secure them from hurting themselves by their own improvident acts.'" *Id.* (quoting 1 W. Blackstone, Commentaries on the Laws of England at *464-65); *see J.R. v. Elec. Arts Inc.*, 98 Cal. App. 5th 1107, 1115-16 (2024) (applying principles to delegation clause); *Douglass v. Pflueger Hawaii, Inc.*, 135 P.3d 129, 134-35 (Haw. 2006) (collecting cases from other states reflecting "the well-established common law principles that the law should protect children from the detrimental consequences of their youthful and improvident acts"). Those who contract with minors accept the risk of disaffirmance—a risk that can be avoided by "declining to enter into the contract." *Michaelis v. Schori*, 20 Cal. App. 4th 133, 136 (1993) (citation omitted); *see also Coughenour v. Del Taco, LLC*, 57 Cal. App. 5th 740, 748 (2020) (refusing to enforce arbitration clause).

Although, for reasons previously explained, the Court should analyze disaffirmance under California law, the degree of uniformity on the relevant points among jurisdictions bears emphasis. Every state law potentially at issue in these bellwether cases recognizes that minors may disaffirm

[24] This case does not implicate the narrow and specifically identified subset of contracts that a minor cannot disaffirm, such as contracts for "necessaries," e.g., shelter. *Rodriguez v. Reading Hous. Auth.*, 8 F.3d 961, 964 (3d Cir. 1993) (Alito, J.) (citing 1 E. Allan Farnsworth, *Farnsworth on Contracts* § 4.4 at 379, § 4.5 at 385 (1990)).

contracts before reaching the age of majority or within a reasonable time thereafter.[25] The law governing disaffirmance is so well-settled that Defendants do not contest its basic contours. It is undisputed, for instance, that any act or declaration that clearly manifests an intent not to be bound by a contract's terms suffices to disaffirm the contract.[26] And it is undisputed that in all relevant states, filing a lawsuit expressly disaffirming the contract is sufficient.[27] Lastly, it is undisputed that a minor's right to disaffirm a contract is the type of generally applicable contract defense that may be applied to invalidate an arbitration agreement.

Each minor Plaintiff has expressly disaffirmed every contract they might have made with Defendants, including the arbitration and delegation clauses specifically. Each Plaintiff did so in their operative Complaint, and each does so again in a declaration submitted with this opposition.[28] These acts of disaffirmation void any contractual obligation Plaintiffs might have had with Defendants, including any obligation to arbitrate disputes. *R.A. v. Epic Games, Inc.*, 2019 WL 6792801, at *6 (C.D. Cal. July 30, 2019) (accepting declaration disaffirming arbitration agreement executed after defendant filed its motion to compel arbitration); *Mercado v. Roblox et al.*, 2026 WL 2910175, at *1, 14 (E.D. Pa. Sept. 25, 2026) (same).

**B. Disaffirmance is a Question for the Court, Not an Arbitrator.**

Based on delegation clauses within the arbitration agreements, Defendants would have these

---

[25] *See* Cal. Fam. Code § 6710; *Muller v. CES Credit Union*, 832 N.E.2d 80, 85 (Ohio Ct. App. 2005); *Putnal v. Walker*, 61 Fla. 720, 722-23 (1911); *Camp v. Bank of Bentonville*, 230 Ark. 414, 416-17 (1959); *Standard Motors, Inc. v. Raue*, 37 Ala. App. 211, 212 (Ala. Ct. App. 1953); *Prudential Bldg. & Loan Ass'n v. Shaw*, 119 Tex. 228, 235 (Comm'n App. 1930); *Merritt v. Jowers*, 184 Ga. 762, 763 (1937); Iowa Code Ann. § 599.2; Mont. Code Ann. § 41-1-304.

[26] *See, e.g.*, *Doe v. Epic Games, Inc.*, 435 F. Supp. 3d 1024, 1035 (N.D. Cal. 2020) (quoting *Celli v. Sports Car Club of Am., Inc.*, 29 Cal. App. 3d 511, 517 (1972)); *Dilallo By & Through Dilallo v. Riding Safely, Inc.*, 687 So. 2d 353, 357 (Fla. Dist. Ct. App. 1997) (citation omitted); *Tatum v. Montgomery Banking Co.*, 31 So. 2d 311, 312 (Ala. Ct. App. 1947).

[27] *See Smoot v. Ryan*, 187 Ala. 396, 403 (1914); *Tays v. Johnson*, 173 Ark. 223, 125 (1927); *Coughenour v. Del Taco, LLC*, 57 Cal. App. 5th 740, 748 (2020); *Smoky, Inc. v. McCray*, 196 Ga. App. 650, 652 (1990); *Doe v. Gregory Scott Stephen*, 2020 WL 12309616, *7 (S.D. Iowa Mar. 4, 2020) (citing *Henriott v. Main*, 225 Iowa 20 (1938)); *Clark v. Tate*, 14 P. 761, 763 (Mont. 1887); *Bramley's Water Conditioning v. Hagen*, 27 Ohio App. 3d 300, 300 (1985); *PAK Foods Houston, LLC v. Garcia*, 433 S.W.3d 171, 177 (Tex. App. 2014).

[28] *See* J.H. Compl. ¶ 4; D.H. Compl. ¶ 5; P.C. Compl. ¶ 4; I.S. Compl. ¶ 4; A.S. Compl. ¶ 4; M.D. Compl. ¶ 4; *see also* J.H. Decl. ¶ 6; D.H. Decl. ¶ 6; P.C. Decl. ¶ 6; I.S. Decl. ¶ 6; A.S. Decl. ¶ 8; M.D. Decl. ¶ 8.

cases sent to arbitration for an arbitrator to decide that Plaintiffs have disaffirmed any agreement to arbitrate. But minors can disaffirm arbitration agreements, and, as the Supreme Court has explained, a delegation clause is merely an "additional arbitration agreement." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 70 (2010). To put it another way: minors cannot be held to contract, but Defendants seek to hold them to a contract, albeit one to arbitrate arbitrability. Plaintiffs have twice disaffirmed the delegation clauses: In their complaints and declarations, they have disaffirmed their entire contracts with Defendants (which necessarily include the delegation clauses); and they have disaffirmed the delegation clauses specifically. The parties thus have not delegated the question of arbitrability to the arbitrator.

Plaintiffs have disaffirmed the entirety of their contracts with Defendants based on an infancy defense. And the Ninth Circuit's recent decision in *Avery* confirms that a "challenge to the entire Agreement" is sufficient to "challenge the validity of the delegation provision at issue." *Avery*, 165 F.4th at 1233. The answer is the same whether a state-law infancy defense technically goes to contract formation or enforceability: Because Plaintiffs' infancy defense "applies 'equally' to the whole contract and to an arbitration or delegation provision, a court must address that challenge." *Suski*, 602 U.S. at 151 (quoting *Rent-A-Center*, 561 U.S. at 71); *see also*, *e.g.*, *MacGreal v. Taylor*, 167 U.S. 688, 698-99 (1897) ("[I]f the infant elects to disaffirm it, he annuls it on both sides, and the parties revert to the same situation as if the contract had not been made.") (internal quotation marks omitted).

But Plaintiffs also have specifically disaffirmed the delegation clause. Under the Ninth Circuit's decision in *Bielski*, a court may determine the enforceability of a delegation clause "if a party's challenge mentions and specifically relates to the validity of the delegation provision in its opposition to the motion to compel arbitration or other pleading." *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1010 (9th Cir. 2023). Plaintiffs are not required to "challenge *only* the arbitration or delegation provision." *Suski*, 602 U.S. at 150-51. They can, and do, challenge both. And the "same argument" can be used to challenge multiple provisions "so long as the party articulates why the argument invalidates each specific provision." *Bielski*, 87 F.4th at 1011.

Plaintiffs easily meet this standard. They have disaffirmed "any" and "all contracts" and have

specifically disaffirmed both the arbitration and delegation clauses in any contracts with Defendants. *See* J.H. Compl. ¶ 4 ("Plaintiff disaffirms any contract that she may have entered as a minor, including any forced arbitration agreement and any delegation clause in any contract[.]"); D.H. Compl. ¶ 5 (same); P.C. Compl. ¶ 4 (same); I.S. Compl. ¶ 4 (same); A.S. Compl. ¶ 4 (same); M.D. Compl. ¶ 4 (same); *see also* J.H. Decl. ¶ 6 (disaffirming "all contracts," "including specifically any arbitration agreement and any delegation provision in those contracts"); D.H. Decl. ¶ 6 (same); P.C. Decl. ¶ 6 (same); I.S. Decl. ¶ 6 (same); A.S. Decl. ¶ 8 (same); M.D. Decl. ¶ 8 (same). That means they have included "arguments directly addressing" the delegation clause's enforceability, *Bielski*, 87 F.4th at 1011, notwithstanding that they "rel[y] on the same legal doctrine and the same arguments in challenging" the arbitration agreement as a whole. *Id.* at 1010. Nothing more is required. *See*, *e.g.*, *Mercado v. Roblox Corp.*, 2026 WL 2916377, at *12 (E.D. Pa. Sept. 28, 2026) ("The Court finds this disaffirmance of the delegation clause effective.").

Defendants rely on many cases that pre-date the Supreme Court's 2024 decision in *Suski* (which Defendants do not cite even once). *See* Roblox Mot. at 31–32 (citing, e.g., *J.A. v. Microsoft Corp.*, 2021 WL 1723454, at *9 (W.D. Wash. Apr. 2, 2021)); Discord Mot. at 24–25 (similar). Before *Suski*, litigants and courts sometimes mis-read *Rent-A-Center* to require that a party's challenges to a delegation clause be sufficiently different from its challenges to the agreement as a whole for the court to consider them. *See Bielski*, 87 F.4th at 1010-11 (describing circuit split). In *Suski*, the Supreme Court made clear that while "a party seeking to avoid arbitration must directly challenge the arbitration or delegation clause, . . . this rule does not require that a party challenge *only* the arbitration or delegation provision. Rather, where a challenge applies 'equally' to the whole contract and to an arbitration or delegation provision, a court must address that challenge." 602 U.S. at 150-51. In so holding, the Supreme Court validated the Ninth Circuit's view of *Rent-A-Center*: "a party may use the same arguments to challenge both the delegation provision and arbitration agreement, so long as the party articulates why the argument invalidates each specific provision." *Bielski*, 87 F.4th at 1011. Remarkably, instead of citing *Suski*, *Bielski*, or *Avery*, Defendants cite cases on the wrong side of the circuit split that the Ninth Circuit and, later, the Supreme Court, both rejected. *See In re StockX*

*Customer Data Sec. Breach Litig.*, 19 F.4th 873, 886 (6th Cir. 2021); *K.F.C. v. Snap, Inc.*, 29 F.4th 835, 838 (7th Cir. 2022) (relying exclusively on *StockX*).

Other cases, though they post-date *Bielski* or *Suski*, do not apply those decisions (likely because litigants did not point the courts to them). For example, the decision in *Williams v. Moon Active Ltd.*, 811 F. Supp. 3d 1079 (N.D. Cal. 2025) (Gonzalez Rogers, J.), never mentions *Suski* or *Bielski*.[29] The district court instead relied on dicta in *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., Inc.*, 925 F.2d 1136 (9th Cir. 1991), a decision that predates *Rent-A-Center*, *Bielski*, *Suski*, and *Avery*, that did not even involve a delegation clause (and so never considered a challenge to one), and whose actual holding *denied* a motion to compel where the opposing party contended that "the signatory" lacked "authority" to contract. *See Three Valleys*, 925 F.2d at 1138, 1140-41.

Defendants' other cases likewise do not apply controlling Supreme Court or Ninth Circuit precedent and are otherwise distinguishable. In several, the plaintiffs did not expressly challenge the delegation clause. *See K.F.C.*, 29 F.4th at 838; *Ziboukh v. Whaleco, Inc.*, 795 F. Supp. 3d 349, 388-89 (E.D.N.Y. 2025); *S.T.G. v. Epic Games, Inc.*, 752 F. Supp. 3d 1200, 1208 (S.D. Cal. 2024); *Orellana v. Roblox Corp.,* 769 F. Supp. 3d 1273, 1289 (M.D. Fla. 2025); *Dunn v. Activision Blizzard, Inc.*, 749 F. Supp. 3d 976, 982 (E.D. Ark. 2024). In others, the court required plaintiffs to rely on different arguments for the delegation clause than they did for other terms. *See StockX*, 19 F.4th at 886; *Courtright v. Epic Games*, 766 F. Supp. 3d 873, 889 (W.D. Mo. 2025); *Johnson v. Activision Blizzard, Inc.*, 2025 WL 679033, at *3 (E.D. Ark. Mar. 3, 2025); *Angelilli v. Activision Blizzard, Inc.*, 2025 WL 524276, at *6 (N.D. Ill. Feb. 18, 2025); *Q.R. v. Multi Media LLC*, 823 F. Supp. 3d 1280, 1288 (D. Kan. 2026); *Antonetti v. Activision Blizzard, Inc.*, 764 F. Supp. 3d 1309, 1322-23 (N.D. Ga. 2025); *French v. Roblox Corp.*, 2026 WL 2195890, at *7 (E.D. Pa. July 29, 2026). But that argument is foreclosed by both the Supreme Court (*Suski*) and the Ninth Circuit (*Bielski* and *Avery*).

Defendants' argument also violates the FAA's mandate by elevating arbitration agreements

[29] The plaintiffs in *Williams* never mentioned *Suski* or *Bielski*, either. *See* Plaintiffs' Opposition to Motion to Compel Arbitration, *Williams v. Moon Active Ltd.*, No. 4:25-CV-01626-YGR, ECF No. 24 (N.D. Cal. July 31, 2025). The briefing in *N.A. v. Nintendo of Am. Inc.* was similar. *See* Plaintiff's Opposition to Motion to Compel Arbitration, No. 4:23-cv-02424-DMR, ECF No. 30 (N.D. Cal. Dec. 11, 2023) (Ryu, M.J.).

above ordinary contracts. Under Defendants' rule, a minor can disaffirm every contract except the one agreement sending arbitrability issues to arbitration. But "[t]he federal policy is about treating arbitration contracts like all others, not about fostering arbitration." *Morgan*, 596 U.S. at 418. Arbitration agreements must be placed on "the same footing" with other contracts, not favored above them. *Id*. (citation omitted). Binding a minor to a delegation clause while she is free to disaffirm every other contract would do just that. *See Melendez v. Ethical Culture Fieldston School*, 789 F. Supp. 3d 316, 328 (S.D.N.Y. 2025) (citing *Suski*, 602 U.S. at 151).

### C. Defendants' Arguments Against Disaffirmance Fail.

None of Defendants' remaining challenges to disaffirmance has merit. *First*, Roblox argues that, because its terms purport to require parental consent, a parent necessarily agrees to those terms on a minor's behalf, and a minor cannot disaffirm a contract a parent made for her. But, as elaborated further below, a parent's authority to contract for a minor extends only to the parent's duty of care, support, or education. It does not prevent a child from disaffirming a contract for videogames. And though Roblox assumes that Plaintiffs are third-party beneficiaries of their parents' contracts with Roblox, they are not. As Roblox's own terms confirm, minor users are principals, so they may disaffirm even if a parent consented.

*Second*, Defendants argue that Plaintiffs forfeited the right to disaffirm by continuing to use the platforms. But continued use during minority cannot extinguish the right to disaffirm, because ratification requires conduct *after* the age of majority. Until that point, minors may disaffirm. Each minor Plaintiff has now stopped using Defendants' platforms and has disaffirmed any arbitration agreements again in declarations made after their last use. Equity demands the same result: Because Defendants designed free platforms to keep children engaged, and because Plaintiffs do not (and by Defendants' own terms, could not) assert any right under these purported contracts, Defendants cannot invoke prior post-filing use to defeat disaffirmance.

*Third*, Discord argues that three Plaintiffs who allegedly entered adult birthdates at sign-up cannot disaffirm. But, as Discord concedes, California law doesn't allow a minor's misstatement of age (even if that occurred here) to defeat disaffirmance. And the result is the same under Discord's

out-of-state cases, all of which involve forged documents and fake identifications to induce a contract. Those cases say nothing about children, here as young as nine, typing a birthdate into an online form that Discord chose not to verify. Discord cannot use its own failure to implement adequate age- and identity-verification measures, one of the many design defects that subjected Plaintiffs to sexual predation, against them here.

**1. *Plaintiffs' parents did not and could not bind them to arbitrate.***

Roblox (but not Discord) asks the Court to disregard Plaintiffs' disaffirmance because Roblox's terms tell parents to consent on their children's behalf. Yet Roblox offers no evidence that parents agreed to bind their children to arbitration. That alone defeats its argument. Roblox cannot create parental consent by asserting parental consent within its own terms, especially not without actually doing anything to ensure parental consent. In any event, parents lack authority to bind children to these agreements, and even when a parent agrees, a child who is a principal to the contract, like Plaintiffs here, may disaffirm it.

Start with the facts. The evidence of parental assent to terms is weak, bordering on non-existent. Roblox's primary argument is that its terms require the user to affirm that an adult had read and agreed to terms. Roblox Mot. at 17-18. But saying so does not make it true—it is undisputed on this record that no minor actually read the terms before agreeing.[30] And every minor Plaintiffs' parent has sworn that they have never agreed to Defendants' terms of use, either on their own or their children's behalf, and do not consent now or in the future to Plaintiffs, as minors, creating accounts on Defendants' platforms, agreeing to Defendants' terms of use in any way, or using Defendants' platforms.[31]

---

[30] A.J. Decl. ¶¶ 4-5 ("I have never read Roblox's Terms of Use. I have never read Discord's Terms of Use."); J.H. Decl. ¶ 4 ("I have never read Roblox's Terms of Use."); D.H. Decl. ¶ 4 ("I have never read Roblox's Terms of Use."); P.C. Decl. ¶ 4 ("I have never read Discord's Terms of Use."); I.S. Decl. ¶ 4 ("I have never read Discord's Terms of Use."); A.S. Decl. ¶¶ 4-5 ("I have never read Roblox's Terms of Use. I have never read Discord's Terms of Use."); M.D. Decl. ¶¶ 4-5 ("I have never read Roblox's Terms of Use. I have never read Discord's Terms of Use.").

[31] *See* M.O. Decl. ¶¶ 3-4 ("I have never agreed to Roblox's Terms of Use on my own behalf or on behalf of J.H. I do not consent now or in the future to J.H., as a minor, creating a Roblox account, agreeing to Roblox Terms of Use in any way, or playing Roblox."); T.T. Decl. ¶¶ 3-4 ("I have never agreed to Roblox's Terms of Use on my own behalf or on behalf of D.H. I do not consent now or in the future to D.H., as a minor, creating a Roblox account, agreeing to Roblox Terms of Use in any

Roblox says that "because Plaintiffs represented that they had obtained such assent, they are now estopped from now arguing otherwise." *Id.* at 27. But minors can disaffirm contracts, meaning any representations contained in those contracts are void ab initio. *See*, *e.g.*, *MacGreal*, 167 U.S. at 698-99 ("[T]he parties revert to the same situation as if the contract had never been made."); *Grissom v. Beidleman*, 129 P.853, 857 (Okla. 1912) ("The disaffirmance of a contract made by an infant nullifies it and renders it void ab initio; and the parties are returned to the same condition as if the contract had never been made."). Indeed, the disaffirmance right exists to "secure [children] from hurting themselves by their own improvident acts," *J.D.B.*, 564 U.S. at 273 (citation omitted), such as agreeing to contractual representations that did not reflect reality.[32] And any estoppel would require Roblox to show justifiable reliance on a representation that it knew no one, especially children, was likely to read, and which Roblox did nothing to ensure was true. *See*, *e.g.*, *Kiefer v. Fred Howe Motors, Inc.*, 158 N.W.2d 288, 293-93 (Wis. 1968) (company could not show "justifiable reliance" on a minor's age representation where company "never took any affirmative steps to determine whether the plaintiff was in fact over twenty-one").

Next, Roblox argues that, contrary to their own declarations, Plaintiffs' parents must have been "involve[d]" with their children's Roblox agreements and use. Roblox Mot. at 18. But "involvement," even if established by anything other than Roblox's own speculation, is not the same as "assent." (And giving a child a credit card to buy Robux does not bind the parent to every agreement the child may enter in the course of doing so, no more than would giving a child a credit card to go to the mall.[33])

Even if Roblox could show parental assent, parents have only limited authority to bind their

---

way, or playing Roblox."); L.S. Decl. ¶¶ 3-4 ("I have never agreed to Roblox's Terms of Use or Discord's Terms of Service on my own behalf or on behalf of A.S. I do not consent now or in the future to A.S., as a minor, creating a Roblox or Discord account, agreeing to Roblox Terms of Use or Discord Terms of Service in any way, or using Roblox or Discord."); C.D. Decl. ¶¶ 3-4 ("I have never agreed to Roblox's Terms of Use or Discord's Terms of Service on behalf of M.D. I do not consent now or in the future to M.D., as a minor, creating a Roblox or Discord account, agreeing to Roblox Terms of Use or Discord Terms of Service in any way, or using Roblox or Discord.").

[32] The same answer applies to Roblox's similar arguments about parental assent to "Blocker Cards." Roblox Mot. at 18. Roblox also cites irrelevant estoppel cases that do not involve minor disaffirmance. *See id.* at 27-28.

[33] In any event, Roblox identifies Robux purchases associated only with Plaintiffs A.W (Plaintiff B), J.H. (Plaintiff C), and M.D. (Plaintiff H).

children such that the child cannot disaffirm. *See Scott ex rel. Scott v. Pacific W. Mountain Resort*, 834 P.2d 6, 12 n.19 (Wash. 1992) (collecting cases). At most, state law permits parents to enter into binding contracts inextricably intertwined with parents' duty of care and protection, such as consent to medical treatment or participation in school activities. *See Doyle v. Giuliucci*, 62 Cal. 2d 606, 610 (1965) (medical care); *Hohe v. San Diego Unified Sch. Dist.*, 224 Cal. App. 3d 1559, 1564-65 (1990) (school activities). An agreement to use a gaming platform does not implicate "a parent's fundamental duty" of care, so parental authority cannot bind a disaffirming child here. *Berg v. Traylor*, 148 Cal. App. 4th 809, 819 (2007) (parent lacked authority to bind disaffirming child to arbitration through personal management contract). Roblox's authorities do not hold otherwise. Its only California case involved a contract squarely within the parental duty of care. *Hohe*, 224 Cal. App. 3d at 1564-65; Roblox Mot. 33. Courts have held that this duty of care may encompass parental consent to attend school fundraisers, *see Hohe*, 224 Cal. App. 3d at 1564-65, or transporting a minor in a car that the parent "bought for its safety features," *A. A. v. Roku, Inc.*, 2026 WL 1349064, at *4 (N.D. Cal. May 14, 2026) (discussing *Yeh v. Tesla, Inc.*, 2023 WL 6795414, at *8 (N.D. Cal. Oct. 12, 2023)). But those are activities tied to the school or otherwise to the minor's safety. Roblox does cite one case that likens "facilitating" online "gameplay" to consent forms for school activities. *S.G. v. Epic Games, Inc.*, 796 F. Supp. 3d 614, 621 (N.D. Cal. 2025). But in that case (unlike these bellwether cases), the parent and minor shared the gaming account, and the case cited no authority—let alone California authority—for drawing this specious comparison. *See id.*; *see also A.A.*, 2026 WL 1349064, at *4 (relying solely on *S.G.* and *Yeh*).

Roblox's remaining cases involve children who were third-party beneficiaries of contracts between adults. *See* Roblox Mot. 29 n.19, 33 n.22. But Plaintiffs are not beneficiaries, they are principals. That distinction matters because a minor may disaffirm a contract to which she is a principal *even if* a parent agreed to it. *See Berg*, 148 Cal. App. 4th at 819 (distinguishing contracts between adults that benefit a minor, which cannot be disaffirmed, from contracts in which the minor is the principal, which can be); *NYC Mgm't Grp., Inc. v. Brown-Miller*, 2004 WL 1087784, at *5 (S.D.N.Y. May 14, 2004) ("[U]nder California law [and the law of several other jurisdictions], if both the minor

and the parent sign a contract under which both are contractually bound to perform, the minor may disaffirm without affecting the parent's contractual obligation.").[34]

Roblox's own terms confirm that Plaintiffs are principals. Those terms provide that "if you are under the legal age of majority (a 'minor') in your jurisdiction or state of residence, before using the services, your parent or legal guardian must read and consent to the Roblox Terms," and that "[b]y permitting a minor to use the services, a minor's parent or guardian becomes subject to the Roblox terms and agrees to be responsible for all of the minor's activities on the services." Jit Decl., Ex. 41 at Introduction (capitalization altered). That language centers entirely on the *child's* use of the service. And a child's representation that a parent or legal guardian consented is not consent to a contract. Cal. Civ. Code § 1568.5. As in *Berg*, the parent's consent (if received at all) reflects the child's minority, i.e., that someone else (a parent) may enter generally non-binding agreements on the child's behalf. But the child is the "you" to whom the agreement refers and applies, and the parent's role is ancillary. Plaintiffs are thus principals to any agreements their parents may have entered on these terms, and they remain free to disaffirm.

Finally, Roblox argues that M.D. (Plaintiff H)'s parent had her own account, but Roblox does not explain why that agreement—which applies only to "you," M.D.'s parent, compels arbitration of M.D.'s claims. As a factual matter, it does not make sense to say that M.D.'s parent's account was for M.D.'s benefit when M.D. had her *own* Roblox account that was independently sufficient to allow her to play Roblox (and that she may disaffirm). All that Roblox says is that a parental account "can" be used to "approve actions taken by their child within Roblox." Jit Decl. ¶ 51. Roblox does not claim that M.D.'s parent actually used her account in that manner (or at all), and certainly cannot show that she did so to M.D.'s benefit, considering what happened to the child on the platform. Plaintiff M.D.

---

[34] Roblox's reliance on *Global Travel Marketing, Inc. v. Shea*, 908 So.2d 392 (Fla. 2005), is misplaced. First, *Global Travel* did not involve any disaffirmance rights because the plaintiff (the minor's estate) did not seek to disaffirm. Second, the parent there was the principal because she signed the contract "on behalf of herself and her son." *Id.* at 395. Similarly, in *Zivich*, the court declined to allow a minor to disaffirm a contract that his mother had signed, waiving negligence claims against volunteers and sponsors of nonprofit sport activities, after characterizing the mother as the principal. *See Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St. 3d 367, 374 (1998) ("She made an important family decision and she assumed the risk of physical injury on behalf of her child and the financial risk on behalf of the family as a whole.").

was the principal of the only account that matters—her own.

This is different from both *E.A.R.R. v. Roku, Inc.*, 2026 WL 369238 (C.D. Cal. Feb. 6, 2026), where the minor actually "*use[d]*" the adult's account, making the agreement his own, *id.* at *4, and *Tomlin v. Roblox Corp.*, 2026 WL 1412606 (E.D. Pa. May 20, 2026), which involved an account "that both M.B. and M.B.'s Responsible Adult had access to." *Id.* at *8. In any event, *Tomlin* did not apply the California law applicable here, under which parents have only limited ability to bind their children to contracts. And though *E.A.R.R.* did apply California law, the plaintiff did not invoke a minor's contractual rights (only a non-signatory's rights in general). Roblox's other cases, to the extent they involve gaming or similar accounts, are likewise distinguishable. *See French*, 2026 WL 2195890, at *6 ("[T]he Epic Accounts created with [the parent's] information were both identified by Plaintiff as those used by [the minor].").

**2. *Plaintiffs' continued use does not defeat disaffirmance***

Defendants contend that Plaintiffs forfeited their right to disaffirm by continuing to use the platforms after filing suit.[35] That is wrong for two reasons. First, continued use *while a minor* does not surrender the minor's right to disaffirm, and the minor Plaintiffs (everyone but A.J.) have disaffirmed again after their last use. Second, governing equitable principles do not allow Defendants to turn any Plaintiff's continued engagement, which Defendants intentionally induce and profit from, into a bar to disaffirmance.

***a. Continued use while still a minor.*** Under California law, a minor may disaffirm "before majority or within a reasonable time afterwards." Cal. Fam. Code § 6710. Conduct during minority does not forfeit that right; only acts "performed *after* the minor reaches an age where she has capacity to act" can ratify a contract. *Lee v. Hibernia Sav. & Loan Soc'y*, 177 Cal. 656, 659 (1918). This court recognized as much in *C.M.D.*, observing that California law "almost certainly would allow plaintiffs to disaffirm." *C.M.D. v. Facebook, Inc.*, 2014 WL 1266291, at *4 (N.D. Cal. Mar. 26, 2014) (Seeborg, J.), *aff'd*, 621 F. App'x 488, 489 (9th Cir. 2015). The minor Plaintiffs have done exactly that. Each

[35] Roblox makes this argument as to all Plaintiffs except for A.S. (Plaintiff G), while Discord makes this argument only as to Plaintiffs A.J. and P.C. (Plaintiffs A and E).

has stopped using Defendants' platforms and has executed a declaration disaffirming any contract with Defendants, including any arbitration and delegation clauses.[36] Those declarations are a "valid disaffirmation" regardless of any post-filing use. *R.A.*, 2019 WL 6792801, at *6. Defendants cannot complain about that result or the possibility of further disaffirmances; they accepted that risk when they chose to contract with minors. "One deals with infants at his peril." *Burnand*, 30 Cal. 2d at 866.

***b. Equity.*** Disaffirmance is an equitable action in which "the trial court is vested with a broad discretion to see that equity is done." *I.B. ex rel. Fife v. Facebook, Inc.*, 905 F. Supp. 2d 989, 1000 (N.D. Cal. 2012) (citation omitted). The estoppel principle Defendants invoke—that a party may not disaffirm a contract while accepting its benefits—is an equitable one as well. Equity supports all Plaintiffs' right to disaffirm under the circumstances.

Here, Defendants have taken no steps to cut off users who have disaffirmed, including users who have filed suit and now have counsel, because Defendants' business model depends on keeping users engaged. *See* Com. Pl. ¶¶ 160, 166-67, 294. They designed their products to maximize use, even at children's expense. *See id.* ¶ 186 ("Roblox's business mission is to get as many kids on the platform as possible rather than to protect them, and safety measures can create friction in the user experience and limit growth."); *id.* ¶ 303 ("Discord's growth strategy has focused on an approach that prioritizes apparent user preferences over child safety."). Where, as here, a defendant's own conduct makes continued use possible—and indeed encourages it—courts permit disaffirmance despite that use. *Quality Motors v. Hays*, 225 S.W.2d 326, 328 (Ark. 1949) (minor could disaffirm car purchase despite driving car after filing suit because seller's conduct kept it accessible). Defendants should not be allowed to engineer Plaintiffs' continued engagement and then use that engagement to deny them a judicial forum any more than Defendants can induce Plaintiffs (unknowingly) to forfeit their already asserted EFAA rights.

The equitable rules Defendants invoke do not change that conclusion. It's true that a party may not keep a contract's benefits while escaping its burdens, but that rule applies only when a party asserts

[36] *See* J.H. Decl. ¶¶ 5-6; D.H. Decl. ¶¶ 5-6; P.C. Decl. ¶¶ 5-6; I.S. Decl. ¶¶ 5-6; A.S. Decl. ¶¶ 6-8; M.D. Decl. ¶¶ 6-8.

rights under contract. *See Boucher v. Alliance Title Co., Inc.*, 127 Cal.App.4th 262, 269 (2005); *Harden v. Am. Airlines*, 178 F.R.D. 583, 587 (M.D. Ala. 1998) (minor who "chooses benefits under the contract . . . may not avoid his obligations thereunder"). And while equitable estoppel may bar a party who "knowingly exploits the agreement" from avoiding its obligations, it likewise does not reach a party who merely participates in the relationship the agreement governs. *See Comer v. Micor*, *Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006); *B.F. v. Amazon.com Inc*, 858 F. App'x 218, 221 (9th Cir. 2021) (no estoppel where plaintiff was "not asserting any right or looking to enforce any duty created by the contract").

Plaintiffs have asserted no contractual right that triggers either rule. A child who plays games on Roblox or chats on Discord does not assert any right under either company's terms. Indeed, those terms give users no enforceable right to continued access. Rather, each company may suspend or terminate any account, at any time, for any reason. *See* Robbins Decl. Ex. G at ECF p. 90 (Discord); Jit Decl. Ex. 47 § 2(e) (Roblox). A child who continues to play or chat after disaffirming can do so because Defendants, acting in their own interests, choose to allow it—not because of any contractual rights that Plaintiffs enjoy. As importantly, Plaintiffs' causes of action—primarily negligence, products liability, and fraud—do not seek to enforce any contractual right. *See B.F.*, 858 F. App'x at 221 ("Plaintiffs are not asserting any right or looking to enforce any duty created by the contracts between their parents and Amazon. Instead, Plaintiffs bring only state statutory claims that do not depend on their parents' contracts. In other words, irrespective of those agreements, Amazon would owe to Plaintiffs the legal duty that Plaintiffs claim has been violated.").

Defendants' authorities are inapposite. They either involve ratification after majority, *Moreau v. Feld Ent., Inc.*, 2025 WL 2161706, at *3 (M.D. Fla. July 30, 2025); no disaffirmance at all, *Wells Fargo Bank, N.A. v. Chapman*, 90 So. 3d 774, 779 (Ala. Civ. App. 2012); *Holbrook v. Louisiana-Pac. Corp.*, 2015 WL 1291534, at *4 (N.D. Ohio Mar. 23, 2015); or an attempt to disaffirm one term of an insurance policy while keeping the rest, *Langstraat v. Midwest Mut. Ins. Co.*, 217 N.W.2d 570, 571 (Iowa 1974); *Lamb v. Midwest Mut. Ins. Co.*, 296 F. Supp. 131, 133 (W.D. Ark. 1969). The rest did not involve plaintiffs who disaffirmed after the use stopped, as Plaintiffs have. *See G.G. v. Valve Corp.*,

2017 WL 1210220, at *3 (W.D. Wash. Apr. 3, 2017) (minor plaintiffs never stopped using), *vacated in part*, 799 F. App'x 557 (9th Cir. 2020) (vacating arbitration order for parents' individual claims because parents were not parties to the relevant subscriber agreements); *accord Merritt*, 184 Ga. at 763. And none addresses (let alone explains) how playing a game or sending a message invokes a contractual right. *See*, *e.g.*, *Tomlin*, 2026 WL 1412606, at *11-12; *Garcia v. Roblox Corp.*, 2026 WL 413636, at *5 (C.D. Cal. Feb. 11, 2026); *E.K.D. ex rel. Dawes v. Facebook, Inc.*, 885 F. Supp. 2d 894, 900 (S.D. Ill. 2012).

**3. *False birthdates would not bar disaffirmance.***

Discord (but not Roblox) argues that A.J., I.S., and M.D. (Plaintiffs A, F, and H) cannot disaffirm because they purportedly entered false birthdates when creating their accounts. Discord Mot. at 28-30. But Discord has no direct evidence of that. The company infers falsity from the absence of a stored birthdate. *See id.*; Robbins Decl. ¶ 3.[37] Nevertheless, even a false birthdate would not bar disaffirmance.

Discord concedes that, "under California law, a minor's misrepresentation of age does not prevent them from disaffirming." Discord Mot. at 29 n.24. California law permits disaffirmance subject only to statutory exceptions, none of which applies. *See* Cal. Fam. Code §§ 6710-6712, 6751. Misstating one's age is not among those exceptions, and, for more than a century, California courts have refused to recognize such an exception. *See Lee*, 177 Cal. at 660 (refusing to treat minor as estopped by "her mature appearance and false representations as to her age" because doing so "would nullify and destroy the plain provisions" of the disaffirmance statutes); *Williams v. Leon T. Shettler Co.*, 98 Cal. App. 282, 283 (1929) (minor who "falsely" claimed to be twenty-two could still disaffirm). That refusal reflects the long-settled principle that "[a]n estoppel *in pais* is not applicable to infants, and a fraudulent representation of capacity cannot be an equivalent for actual capacity." *Sims v. Everhardt*, 102 U.S. 300, 313 (1880). After all, the disaffirmance right exists to "secure

[37] Because Discord does not store adult birthdates, it assumes the conclusion that these Plaintiffs represented themselves as adults whenever it finds no birthdates in its records. But a stored birthdate could be missing for many reasons, including that data was lost or deleted. Discord rules out none of this. *See* Discord Mot. 4-5 & Robbins Decl. ¶ 11.

[children] from hurting themselves by their own improvident acts." *J.D.B.*, 564 U.S. at 273 (citation omitted).

Discord instead invokes the laws of these Plaintiffs' home states. Yet Discord chose California law in its terms, and Discord relies on California law for every other disaffirmance question. *See* Discord Mot. at 15, 25-28. It cannot set California law aside where it proves inconvenient. Even under the laws of Florida (A.J.), Texas (I.S.), and Georgia (M.D.), however, the result would be the same.

Discord's Florida, Texas, and Georgia cases all concern minors who defeated real age-verification measures—which Discord did not have—with fraudulent documents. *See Off the Wall & Gameroom LLC v. Gabbai*, 301 So. 3d 281, 282 (Fla. Dist. Ct. App. 2020) (minor provided false name, birthdate, and driver's license number); *Mossler Acceptance Co. v. Perlman*, 47 So. 2d 296, 297 (Fla. 1950) (fake driver's license corroborating falsely represented age); *Topheavy Studios, Inc. v. Doe*, 2005 WL 1940159, at *2 (Tex. App. Aug. 11, 2005) (fake driver's license and other identifying information); *Evans v. Henry*, 230 S.W.2d 620, 621 (Tex. Civ. App. 1950) (minor claimed and appeared to be twenty one and provided extensive personal and financial information to support this claim); *Smith v. Adventure Air Sports Kennesaw, LLC*, 849 S.E.2d 738, 742 & n.8 (Ga. Ct. App. 2020) (estoppel requires the counterparty to be "justified in accepting such representation as true, and [be] free from fault or negligence own part, such as a failure to use all ready means of ascertaining the truth touching the [minor's] apparent majority," and finding estoppel only where minor forged his father's signature and provided a copy of his father's driver's license) (citation omitted). That is not this case. Even if any of these Plaintiffs did provide a false birthdate as a minor, they did so by typing a birthdate into a form that Discord never verified. Discord's own cases demand that a contracting party "exercise ordinary care and reasonable diligence for the protection of his own interests." *Topheavy Studios*, 2005 WL 1940159 at *4. Discord did not.

Discord also appeals generally to equity, but "equity aids the vigilant . . . ." *Bent v. Garland*, 115 F.4th 934, 942 (9th Cir. 2024) (citation omitted). Discord let any user (including children under thirteen) enter any birthdate. And it declined to verify any users' ages—even adult predators pretending to be kids—sacrificing child safety for frictionless growth. *See* Com. Pl. ¶¶ 186, 294, 305,

315.[38] Having deliberately accepted whatever birthdate a user entered to accelerate growth and boost profits, Discord cannot claim to have been deceived if a child entered a false one, as it certainly knew that some would. Equity does not allow Discord to claim estoppel from the very risk it chose to accept. *See Kiefer*, 158 N.W.2d at 292-93 (company cannot show "justifiable reliance" on age misrepresentation where it "never took any affirmative steps to determine whether the plaintiff was in fact over twenty-one").

What's more, as discussed, estoppel "applies only where the minor received and retained a benefit under the contract he or she fraudulently induced." *Matullo v. Sky Zone Trampoline Park*, 276 A.3d 178, 182-83 (N.J. Super. Ct. App. Div. 2022) (cleaned up). Again, Plaintiffs retained no such benefit; Discord can cancel their accounts at any time. Nor did Discord suffer harm. The only thing Plaintiffs obtained was access to Discord's platform, and Discord benefits the more that people use the platform. That is far afield from the heartland case of a seller duped into delivering goods that the minor later returns damaged. *See*, *e.g.*, *Evans*, 230 S.W.2d at 620.

Finally, estoppel does not apply to a minor who has not "arrived at those years of discretion when a fraudulent intent could be reasonably imputed." Discord Mot. 30 (quoting *Smith*, 849 S.E.2d at 743). The case Discord quotes, *Smith*, concerned a seventeen-year-old. *See* 849 S.E.2d at 742. Plaintiff M.D. was nine, and I.S. was twelve, when they created their accounts. *See* Li Decl. ¶¶ 10, 12. That a nine- or twelve-year-old "knows her own birthday," Discord Mot. 30, does not come close to showing the maturity needed to impute fraudulent intent. Nor is there any basis to impute fraudulent intent to A.J., who used Discord's platform—which does not require a real birthdate—in the way Discord designed it.

## III. Roblox's Arbitration Clause and the "Mass Arbitration" Rules It Invokes Are Unconscionable.

If the Court enforces Roblox's arbitration terms against any bellwether Plaintiff, the effect will not just subject that Plaintiff to individual, bilateral arbitration. Roblox's terms would subject all Plaintiffs represented by the same or "coordinated" law firms to "mass" arbitration. For the reasons

[38] Discord's subsequent adoption of additional verification measures confirms their feasibility.

above, it would be unconscionable to force Plaintiffs into arbitration based on any purported post-filing agreements. *See* § I.D, *supra*. But Roblox's mass-arbitration terms separately serve to remove *any* purported arbitration agreements from the FAA's protection and render them unconscionable under California law.

Roblox's Terms impose "mass arbitration" rules that are "unworthy even of the name of arbitration." *See Heckman v. Live Nation Ent., Inc.*, 120 F.4th 670, 690 (9th Cir. 2024), *cert. denied,* 146 S. Ct. 96 (2025) (citation omitted) (holding similar mass arbitration agreement exempt form FAA and unconscionable under California law); *see* Jit Decl., Ex. 41 § 11(b)(iv) (FedArb's "Mass Arbitration" rules apply "if five or more demands for arbitration are filed that share common factual or legal issues, and if counsel for the parties submitting those demands are the same or coordinated"); *see also In re Roblox Corp. Child Sexual Exploitation & Assault Litig.*, MDL No. 3166, ECF No. 98 (J.P.M.L. Dec. 12, 2025) (coordinating cases because of common issues). Those non-negotiable rules rob survivors of any meaningful opportunity to adjudicate their claims—they severely limit discovery and the ability to brief legal or factual disputes, and bind claimants to early rulings despite differences. The result is a sweeping determination for current and future survivors that is little more than a *fait accompli.* Because the agreement's rules are unconscionable root and branch and the agreement cannot be saved through severance, the Court should hold it unconscionable.

### A. FedArb's Mass Arbitration Procedures Are Not Entitled to the FAA's Protections.

The FAA "does not apply to and protect the mass arbitration model set forth in" FedArb's rules. *Heckman*, 120 F.4th at 689. The FAA only protects "individualized form of arbitration," i.e., "bilateral arbitration," from state law rules that single out arbitration for disfavor. *Id.* at 689-90 (quoting *Viking River Cruises v. Moriana*, 596 U.S. 639, 656–57 (2022)). "The Supreme Court has consistently disparaged the use of aggregation in arbitration," and has emphasized that it is not "arbitration as envisioned by the FAA." *Id.* at 690. Therefore, courts "should not read the FAA as protecting such arbitration." *Id* at 689. Because mass arbitration procedures are not "forms of arbitration covered by the FAA," in the context of mass arbitration, state-law doctrines cannot be

preempted for "pos[ing] an 'obstacle' to objectives of the FAA" *Id.* (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 352 (2011)).

FedArb's "Framework for Mass Arbitration Proceedings" looks nothing like the "traditional, bilateral arbitration agreements" that the FAA makes enforceable. *Heckman*, 120 F.4th at 691 (VanDyke, J., concurring). Rather than "increasing the speed of dispute resolution," *Concepcion*, 563 U.S. at 345, FedArb makes "all individual arbitrations . . . automatically stayed pending completion of" a "MDL Tribunal process." Huyett Decl., Ex. 5 ¶ 1.b.iv (FedArb, *ADR-MDL™ Framework for Mass Arbitration Proceedings*, hereinafter "FedArb Mass Rules").

At the outset, "either party can make a motion for "lack of arbitrability," noncompliance with the arbitration agreement, or "failure to state a plausible claim" under a Rule 12(b)(6) standard. *Id.* ¶ 1.c.ii. The moving party must pay "a $30,000 administrative fee, in addition to the fees charged by the arbitrator hearing the motion." *Id.* ¶ 1.c.iv. No individual claimant, and certainly no child, will spend $30,000 to file one. In practice, this is a tool for Roblox alone, as FedArb promotes as a feature of its services. It markets the procedure to companies as a way to "[e]liminate non-meritorious claims before paying filing fees" and to "filter[] out unmeritorious cases early." Huyett Decl., Ex. 6 (FedArb, *Mass Arbitration Solutions*).

After that initial stage, the "tribunal of three arbitrators" will decide "all common issues of fact or law," with the "goal [of] reduc[ing] the number of individual issues that need to be arbitrated." FedArb Mass Rules ¶ 1.e. After "the Tribunal has rendered its findings and decisions," claimants can proceed to "individual arbitration . . . consistent with the Tribunal's binding findings and decisions." *Id.* ¶ 1.f. That arbitration, in turn, will involve "limited briefing, limited discovery," and "no post hearing briefs." *Id.* ¶ 1.g.i. The "Tribunal's resolution of all issues presented by the parties will be binding on the parties and dispositive." *Id.* ¶ 1.g.ii.

The rules leave unstated whether the arbitrator will apply the same rulings to future cases determined (presumably by the arbitrator) to have been submitted "by or with the assistance or coordination of the same law firms or organizations" as the earlier group. *Id.* It is, however, "obvious

that anything more than an occasional failure to apply precedent established" in one set of cases to another "would defeat the very purpose of the mass arbitration protocol." *Heckman*, 120 F. 4th at 685.

These mass arbitration procedures do not implicate the FAA. The "FAA simply does not apply to and protect the mass arbitration model" set forth in FedArb's rules. *Heckman*, 120 F. 4th at 689 (expressly "agree[ing] with our concurring colleague" on this point). As Judge VanDyke explained concurring in *Heckman*, "[t]he FAA's objective is to 'ensure the enforcement of arbitration agreements,' which Congress in 1925 understood to be bilateral in nature, not collective." *Heckman*, 120 F.4th at 691 (quoting *Concepcion*, 563 U.S. at 344). It "was enforcement of a *particular type* of arbitration—bilateral arbitration with its specific advantages and attributes—that Congress set out to protect when it passed the FAA roughly on hundred years ago." *Id.* So, "a threshold issue in analyzing FAA obstacle preemption has to be whether the arbitration agreement under consideration is one that shares the attributes of bilateral arbitration as understood in 1925—the only form of arbitration conceived of by Congress at the time." *Id.* That is so because "the scope of obstacle preemption under the FAA is limited to state laws that frustrate Congress's goal of protecting 'arbitration's traditionally individualized form.'" *Id.* at 692 (quoting *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 655 (2022)).

Indeed, FedArb's procedures, although invoking the "MDL" label and labeled "Mass Arbitration," in practice are really "class arbitration." The Tribunal is tasked with resolving "common issues "in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). This is not akin to MDL practice, in which each case "ordinarily retain[s] [its] separate identit[y]." *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 406 (2015). And the plain implication of FedArb's procedures is that the "binding" rules will almost certainly control in future, yet-to-be-filed arbitrations—just like absent class members. As the *Heckman* majority explained, "[i]t is clear that Congress did not have class-wide arbitration in mind when it passed the FAA." 120 F.4th at 689; *see also Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 184 (2019) ("[I]t is important to recognize the 'fundamental' difference between class arbitration and the individualized form of arbitration envisioned by the FAA."). Accordingly, the Court "should not read the FAA as protecting such arbitration." *Heckman*, 120 F.4th at 689.

**B. Absent FAA Preemption, Roblox's Arbitration Agreement is Clearly Unconscionable Under California Law.**

Because Roblox's mass arbitration agreements do not implicate the FAA, they receive none of the federal protections against state unconscionability law that would otherwise make arbitration enforceable. That means Roblox's arbitration agreements may be unconscionable under California's unconscionability rules, even if those rules would be preempted in the context of a traditional, bilateral arbitration agreement. In *Heckman*, for example, the court applied the California Supreme Court's *Discover Bank* rule to invalidate an arbitration agreement, even though ordinarily that rule would be preempted by the FAA. *See Heckman*, 120 F.4th at 690. And California's *Discover Bank* rule is not alone. California has developed a robust unconscionability law for consumer contracts outside of the FAA's confines, and that law applies in full to Roblox's collective arbitration agreement.

From the start, FedArb's rules provide for class proceedings lacking essential procedural protections. The FedArb Rules mandate mass resolution of common questions, but without requiring any determination that those common questions are sufficiently susceptible of common answers, or that common questions predominate, findings necessary to protect claimants' due process rights. *See*, *e.g.*, *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785, 796 (3d Cir. 1995). No standards are supplied for the determination of the propriety of class proceedings, nor is any appeal from that crucial decision permitted. And the Rules are conspicuously ambiguous as to when and how Tribunal rulings apply in future, not-yet-filed cases by the same or "coordinated" counsel. *See Heckman*, 120 F. 4th at 685 ("[E]ven if some discretion exists as to when bellwether precedent is applied to non-bellwether cases, the Rules provide no guidance as to *how* the neutral is to exercise that discretion, . . . creat[ing] a process that poses a serious risk of being fundamentally unfair to claimants, and therefore evince[ing] elements of substantive unconscionability.") (internal quotation marks omitted).

Once a claimant has had all "common issues of fact or law" decided on a "binding" and "dispositive" basis, she then proceeds to "individual arbitration" under "FedArb's Expedited

Arbitration Rules." FedArb Mass Rules ¶¶ 1.e, 1.g.ii. The "expedited" rules provide harsh limits on discovery and briefing inherently inadequate for a complex sexual assault case:

- Almost no document discovery. Parties are required to produce only documents on which they "intend[] to rely at the hearing." Huyett Decl., Ex. 7 at Rule 13 (FedArb, *Expedited Arbitration Rules*, hereinafter "FedArb Exp. Rules"). Any additional documentary discovery is available only if the claimant shows the Tribunal that "the collection and production of the requested materials . . . will not unduly delay the expedited arbitration." *Id.* By definition, of course, discovery will delay the arbitration.

- No depositions unless Roblox agrees or the tribunal finds that the interests of justice require a particular witness's testimony. FedArb Exp. Rule 15.

- No briefs unless Roblox agrees to permit them. Fed Arb Exp. Rules 17, 20.

- No guaranteed hearing. "In the absence of agreement, the matter shall be determined by the paper submissions, unless the tribunal determines that a hearing by either video conference or in-person is necessary to ensure fairness." FedArb Exp. Rule 19.

It is unclear how a survivor is supposed to sue Roblox for sexual assault without *any* documentary or deposition discovery and without even a guaranteed right to file a brief or have a hearing. *See Heckman*, 120 F.4th at 685 (finding unconscionable "restrictions" that "border on the absurd"). Plaintiffs' claims all turn on Roblox's knowledge, actions, and inactions, much of which is not a matter of public record or otherwise within Plaintiffs' possession. Before *Concepcion* expanded the scope of FAA preemption, California courts recognized that arbitration agreements may be "substantively unconscionable inasmuch as they may operate effectively as exculpatory contract clauses that are contrary to public policy." *Discover Bank v. Super. Ct.*, 36 Cal. 4th 148, 161 (2005). As *Heckman* explained, "[d]iscovery is often necessary" just "to decide threshold issues such as a validity of the delegation clause." 120 F.4th at 685. And in *Martinez v. Master Protection Corp.*, for example, the court upheld parts of an arbitration agreement that limited the employee plaintiff "to a single deposition and document request" only because the employee's claims were "relatively straightforward" and the "possibility that proof of Martinez's Labor Code claims will rest largely on documentation rather than testimony." 118 Cal. App. 4th 107, 118-19 (2004); *see also id.* ("We recognize that, in many employment disputes, restricting a plaintiff to a single deposition and document request could place him at a serious disadvantage if testimony from numerous witnesses is

necessary to prepare his case."). Plaintiffs' claims here are less "straightforward" than a simple employee dispute, and Roblox's onerous terms essentially deprive them of all discovery.

Roblox may argue that the Expedited rules merely commit the scope of the discovery to the arbitrator's discretion, but that is not a fair reading of the rules. Roblox *could* have selected FedArb's standard (i.e., non-"expedited") arbitration rules, which do exactly that: "The Tribunal shall closely supervise discovery, and if necessary, may appoint a Discovery Master for that purpose." Huyett Decl., Ex. 8 at Rule 10.07 (FedArb, *FedArb* Rules). Instead, Roblox selected the "Expedited" rules that make clear that no discovery is anticipated: "There are to be no motions to enforce discovery requests . . . except (1) by agreement . . . or (2) upon a determination by the tribunal that the motion is necessary and likely to enhance efficiency." FedArb Exp. Rule 11. Discovery motions, by definition, do not "enhance efficiency." And without discovery motions, any discovery right is illusory. The Ninth Circuit in *Heckman* was not fooled by false gestures towards "discretion," and this Court should not be either. *See Heckman*, 120 F.4th at 679 (noting that the arbitration rules gave the arbitrator "discretion" to "upgrade" the arbitration to permit discovery); *id.* at 683 ("agree[ing]" that the "lack of a right to discovery" contributed to unconscionability).

The unconscionability extends to the delegation clause too (given that it is required to be litigated through the unconscionable "mass" procedures). But even if it did not, that would not matter: the clause is unconscionable even standing alone. Absent the FAA as interpreted in *Concepcion* and later cases, California courts do not enforce delegation clauses in contracts of adhesion. *See*, *e.g.*, *Murphy v. Check'n Go of Cal., Inc.*, 156 Cal. App. 4th 138, 145 (2007) (explaining that "parties would not ordinarily expect that an arbitrator, rather than a court, would determine his or her own jurisdiction" and that a "provision for arbitrator determinations of unconscionability is also itself substantively unconscionable" because "the provision is entirely one-sided" as "defendant cannot be expected to claim that it drafted an unconscionable agreement"); *Ontiveros v. DHL Exp. (USA), Inc.*, 164 Cal. App. 4th 494, 505 (2008) ("We agree with the analysis of the appellate court in *Murphy* and find, in the present case . . . that the provision in the arbitration agreement giving the arbitrator

exclusive authority to decide enforceability issues is unconscionable and, therefore, unenforceable."), *disapproved of on other grounds*, *Ramirez v. Charter Commc'ns Inc.*, 16 Cal. 5th 478 (2024).

Among other problems, California courts recognized "the potential for the inequitable use of such arbitration provisions . . . in which one party tends to be a repeat player" and "the arbitrator" therefore "has a unique self-interest in deciding that a dispute is arbitrable." *Ontiveros*, 164 Cal. App. 4th at 505. Indeed, "an arbitrator who finds an arbitration agreement unconscionable would not only have nothing further to arbitrate, but could also reasonably expect to obtain less business in the future, at least from the provider in question." *Id.* at 506-07. The same is true of other issues Roblox says are subject to the delegation clause, such as a minor's disaffirmance rights.

Finally, Roblox may argue that any offensive provisions may be severed. They cannot. California "law grants broad leeway to trial courts to remedy unconscionable contracts." *Heckman*, 120 F.4th at 688 (citing Cal. Civ. Code § 1670.5(a)). The court "should ask whether the central purpose of the contract is tainted with illegality and whether the interests of justice would be furthered by severance." *Id.* (internal quotation marks omitted). The "presence of multiple unconscionable clauses weighs in favor of severance." *Id.*

Here, illegality permeates the agreement, affecting multiple parts of both the "mass" and "expedited individual" parts of the rules. Severance would result in an agreement that no one ever accepted. Roblox did not want traditional, individual arbitration; instead, it wanted the benefits of consolidated proceedings but with none of the burdens of litigation in court. Roblox's selection of "expedited" individual arbitration with almost no discovery or argument goes hand-in-hand with the "mass arbitration" proceeding where "common legal and fact issues" will be resolved. The Court can rescue this arbitration agreement only by rewriting it. Severance is inappropriate.

## IV. Defendants Have Not Shown That Plaintiffs Agreed to Arbitrate.

As the parties seeking to compel arbitration, Discord and Roblox bear "the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017). The Court decides this question "even in

the presence of a delegation clause." *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 (9th Cir. 2022). Defendants have not carried their burden.

Formation requires "actual or constructive notice of the agreement" and that "the parties manifest[ed] mutual assent." *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154 (9th Cir. 2025) (citation omitted).[39] Defendants do not claim that Plaintiffs had "actual knowledge" of their terms when signing up, so formation turns on whether "the website puts the consumer on constructive notice"—i.e., inquiry notice—"of the contractual terms." *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 461 (2021) (citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014)).

Discord calls its notices "clickwrap" or "sign-in wrap," Discord Mot. 18, and Roblox alludes to "clickwrap," Roblox Mot. 21. But both analyze these assent flows as sign-in wraps, *see* Discord Mot. 18-20; Roblox Mot. 21-25, and rightly so. A clickwrap presents "specified contractual terms on a pop-up screen" alongside a "box explicitly stating 'I agree.'" *Oberstein v. Live Nation Entertainment, Inc.*, 60 F.4th 505, 513 (9th Cir. 2023); *see* Discord Mot. n. 18. Defendants' flows do not.[40] Each instead "provides a link to terms of use and indicates that some action may bind the user but does not require that the user actually review those terms." *Chabolla*, 129 F.4th at 1154.

Defendants' flows are therefore sign-in wraps—a sign-in wrap by any other name is still a sign-in wrap. Such agreements sit between unenforceable "browsewraps" and enforceable clickwraps. *See id*. A sign-in wrap binds a user only if "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; *and* (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Id.* at 1154-55 (emphasis added). Defendants' flows fail both requirements.

---

[39] The Ninth Circuit has "consistently stated that no differences exist in the law of the different states as to internet contract formation." *Godun v. JustAnswer LLC*, 135 F.4th 699, 708 (9th Cir. 2025). So the Court can apply California law, as Defendants concede. *See also id.* at 708 n.2 (other circuits "generally find state law uniform with respect to internet contract formation").

[40] Roblox and Discord assert that Plaintiffs assented to their terms via "blocker" cards that allegedly popped up on their screens. Discord also points to one sign-up flow on its registration page that involves a checkbox. All these flows are sign-in wrap because they merely "provide[ ] a link to terms of use and indicates that some action may bind the user but does not require that the user actually review those terms." *Chabolla*, 129 F.4th 1147 at 1154.

**A. Defendants' Flows Did Not Provide Reasonably Conspicuous Notice.**

Defendants' flows bear all the hallmarks of inconspicuousness, especially when considering the audience: children. *See* Com. Pl. ¶¶ 16 (Roblox's annual report noted that the majority of its users are under 16), 244 (Discord targets young users). Although Defendants' notices are equally inconspicuous to anyone, this court has recognized the reality that what might be inquiry notice to an adult might not be sufficient when the intended recipient is a child. Judge Orrick, when considering a Roblox sign-up page identical to the "Web Registration" page displayed from August 2, 2020, to December 4, 2025, noted that most Roblox users are minors and held that "[e]ven if the notice would be sufficiently conspicuous and understandable for an adult, it is not for a child." *Doe v. Roblox Corp.*, 602 F. Supp. 3d 1243, 1256-57 (N.D. Cal. 2022). Roblox does not mention Judge Orrick's analysis. Instead, it claims that the inquiry-notice "analysis is no different for minors." Roblox Mot. at 22. None of Roblox's cited cases address that question.[41] In *G.G.*, for example, Judge Chhabria declined to consider whether a "reasonably prudent child" could *understand* Roblox's *terms* given that California law "treat[s] minors in the same manner as an adult for the purposes of determining contract formation," subject to minors' right to disaffirm. 2026 WL 1615999, at *1 (quotation marks omitted). But this case concerns whether minors would understand that they are entering a contract in the first place. That question is decided under an "inquiry notice standard," which is "tailored to the reasonably prudent Internet user." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022). When applying "a 'reasonable person' standard," "the common law has reflected the reality that children are not adults." *J.D.B.*, 564 U.S. at 274. There is nothing inconsistent about recognizing that both children and adults may legally enter contracts and have the capacity to understand contract terms

[41] *See, e.g.*, *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1020-21 (9th Cir. 2024); *Whalen v. Facebook, Inc.*, 2022 WL 19934419, at *4 (N.D. Cal. Apr. 11, 2022); *Slaviero v. Baby List, Inc.*, 2026 WL 1097746, at *2-3 (N.D. Cal. Apr. 22, 2026); *Baumeister v. Nouveau Essentials Mktg., LLC*, 2026 WL 2093903, at *3 (N.D. Cal. July 21, 2026); *G.G. v. Roblox Corp.*, 2026 WL 1615999, at *1 (N.D. Cal. June 5, 2026) (rejecting the distinct argument that *substance* of Roblox's Terms presented on its blocker cards is "impenetrable" to minors); *Courtright v. Epic Games, Inc.*, 766 F. Supp. 3d 873, 87-89 (W.D. Mo. 2025) (no analysis of inquiry notice because plaintiff argued that he lacked capacity to contract in the first place); *Garcia v. Roblox Corp.*, 2026 WL 413636 (C.D. Cal. Feb. 11, 2026) (same). Although *B.D. v. Blizzard Entm't, Inc.*, 76 Cal. App. 5th 931 (2022), involved a minor plaintiff, the court likewise did not address this question, which the plaintiff does not appear to have raised. *See id.* at 940-41.

while also recognizing that children need better notice that they are being asked to enter a contract in the first place. Children, after all, are inherently more susceptible to the cartoonish graphics that Defendants use to distract from their notices. Notwithstanding minors' general capacity to contract, both Judge Orrick and Judge Chhabria have recognized that the inquiry-notice analysis must "take into account particular features of individuals doing the contracting," including their youth. *Doe*, 602 F. Supp. 3d at 1257 (minors' capacity to contract "does not change" that reality); *see also De Ridder v. Roblox Corp.*, 2025 WL 3537260 (N.D. Cal. Oct. 8, 2025) (Chhabria, J.) (citing *Doe*, 602 F. Supp. 3d at 1256) ("Even if [flow similar to Roblox's] would put a reasonably prudent adult on notice, which the Court doubts it would, it certainly would not put a minor user on notice that they were agreeing to an arbitration clause."). In fact, none of the Plaintiffs ever read Defendants' terms.[42]

Considering their overall design, as well as their placement, font, and hyperlink formatting, Defendants' notices were anything but conspicuous, especially when measured against the age and sophistication of the intended audience.

***a. Design***. To determine conspicuousness, courts look at the screen's overall design, including whether "visual elements draw the user's attention away" from important terms. *Berman*, 30 F.4th at 857. Defendants' notices are overshadowed by large, bright buttons and colorful graphics that direct the user's attention "everywhere else" but the notice. *See id.*; *Doe*, 602 F. Supp. 3d at 1256 (Roblox's notice "much less conspicuous" than its "bright, large 'Sign Up' button"). The evidence here, including what Defendants themselves have offered, colorfully illustrates this defect. *See* Jit Decl. Exs. 7-14 (Roblox web registration set against theme-park background or game thumbnails); *id.* Exs. 15-22 (app registration pages, all of which include large, bright buttons to select a gender and "Sign Up" or "Continue"); *id.* Exs. 24, 27 (blocker cards surrounded by game thumbnails and notifications);[43] *id.* Exs. 33-38 (Roblox gift card redemption screens with large "Redeem" buttons

---

[42] J.H. Decl. ¶ 4; D.H. Decl. ¶ 4; P.C. Decl. ¶ 4; I.S. Decl. ¶ 4; A.S. Decl. ¶¶ 4-5; M.D. Decl. ¶¶ 4-5; A.J. Decl. ¶¶ 4-5.

[43] The *G.G.* court did not address this visual clutter, *see* 2026 WL 1615999 at *1, and it was not present in *Chin v. Thumbtack Inc.*, 2026 WL 807276, at *4 (N.D. Cal. Mar. 24, 2026) or *B.D.*, 76 Cal. App. 5th at 935.

and, in an otherwise monochromatic page, colorful ads for Rolox gift cards);[44] Huyett Decl., Ex. 4 at 4-5 (in-app purchase notice atop screen of Robux packages); Robbins Decl. Exs. B, C (Discord pages cluttered with colorful imagery); *id.* ¶¶ 8-9 (large, bright "Create Account" button); *id.* ¶ 16 (logo and multicolored sparkles filling a quarter of Discord's update card).

***b. Placement.*** Courts also consider the notice's placement relative to the action button, i.e., what users click to accept. *See Chabolla*, 129 F.4th at 1157; *Godun v. JustAnswer LLC*, 135 F.4th 699, 711-12 (9th Cir. 2025) (finding placement of notice two lines from action button inconspicuous, as it was "not located directly above or below the action [] button") (quotations omitted). Roblox's notices generally sit multiple lines below the action button or away from where the user's attention is focused. *See* Jit Decl. Exs. 15-16 (link two lines above); *id.* 17-20 (link four lines below); *id.* 21-22 (link five lines below); *id.* Ex. 29 (Xsolla notice separated from the payment fields by three lines, and from the button by an optional field); *id.* Ex. 30 (Stripe notice separated from four alternative payment fields); *id.* Ex. 31 (Stripe notice outside payment box); Huyett Decl., Ex. 4 at 4-5 (in-app notice on separate screen from purchase).

***c. Font.*** Courts further examine font size and contrast. *See Berman*, 30 F.4th at 856-57. Defendants designed their notices with the smallest and least contrasting text on screen, so that the notices do not stick out to the user from everything else Defendants prefer to show. *See* Jit Decl. Exs. 7-22, 29-38; *see* Robbins Decl. ¶¶ 8-9, Exs. B, C. Putting it mildly, these notices are "notably timid in both size and color." *Chabolla*, 129 F.4th at 1157.

***d. Hyperlinks.*** Courts also analyze how hyperlinks are denoted. *See Chabolla*, 129 F.4th at 1156. Defendants "must do more than simply underscore the hyperlinked text." *Berman*, 30 F.4th at 857. They can add all-caps and different colors. *See id*. Defendants never combine all these elements. *See* Jit Decl. Exs. 7-22, 24, 26-39; *see* Robbins Decl. ¶¶ 12-13, 16; Ex. C.

Altogether, these design elements function to hide Defendants' notices and cause users to click "agree" without real consent. Nor could Plaintiffs have "reinforce[d]" any consent by purportedly

[44] Roblox also mentions that from August 22, 2025, users were able to redeem gift cards on its app. Jit Decl. ¶ 50. Roblox does not identify any plaintiffs who redeemed gift cards after that date, *see id.* Exs. 1-6, so Plaintiffs do not address the in-app gift card redemption screen.

agreeing multiple times. *Lee v. Ticketmaster LLC*, 817 F. App'x 393, 395 (9th Cir. 2020). Plaintiffs never received adequate notice at any time.[45]

**B. Plaintiffs Did Not Unambiguously Manifest Assent.**

In addition, Plaintiffs could not unambiguously manifest assent through some of Defendants' flows (all of which provided inadequate notice) because Plaintiffs were not "explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Berman*, 30 F.4th at 857. Roblox's purchase screens do not clearly communicate whose terms Plaintiffs would be agreeing to. *See* Jit Decl. ¶ 38 (notice text stating that purchasers are "agree[ing] to be bound by *Xsolla's* . . . Roblox Terms," i.e., Xsolla's terms governing Roblox-related purchases), Ex. 30 (Stripe purchase page referring to "*our* [Stripe's] Terms of Use"); Huyett Decl., Ex. 4 at 5 (Android purchase screen stating that purchasers "accept the following *Google* Payment terms of service") (emphases added). And some of Roblox and Discord's screens do not expressly state what action will constitute agreement to the terms. *See* Discord Mot. at 4 (Discord's Home page instructing users to "enter a username," but saying that a user only agrees to Discord's Terms "[b]y registering"); *id.* at 3 (similar for Discord mobile sign-up with "Create an account button"); Jit Decl. Ex. 31 (Roblox Stripe payment screen stating that "[b]y submitting payment information you agree to Roblox Terms," which refers to the checkbox next to "[s]ave my payment information"); Huyett Decl., Ex. 4 at 5 (iPhone Robux purchase screen with no mention of Roblox terms). "[T]he resulting ambiguity is dispositive." *Chabolla*, 129 F.4th at 1158-59.[46]

Because Roblox cannot show that Plaintiffs had inquiry notice of the terms, including the provision providing that continued use would be interpreted as agreement to the terms, it has not shown

---

[45] Roblox mentions that its practice is to send notification messages about updates, Roblox Mot. 8, but it does not argue that any Plaintiff received inquiry notice of its terms in this way, *id.* 24-25. Even if it had, Roblox's "declaration with a vague statement that a notice of updated terms was sent via" electronic message does not carry Roblox's burden to show formation. *Tempest v. Safeway, Inc.*, 2025 WL 1953465, at *5 (N.D. Cal. July 16, 2025) (quoting *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1100 (9th Cir. 2023)).

[46] Discord relies on *Taylor v. Discord Inc.*, 2026 WL 2689815 (W.D. Wash. Sept. 14, 2026), but that case overlooked *Chabolla's* binding precedent on the specificity required for notice language instructing users on how to assent, *see id.* at *7.

that Plaintiffs' continued use manifested assent to arbitration. Every case cited by Roblox for this point involved initial inquiry notice. *See* Roblox Mot. at 26.[47] And even if Roblox could show that Plaintiffs had inquiry notice of the terms, it cannot show that any Plaintiff assented to its terms. As addressed above, *supra* § I.E, Roblox's data is filled with gaps and anomalies. *See* Seitz Decl. ¶ 24. As a result, Roblox has not shown that any on-platform actions, including account creations, logins, and Blocker Card clicks, can be attributed to any Plaintiff. *Id.* ¶¶ 32-33.

Roblox (but not Discord) argues that Plaintiffs had "actual knowledge" of the terms "due to this litigation." *Id*. at 27. But the only case cited for this proposition—*Ligeri v. Amazon.com Inc.*, 2024 WL 3638241, at *7 (D. Conn. Aug 2, 2024)—did not involve plaintiffs who purportedly gained knowledge of arbitration terms "due to" pursuing claims in litigation, as a federal statute (the EFAA) specifically entitled Plaintiffs to do here. That case also did not involve minor Plaintiffs. As discussed earlier in this brief, in litigation children are not charged with the same knowledge and autonomy as adults. *See* Fed. R. Civ. P. 17(c)(2). Accordingly, it does not make sense to presume minors have knowledge of terms merely because their complaints disaffirm any such terms. Courts applying the rule Roblox asserts do so on the basis that post-litigation product use "conduct that a *reasonable person* would understand to constitute assent." *In re Ring LLC Privacy Litig.*, 2021 WL 2621197, at *7 (C.D. Cal. June 24, 2021) (citation omitted; emphasis added). But across the law, "the reasonable person standard is adjusted to that of a reasonable child in their position." *Williams v. Cnty. of San Diego*, 2020 WL 7318125, at *4 (S.D. Cal. Dec. 11, 2020); *see also J.D.B.*, 564 U.S. at 274 ("[Where a 'reasonable person' standard otherwise applies, the common law has reflected the reality that children are not adults."); *Daun v. Truax*, 56 Cal. 2d 647, 654 (1961) ("Children are judged by a special subjective standard . . . . They are only required to exercise that degree of care expected of children of like age, experience and intelligence.").

[47] Roblox cites cases for the basic proposition that continued use can constitute assent in some circumstances. None involved plaintiffs with rights under the EFAA, and only one, *Whittaker v. Roblox Corp.*, 2026 WL 2640984 (D. Colo. Sept. 2, 2026), involved a minor plaintiff who had attempted to disaffirm. The court held there, however, that the plaintiff could not "continu[e] to enjoy the benefits of the agreements she purports to disaffirm by using the services," which Plaintiffs have declared that they no longer do. *Id.* at *4.

Finally, as explained above in the disaffirmance section, Roblox does not establish that any parent agreed to terms relevant here, and so there is no need for the Court to address Roblox's third-party beneficiary or equitable estoppel theories.

**CONCLUSION**

The Court should deny Roblox's and Discord's motions to compel arbitration in each bellwether case and deny their requests for a stay. Alternatively, if the Court finds any Plaintiff's allegations of EFAA-covered conduct insufficient, it should grant leave to amend those allegations. And if the Court finds that a genuine dispute of material fact exists as to whether an enforceable arbitration agreement was formed, the Court should order a trial under 9 U.S.C. § 4.

Dated: October 27, 2026

Respectfully submitted,

By: *<u>/s/ Sarah R. London</u>*
Sarah R. London (SBN 267083)
Andrew R. Kaufman (*pro hac vice*)
Isabel Velez (SBN 359574)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
slondon@girardsharp.com
akaufman@girardsharp.com
ivelez@girardsharp.com

By: *<u>/s/ Alexandra M. Walsh</u>*
Alexandra M. Walsh (*pro hac vice forthcoming*)
D. Patrick Huyett (*pro hac vice forthcoming*)
Paige Boldt (SBN 308772)
**ANAPOL WEISS**
One Logan Square
130 North 18th Street, Suite 1600
Philadelphia, PA 19103
Telephone: (215) 608-9645
awalsh@anapolweiss.com
phuyett@anapolweiss.com
pboldt@anapolweiss.com

By: */s/ Bryan F. Aylstock*
Bryan F. Aylstock (*pro hac vice*)
Hillary Nappi (*pro hac vice*)
Jennifer Hoekstra (*pro hac vice forthcoming*)
**AYLSTOCK WITKIN KREIS OVERHOLTZ, PLC**
17 East Main Street, Suite 200
Pensacola, Florida 32502
Telephone: (850) 202-1010
BAylstock@awkolaw.com
HNappi@awk-saa.com
JHoekstra@awkolaw.com

*Co-Lead Counsel for Plaintiffs*

Joe Masterman (*pro hac vice*)
**COOPER MASTERMAN, PLLC**
1717 Pennsylvania Ave, NW
Washington, DC 20006
Tel: (202) 866-0171
joe@coopermasterman.com

Andre M. Mura (SBN 298541)
**GIBBS MURA LLP**
1111 Broadway, Suite 2100
Oakland, CA 94607
Tel: (510) 350-9717
amm@classlawgroup.com

*Co-Chairs of Law and Briefing*
(with Andrew Kaufman of Girard Sharp)

## FILER'S ATTESTATION

I am the ECF User whose ID and password are being used to file this document. In compliance with L.R. 5-1(i)(3), I attest that the signatories above concurred in this filing.

Dated: October 27, 2026 By: */s/ Andre M. Mura*
Andre M. Mura